David M. Goodrich, State Bar No. 208675
dgoodrich@go2.law
Anerio V. Altman, State Bar No. 228445
aaltman@go2.law
**GOLDEN GOODRICH LLP**
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Telephone 714-966-1000
Facsimile 714-966-1002

Proposed Counsel for John J. Menchaca,
Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>R&LS INVESTMENTS, INC.,<br><br>Debtor. | Case No. 2:23-bk-14467-WB<br><br>Chapter 7<br><br>**MOTION FOR ORDER APPROVING COMPROMISE OF CONTROVERSY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JOHN J. MENCHACA IN SUPPORT**<br><br>Hearing Date/Time/Location:<br><br>DATE: April 17, 2025<br>TIME: 2:00 p.m.<br>PLACE: Courtroom 1375<br>255 E. Temple Street<br>Los Angeles, California 90012 |



Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**TO THE HONORABLE JULIA W. BRAND, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR AND DEBTOR'S COUNSEL, AND ALL PARTIES IN INTEREST:**

John J. Menchaca, the duly appointed, qualified and acting chapter 7 trustee ("Trustee") for the bankruptcy estate ("Estate") of R&LS Investments, Inc. ("Debtor"), files this *Motion for Order Approving Compromise of Controversy Pursuant to Federal Rule of Bankruptcy Procedure 9019* ("Motion"). In support of the Motion, the Trustee submits the following memorandum of points and authorities and the Declaration of John J. Menchaca ("Menchaca Dec."). This Motion is set on shortened notice as allowed by the Court in its order entered on April 4, 2025. See Dkt. No. 381.

## I. STATEMENT OF FACTS

### A. General Background

On July 18, 2023 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, case no. 2:23-bk-14467-WB ("Case"). *See* Docket No. 1.[1] On July 20, 2023, Moriah Douglas Flahaut was appointed as the subchapter V Trustee.

On August 1, 2023, the Debtor filed its schedules, a Statement of Financial Affairs and related documents. *See* Docket No. 10. The Debtor scheduled $313,971.67 in assets, $501,208.18 in deposits, and $21,539.20 in accounts receivable. The Debtor scheduled no secured claims, no priority unsecured claims, and $682,378.08 in nonpriority unsecured claims. The Trustee learned during his investigation that a debt of approximately $15,000 in favor of the U.S. Small Business Administration is secured against all assets of the Debtor.

---

[1] The Trustee requests the Court take judicial notice of its docket, the date of filing of pleadings on its docket and admissions of the Debtor in its schedules and related documents.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

On October 16, 2023, the Debtor filed amended schedules ("Amended Schedules"). *See* Docket No. 37. The Amended Schedules reflect $288,811.97 in assets, $501,208.18 in deposits and $481,117.32 in nonpriority unsecured claims.

The Debtor is a real estate brokerage business ("Business"), wholly owned by its sole shareholder, Richard Cunningham. The Debtor operated under several names, including "Keller Williams Realty Santa Monica." As of the Petition Date, the Debtor had four leased office locations and 432 commercial and/or residential real estate agents. According to the SOFA, the gross income of the Business for calendar years 2021 and 2022 was $43,199,408.49 and $46,187,707.94, respectively. From January 1, 2023, to the Petition Date, the gross income of the Business was $13,643,058.15.

On March 3, 3025, the Court entered an order converting the Case to chapter 7. *See* Docket No. 339. On March 5, 2025, the Trustee filed his acceptance of appointment as chapter 7 trustee. *See* Docket No. 340.

The Debtor is a licensee under a *Keller Williams Realty, Inc. Market Center License Agreement* dated March 30, 2020 ("License Agreement"). Attached hereto as **Exhibit 1** is a true and correct copy of the License Agreement. Pursuant to Section 5.02 of the License Agreement, 6% of the Debtor's monthly gross revenue is owed as a license fee to Keller Williams Realty, LLC ("Keller Williams"). The License Agreement also permits Keller Williams to charge associate, renewal, software, technology, and late fees.

On February 12, 2025, Keller Williams filed an *Application of Keller Williams Realty, Inc. for Allowance and Payment of Administrative Priority Claim Pursuant to Section 503(b)(1)(A) of the Bankruptcy Code* [Docket No. 329] (the "Administrative Claim Motion") seeking allowance and immediate payment of $340,787.29 in post-petition License Fees (the "Chapter 11 Administrative Claim"). On March 13, 2025, the Trustee filed his objection to the Application [Docket No. 349] (the "Administrative Claim Objection").

Keller Williams also asserts a chapter 7 administrative claim in the amount of $86,191.32 on account of accruing post-conversion license fees and associated fees and charges ("Chapter 7 Administrative Claim").

On March 19, 2025, the Trustee filed his *Motion for Order Extending Time to Assume or Reject Executory Contracts and Unexpired Nonresidential Real Property Leases Pursuant to 11 U.S.C. § 365(d)(4)* [Docket No. 353] (the "Extension Motion"), requesting a 90-day extension to assume or reject the License Agreement. On April 3, 2025, Keller Williams filed an objection to the Extension Motion [Docket No. 377] (the "Extension Objection").

On March 28, 2025, the Trustee filed his *Emergency Motion for Order: (1) Rejecting Unexpired Real Property Leases Pursuant to 11 U.S.C. § 365; (2) Rejecting Executory Contracts Pursuant to 11 U.S.C. §§ 365 & 107; (4) Allowing Transactions in Escrow to Process; (5) Closing the Debtor's Business; and (6) Abandoning Remaining Personal Property and the Estate's Possessory Interest in Real Property Pursuant to 11 U.S.C. § 554(a)* [Docket No. 366] (as supplemented at Docket No. 376, the "Shutdown and Rejection Motion"). The Bankruptcy Court granted the Shutdown and Rejection Motion on an interim and final basis. [Docket Nos. 374 & 381]. As is set forth in the Shutdown and Rejection Motion, the Trustee has ceased operating the R&LS business.

On April 1, 2025, Keller Williams filed its *Motion for Relief from the Automatic Stay* [Docket No. 370] (the "Lift Stay Motion"), seeking Bankruptcy Court authority to lift the automatic stay to terminate the License Agreement.

The Trustee and Keller Williams have discussed the Administrative Claim Motion, the potential Chapter 7 Administrative Claim, the Lift Stay Motion and the Trustee's plans for the Franchise Agreement. The Trustee and Keller Williams have agreed to: (1) reject and terminate the Franchise Agreement, (2) allow, but compromise the amount to be distributed to Keller Williams as part of the Administrative Claim Motion and a potential application seeking to allow the Chapter 7 Administrative Claim, (3) resolve the Lift Stay Motion, and (4) resolve Extension Motion Objection. Attached hereto as **Exhibit 2** is a true and correct copy of the proposed settlement agreement ("Settlement Agreement").

**Golden Goodrich LLP**
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**B. Summary of the Agreement**

The salient terms of the Settlement Agreement are as follows:

1. The Settlement Agreement will become effective on the date (the "Effective Date") on which the Court's order approving this Settlement Agreement becomes a final, non-appealable order, should the Court approve the Settlement Agreement at all.

2. The License Agreement will be rejected and terminated as of the Effective Date.

3. Keller Williams' Chapter 7 Administrative Claim of $86,191.32 (the "Allowed Chapter 7 Administrative Claim") will be allowed in its entirety.

4. Keller Williams agrees to waive any distribution from the Estate with respect to the Allowed Chapter 7 Administrative Claim.

5. Keller Williams' Chapter 11 Administrative Claim of $340,787.29 will be allowed in its entirety.

6. The first $50,000 of the Allowed Chapter 11 Administrative Claim to be paid, should a distribution be paid on the Allowed Chapter 11 Administrative Claim, will be subordinated to all other allowed administrative, priority, and general unsecured claims in the Bankruptcy Case.

7. The Administrative Claim Motion and the Administrative Claim Objection will be deemed resolved and the Administrative Claim Objection will be withdrawn.

8. The relief in relation to the Franchise Agreement reflected in the Trustee's Extension Motion is withdrawn and Extension Objection is withdrawn.

9. Keller Williams' Lift Stay Motion is withdrawn.

10. The Settlement Agreement provides for mutual releases.[2]

---

[2] Parties are advised to consult the Settlement Agreement for all terms and conditions. The Trustee has only summarized the key terms of the Settlement Agreement.

## II. MEMORANDUM OF POINTS AND AUTHORITIES

### A. Standard for Approving a Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019(a)

Federal Rule of Bankruptcy Procedure 9019(a) provides:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

The standard to be applied to the approval of a settlement includes the probability of success of any litigation, the difficulties in collection on a judgment, the complexity of the matter, the expense, inconvenience or delay occasioned by resolution through litigation, and interests of creditors, and the reasonableness of the compromise. *See In re A&C Properties,* 784 F.2d 1377, 1380-81 (9th Cir. 1986), *cert. den., Martin v. Robinson,* 479 U.S. 854, 107 S.Ct. 189 (1989). Although the court is to consider the range of results in litigation, "the court's assessment does not require resolution of the issues, but only their identification, so that the reasonableness of the settlement may be evaluated." *In re Hermitage Inn, Inc.,* 66 B.R. 71, 72 (Bankr. D. Colo. 1986).

The Court need to conduct an extensive investigation into the merits of the claims that the parties seek to settle. *See In re Walsh Const., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, the court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant*, 699 F.2d 599, 608 (2d Cir. 1982); *see also In re Bell & Beckwith*, 87 B.R. 472, 474 (N.D. Ohio 1987). Consideration must also be given to the principle that the law favors compromise and not litigation for its own sake. *See Blair*, 538 F.2d at 851.

#### 1. Probability of Success in Litigation

The Settlement Agreement resolves two potentially allowable administrative claims, a motion for relief from the automatic stay, and a possible motion to reject the Keller Williams Franchise Agreement.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

As articulated in the Administrative Claim Objection, the Trustee contends: (1) the Administrative Claim Motion lacks sufficient evidence to establish an allowed administrative claim, (2) there is no proof of a post-petition relationship between the Debtor and Keller Williams to warrant the allowance of an administrative claim, (3) Keller Williams did not provide any new value or services to the Debtor post-petition, and (4) there is no evidence of a benefit to the Estate. *See* Administrative Claim Objection. Keller Williams has staunchly objected to the Trustee's contentions and argues there is ample evidence supporting a post-petition transaction between the Debtor and Keller Williams with "clear" post-petition benefits conferred upon the Estate. *See* Dkt. No. 357. Specifically, Keller Williams contends that the Debtor availed itself of the intellectual property of Keller Williams and support services, and therefore, the Estate benefitted. *Id.*

In order for Keller Williams to prevail on its Application, Keller Williams must prove that its debt: "(1) arose post-petition, (2) from a transaction with the trustee or debtor-in-possession, and (3) directly and substantially benefitted the estate." *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir. 1995). The Trustee believes his objections to the Administrative Claim Motion are valid and that more proof is required to establish an administrative claim. Nevertheless, Keller Williams may potentially demonstrate its right to an administrative claim in the chapter 11 case (and possibly the chapter 7 case) with proof of a post-petition debt that resulted in a benefit conferred upon the Estate. Even though the Trustee does not concede a benefit was conferred upon the Estate through the post-petition use of rights provided under the License Agreement, the Trustee recognizes the fact the Debtor negotiated with Keller Williams for the rights provided under the License Agreement and paid amounts due to Keller Williams from 2020 until the Debtor's recent non-payments. If there were no value to the License Agreement, the Debtor would not likely have paid Keller Williams for the rights provided under the License Agreement. Moreover, the Debtor would likely have sought an order rejecting the License Agreement during the chapter 11 case if the License Agreement provided no benefit. In short, Keller Williams may convince the Court that it is entitled to an administrative claim.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

The Lift Stay Motion was recently filed. The Trustee has not yet filed an objection to the Lift Stay Motion. The crux of the issue in the Lift Stay Motion is the assignability of the License Agreement under 9th Circuit law. Unless Keller Williams consents to the assignment of the License Agreement, it can refuse to honor the rights of any assignee. *In re Catapult Ent., Inc.,* 165 F.3d 747, 753 (9th Cir. 1999). The Trustee recognizes and appreciates the need for approval of any assignment of the License Agreement by Keller Williams. Further, the Trustee must promptly cure all arrears under the License Agreement before it can be assumed an assigned. The Trustee may be able to cure the arrears under the License Agreement, but the cure amount could equal or exceed the total value the License Agreement offers for the Estate. On the other hand, the Trustee may locate a buyer to assign the License Agreement to and should Keller Williams consent to the assignment, value could be realized for the Estate. Hence, the License Agreement holds value for the Estate, but that value is partially controlled by Keller Williams and unless Keller Williams consents to the assignment, there is no value to the Estate.

The Trustee faces a potential motion to compel the rejection of the License Agreement should he defeat the Lift Stay Motion. In the context of a motion to compel the rejection of the License Agreement, the Trustee will need to address the same issues that will undoubtedly arise in the context of the Lift Stay Motion. As noted above, the Trustee's ability to assume and assign the License Agreement is at the mercy of Keller Williams.

Given the issues noted above, this factor appears to weigh in favor of approving the Settlement Agreement.

**2. Difficulties of Collection on a Judgment**

If the Trustee succeeds in defeating the Lift Stay Motion or any motion to compel the rejection of the License Agreement, the Trustee must still secure the consent of Keller Williams to the assignment of the License Agreement to a third party. In a technical sense, there is no judgment to collect and this factor does not appear to apply. Even if this factor applies, the Trustee's ability to recover money will be dictated by the

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

assignment of the License Agreement. If the License Agreement can be assigned, then the Trustee will have no difficulty collecting should a buyer by located.

### 3. Complexity of the Matter

The Application and possible Chapter 7 Administrative Claim do not pose complex legal issues to the Court. Instead, each requires proof of a benefit conferred on the Estate. While the evidentiary standard may be high, the law on the allowance of an administrative claim is not too complex.

The Court may also be asked to determine if the License Agreement can be assumed and assigned. Absent a factor that distinguishes the License Agreement from a typical franchise agreement, the law on assignments of license agreements in the 9th Circuit seems relatively clear – it cannot be done without Keller Williams' consent. As is the case with potential administrative claims, the issues related to the License Agreement are not complex. Although the issues are not complex, this factor still weighs in favor of approval of the Settlement Agreement.

### 4. Inconvenience of the Delay/Best Interest of Creditors

The Settlement Agreement resolves several pending motions and will likely resolve potentially more disputes and claims. Should the Court not approve the Settlement Agreement, the Trustee will continue to incur legal fees responding to the Administrative Claim Motion and potentially a second administrative claim motion for the chapter 7 case. Further, the Trustee will likely need to file a motion to reject the License Agreement, possibly defend against the Lift Stay Motion, and respond to Keller Williams' objection to the Extension Motion. The Settlement Agreement resolves these matters and will save the Estate significant time and money. As such, the Settlement Agreement is in the best interests of creditors and the Estate because it resolves costly legal battles and disposes of the License Agreement without the need for additional cost.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**5. The Agreement is Fair and Reasonable and in the Best Interest of the Estate and Creditors**

The Trustee believes the Settlement Agreement is fair, reasonable, and adequate, is in the best interest of the Estate and its creditors in light of all known facts and circumstances. Further, the compromise was entered into in good faith and was negotiated at arms' length. Accordingly, the Trustee requests that the Court enter an order pursuant to FRBP 9019 authorizing the Trustee to enter into the Settlement Agreement and approving the terms of the compromise as agreed upon by the parties.

## III. CONCLUSION

Based on the foregoing, the Trustee respectfully requests that this Court enter an order granting the Motion as follows:

1. Finding that notice of the Motion is proper and adequate;

2. Approving the terms of the Agreement, a copy of which is attached as **Exhibit 2**, and authorizing the Trustee to enter into the Agreement;

3. Authorizing the Trustee to execute any documents or take any actions reasonably necessary to effectuate the terms of the Agreement;

4. Allowing the Allowed Chapter 7 Administrative Claim of $86,191.32;

5. Allowing the Chapter 11 Allowed Administrative Claim of $340,787.29;

6. Ordering the first $50,000 of the Chapter 11 Allowed Administrative Claim of $340,787.29 subordinated to all other allowed administrative, priority, and general unsecured claims;

7. Vacating the hearing on the Administrative Claim Motion;

8. Vacating the hearing on the Lift Stay Motion;

9. Waiving the stay under FRBP 4001(a)(3) and any other stay; and

10. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: April 7, 2025

GOLDEN GOODRICH LLP

By: _/s/ David M. Goodrich_
DAVID M. GOODRICH
ANERIO V. ALTMAN
Proposed Attorneys for Chapter 7 Trustee John J. Menchaca

**Golden Goodrich LLP**
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

**DECLARATION OF JOHN J. MENCHACA**

I, John J. Menchaca, declare as follows:

1. I am the duly appointed chapter 7 Trustee for the bankruptcy estate of R&LS Investments, Inc. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. Any terms not specifically defined herein shall have the meaning set forth in the Supplement.

2. On July 18, 2023 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11, subchapter V of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division, case no. 2:23-bk-14467-WB ("Case").

3. On August 1, 2023, the Debtor filed its schedules, a Statement of Financial Affairs and related documents. The Debtor scheduled $313,971.67 in assets, $501,208.18 in deposits, and $21,539.20 in accounts receivable. The Debtor scheduled no secured claims, no priority unsecured claims, and $682,378.08 in nonpriority unsecured claims. I learned during my investigation that a debt of approximately $15,000 in favor of the U.S. Small Business Administration is secured against all assets of the Debtor.

4. On October 16, 2023, the Debtor filed amended schedules ("Amended Schedules"). The Amended Schedules reflect $288,811.97 in assets, $501,208.18 in deposits and $481,117.32 in nonpriority unsecured claims.

5. The Debtor is a real estate brokerage business ("Business"), wholly owned by its sole shareholder, Richard Cunningham. The Debtor operated under several names, including “Keller Williams Realty Santa Monica.” As of the Petition Date, the Debtor had four leased office locations and 432 commercial and/or residential real estate agents. According to the SOFA, the gross income of the Business for calendar years 2021 and 2022 was $43,199,408.49 and $46,187,707.94, respectively. From January 1, 2023, to the Petition Date, the gross income of the Business was $13,643,058.15.

6. On March 3, 3025, the Court entered an order converting the Case to chapter 7. On March 5, 2025, I filed my acceptance of appointment as chapter 7 trustee.

7. The Debtor is a licensee under a *Keller Williams Realty, Inc. Market Center License Agreement* dated March 30, 2020 ("License Agreement"). Attached hereto as **Exhibit 1** is a true and correct copy of the License Agreement.

8. On February 12, 2025, Keller Williams filed an *Application of Keller Williams Realty, Inc. for Allowance and Payment of Administrative Priority Claim Pursuant to Section 503(b)(1)(A) of the Bankruptcy Code* [Docket No. 329] (the "Administrative Claim Motion") seeking allowance and immediate payment of $340,787.29 in post-petition License Fees (the "Chapter 11 Administrative Claim"). On March 13, 2025, I filed an objection to the Application [Docket No. 349] (the "Administrative Claim Objection").

9. Keller Williams also asserts a chapter 7 administrative claim in the amount of $86,191.32 on account of accruing post-conversion license fees and associated fees and charges ("Chapter 7 Administrative Claim").

10. On March 19, 2025, I filed a *Motion for Order Extending Time to Assume or Reject Executory Contracts and Unexpired Nonresidential Real Property Leases Pursuant to 11 U.S.C. § 365(d)(4)* [Docket No. 353] (the "Extension Motion"), requesting a 90-day extension to assume or reject the License Agreement. On April 3, 2025, Keller Williams filed an objection to the Extension Motion [Docket No. 377] (the "Extension Objection").

11. On March 28, 2025, I filed an *Emergency Motion for Order: (1) Rejecting Unexpired Real Property Leases Pursuant to 11 U.S.C. § 365; (2) Rejecting Executory Contracts Pursuant to 11 U.S.C. §§ 365 & 107; (4) Allowing Transactions in Escrow to Process; (5) Closing the Debtor's Business; and (6) Abandoning Remaining Personal Property and the Estate's Possessory Interest in Real Property Pursuant to 11 U.S.C. § 554(a)* ("Shutdown and Rejection Motion"). The Bankruptcy Court granted the Shutdown and Rejection Motion on an interim and final basis. As is set forth in the Shutdown and Rejection Motion, I ceased operating the R&LS business.

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

12. On April 1, 2025, Keller Williams filed its *Motion for Relief from the Automatic Stay* [Docket No. 370] (the "Lift Stay Motion"), seeking Bankruptcy Court authority to lift the automatic stay to terminate the License Agreement.

13. Keller Williams and I, through our counsel, have discussed the Administrative Claim Motion, the potential Chapter 7 Administrative Claim, the Lift Stay Motion and my plans for the Franchise Agreement. Attached hereto is a **Exhibit 2** is a true and correct copy of the proposed settlement agreement ("Settlement Agreement").

14. I have reviewed the Agreement, a true and correct copy of which is attached as **Exhibit 2**, and believe the compromise contemplated in the Agreement is fair and reasonable and in the best interest of my estate and creditors due to the fact that the Agreement resolves all issues between the Parties, avoids the costs and delays of litigation, and allows me to move toward confirming my plan. The compromise was entered into in good faith and was negotiated at arms' length.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of April, 2025.

John J. Menchaca

Golden Goodrich LLP
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

# Exhibit 1

LICENSE AGREEMENT RECEIPT

The undersigned hereby acknowledges and agrees that on the date below, a KELLER WILLIAMS LICENSE AGREEMENT was received including all applicable exhibits with all information completed in a form ready to execute.

Upon signature of this receipt, a statutorily required 7 DAY hold period will begin. A notification will be sent to you when signatures are permitted.

01/20/2021

Date

DocuSigned by:
Rick Cunningham
519E9FB03F9448E...

Signature

**KELLER WILLIAMS REALTY, INC.**

**MARKET CENTER LICENSE AGREEMENT**

Santa Monica
MC #549

March 30, 2020 (FTC)

LICENSEE Initials/Date RC _____

**KELLER WILIAMS REALTY, INC.**
**MARKET CENTER LICENSE AGREEMENT**
**TABLE OF CONTENTS**

Section Page

1 DEFINITIONS ........ 1
2. GRANT OF LICENSE ........ 8
3. TERM AND RENEWAL ........ 11
4. COMPANY'S SERVICES ........ 13
5. FEES ........ 15
6. DUTIES, REPRESENTATIONS, WARRANTIES AND COVENANTS OF LICENSEE ........ 17
7. TRADEMARKS AND COPYRIGHTED MATERIAL ........ 28
8. CONFIDENTIAL INFORMATION ........ 29
9. INTERNET USAGE ........ 33
10. ACCOUNTING AND RECORDS ........ 34
11. ADVERTISING ........ 36
12. PROFIT SHARING PLAN ........ 39
13. INSURANCE ........ 41
14. TRANSFER OF INTEREST ........ 42
15. DEFAULT ........ 48
16. TERMINATION; OTHER REMEDIES ........ 53
17. ADDITIONAL COVENANTS ........ 56
18. TAXES, PERMITS AND INDEBTEDNESS ........ 59
19. GENERAL CONDITIONS AND PROVISIONS ........ 59
20. DISPUTE RESOLUTION ........ 64
21. ACKNOWLEDGMENTS ........ 69

**ATTACHMENTS**

A AGREEMENT AND GUARANTY OF CONTROLLING PRINCIPALS
B UNDERTAKING OF LICENSEE'S PRINCIPALS
C ELECTRONIC DEBIT/CREDIT AUTHORIZATION
D SOFTWARE LICENSE
E CONFIDENTIALITY AGREEMENT
F PROFIT SHARING CONTRIBUTION CALCULATION

STATE SPECIFIC AMENDMENTS

Case 2:23-bk-14467-WB Doc 3841 Filed 04/07/25 Entered 04/07/25 17:30:41 Desc Exhibit A Page 19 of 125

LICENSEE Initials/Date RC ______

## INFORMATION SUMMARY

**Effective Date**: 1/29/2021 **Market Center No.**: 549

**Licensee**: R & LS INVESTMENTS, INC.

**DBA Name:** Keller Williams Santa Monica

**Market Center Street Address (the "Approved Location")**:
2701 Ocean Park Blvd., Suite 140
Santa Monica, CA 90405

**Market Center Phone Number:** (310) 482-2200

**Market Center Website:** None

**Market Center Leadership Team:**

- **Operating Principal**: Rick Cunningham
- **Team Leader**: Andrew Bloom
- **Market Center Administrator**: Samina Merchant

**Opening Date**: 5/9/2005 **First Transmittal Date**: N/A

**Region**: California-Westside LA

**Type of License Agreement**:

☐ **New License Agreement**
- Initial Term: 5 years from Effective Date

☑ **Renewal of Existing License Agreement**
- Renewal Term: 10 years from renewal date of the prior License Agreement (from Effective Date to 4/26/2030)

☐ **Transfer of Existing License Agreement**
- Term: Remaining Term of Transferred License (from Effective Date to _________)

**Production Royalty Rate**: Six Percent (6%)

**Certain Fees:**
- Initial License Fee: $35,000 (unless renewal or transfer of existing License Agreement)
- Renewal Fee: 10% of the then-current License Fee or $5,000 whichever is less
- Transfer Fee: $2,000 maximum, plus our costs to review transfer

LICENSEE Initials/Date RC _____

**Awarded Area**:
That certain territory circumscribed as follows as of the effective date:

Starting at Rose Avenue and the Pacific Ocean,
Travel East along Rose Avenue to Centinela Avenue.
Travel North along Centinela Avenue, which first becomes S. Bundy Drive.
Take S. Bundy Drive to Wilshire Blvd.
Travel West along Wilshire Blvd to Centinela Avenue
Travel North along Centinela Avenue to Montana Avenue
Travel West along Montana Avenue to 26th Street.
Travel North along 26th Street, continuing along Allenford Avenue, W. Sunset Blvd., Capri Drive, Casale Road, and Sullivan Fire Road until it loops back around to the east and meets Farmer's Fire Road
At that point, continue directly north approximately 0.5 mile through Topanga Street Park to Mulholland Drive.
Travel West along Mulholland Drive to Mulholland Highway.
Continue West along Mulholland Highway to Cold Canyon Road
Travel South along Cold Canyon Road to Pluma Road
Travel West along Pluma Road to Las Virgenes Road.
Travel North along Las Virgenes Road to Mulholland Highway
Travel West then South along Mulholland Highway to the Pacific Ocean
Take the Pacific Ocean East to Rose Avenue, the starting point.

**The metropolitan area in which the Awarded Area is located is**: Santa Monica, CA

LICENSEE Initials/Date RC _____

**Licensee's Owners/Principals:**

The following is a list of all direct and indirect owners and beneficial owners of Licensee, all Persons with voting rights over any ownership interests in Licensee regardless of form of Business Entity or type of ownership or voting interest, and all Licensee's Principals described in and designated pursuant to Section 6.01(b)(6) of this Agreement. Each Controlling Principal shall execute the Agreement and Guaranty of Controlling Principals in the form set forth in Attachment A of this Agreement. Unless designated as a Controlling Principal, each Licensee's Principals shall execute the Undertaking of Licensee's Principals in the form set forth in Attachment B of this Agreement and, as requested by Company the Agreement for the Protection of Trade Secrets in the form set forth in Attachment E to this Agreement.

| | Principals | Percentage of Ownership |
|---|---|---|
| **(CP)** | Rick Cunningham | 100% |

(CP indicates a Controlling Principal)

**Addresses for Notices:**

Company:
Keller Williams Realty, Inc.
1221 South Mopac Expressway, Suite 110
Austin, Texas 78746
Attn: Legal/Commitment Department
legal@kw.com

Licensee:
R & LS Investments, Inc.
2701 Ocean Park Blvd., Suite 140
Santa Monica, CA 90405
Attn: Rick Cunningham

**Principal Trademarks:**

| Trademark | U.S. Federal Registration (Application) Number | U.S. Date of Registration (Application) |
|---|---|---|
| KW | 2146559 | March 24, 1998, renewed March 24, 2018 |
| kw | 5073599 | November 1, 2016 |
| Keller Williams | 2309099 | January 18, 2000 |
| kw KELLERWILLIAMS | 4724633 | April 21, 2015 |
| Keller Williams Luxury International | 5406528 | February 20, 2018 |
| KW Commercial | 3845921 | September 7, 2010 |
| KW Land | 5729053 | April 16, 2019 |

**Insurance Requirements:**

(1) Comprehensive General Liability Insurance, including broad form contractual liability, broad form property damage, personal injury, completed operations, fire damage, advertising and products liability coverage, in the amount of $1,000,000 per occurrence for bodily injury and property damage.

(2) Workers' Compensation and employers liability insurance in the minimum amount of $500,000 for bodily injury per accident, $500,000 for bodily disease per employee, $500,000 bodily disease policy limit, or such other amounts as may be prescribed by the state or locality in which the Market Center is located, unless Licensee's state requires that employers participate in a state-administered insurance pool in which case Licensee must adopt and implement a qualifying plan. Such policies shall also include a waiver of subrogation in favor of Company and its subsidiaries, affiliates, successors and assigns and their respective directors, officers, shareholders, members, managers, partners, employees, servants, representatives, independent contractors and associates.

(3) Automobile liability coverage, including coverage of any owned, non-owned and hired vehicles, in amounts not less than $1,000,000 combined single limit.

(4) Errors and omissions liability insurance in the minimum amount of $1,000,000 per occurrence covering real estate brokerage services and any other approved services and products, as applicable, that any Person associated with the Market Center offers. For Market Centers that support commercial real estate activities, E&O liability insurance covering commercial real estate brokerage services and all offered ancillary practices shall not be less than $2,000,000 per occurrence.

(5) Such other insurance as may be required by the state or locality in which the Market Center is located and operated.

(6) Keller Williams Realty, Inc. must be named as an additional insured on all policies. Such policies shall also include a waiver of subrogation in favor of Company and its subsidiaries, affiliates, successors and assigns and their respective directors, officers, shareholders, members, managers, partners, employees, representatives, independent contractors and associates.

See Section 13 of the License Agreement for additional information regarding Insurance Requirements.

LICENSEE Initials/Date RC _____

# KELLER WILLIAMS MARKET CENTER LICENSE AGREEMENT

This Market Center License Agreement ("Agreement") is entered into as of the Effective Date set forth in the Information Summary (which is incorporated by reference for all purposes into this Agreement) between Keller Williams Realty, Inc., a Texas corporation ("Company"), and the Licensee identified in the Information Summary. Certain capitalized terms are used in this Agreement with the meanings assigned in Article 1.

## RECITALS

As a result of the considerable expenditure of time, skill, effort and money, Company has developed and owns a distinctive System that governs the establishment and operation of Market Centers that operate under the Keller Williams® name and related Trademarks. Company intends for the franchise system of Keller Williams® Market Centers to be a limited opportunity franchise with a finite number of franchised Market Centers – that is, a franchise system not focused on developing a franchised outlet on every street corner or promoting growth in number of franchises simply for the sake of growth. Company places a high value on the quality rather than simply the quantity of its franchised locations. For these reasons, Company requires high standards for its business model, representatives and Licensees.

Licensee understands and acknowledges the importance of Company's high standards of quality and service and the necessity of operating Market Centers in conformity with Company's standards and specifications. Licensee wants to obtain a license to use the System and the Trademarks in connection with the operation of a Market Center at the Approved Location.

Company has reviewed Licensee's application and is willing to award Licensee a license to use the System and the Trademarks in connection with the operation of a Market Center at the Approved Location, only, on the basis that Licensee will provide leadership to Associates and instill Associates with an understanding and appreciation of Company's unique business philosophy and culture.

In consideration of the undertakings and commitments of each party set forth in this Agreement, the parties agree as follows:

## 1. DEFINITIONS

The following capitalized terms are used in this Agreement with the meaning assigned or referred to in this Article 1.

**1.01 Abandon** means to close the Market Center for seven or more consecutive days without Company's prior written consent. A pattern of closures for periods of less than seven consecutive days may also result in the Market Center's being deemed Abandoned if, in Company's sole judgment, such closures adversely impact the Market Center or reflect negatively on the goodwill or public image of the Keller Williams brand or network of Market Centers.

**1.02 Affiliate** means a Person that controls, is controlled by or is under common control with another Person.

**1.03 Associate Leadership Council** or **ALC** refers to and includes the International Associate Leadership Council or a regional, city or local Associate Leadership Council in which both Associates and Market Center management personnel are represented. An ALC is designed to provide Associates and Market Center Licensees an opportunity to give direct input to Company regarding the operation of the System. The composition and responsibilities of each level of ALC is stated in the Brand Standards Manuals.

**1.04 Annual Business Plan** is defined in Section 6.01(h)(2).

**1.05 Annual Sales Potential** means an Awarded Area's potential for generating annual gross closed commissions through the sale of residential real estate, as measured in accordance with a formula stated in the Brand Standards Manuals, as of a measurement date. Currently, the formula that Company uses to determine Annual Sales Potential is based on the average sales price of residential property in the Awarded Area times 1,000 sold units within the 12 months preceding the measurement date, as reported by the local Multiple Listing Service ("MLS").

**1.06 Approved Budget Expenses** means those expenses that Company considers essential to the operation of a Market Center. Approved Budget Expenses may include expenses relating to accounting, tax preparation, computer services, contests and sales awards, contributions, gifts, copying, Board of Realtors and MLS dues, subscriptions, entertainment, insurance, legal expenses, equipment maintenance, federal, state and local taxes, postage, printing, public relations, rent, salaries, supplies, telephone service, training, advertising and travel. Approved Budget Expenses, and the amount allowable for each category, are described in the Brand Standards Manuals.

**1.07 Approved Location** means the sole physical address of the premises at which Licensee is authorized to establish and operate the Market Center.

**1.08 Associate** means a real estate broker or sales person who possesses a real estate broker's license or sales person's license that is valid and effective in the applicable state(s) in which he or she provides services and who represents buyers and sellers in the sale of real estate under contract with a Licensee.

**1.09 Associate Commission(s)** means the portion of the Gross Commissions paid to each of Licensee's Associates based on the real estate sales closed by such Associate during the period for which a determination of Associate Commissions is to be made.

**1.10 Assumed Name** means the name under which Licensee shall conduct the licensed business, which must incorporate (a) those Trademarks set forth in the "Identity Standards" portion of the Brand Standards Manuals, and (b) a name selected by Licensee and approved by Company.

**1.11 Awarded Area** means the geographic area selected by Licensee and designated by Company in which a Market Center Approved Location shall be located. The Awarded Area associated with Licensee's Market Center is delineated in the Information Summary to this Agreement.

**1.12 Business Day** means any day other than Saturday, Sunday, or days on which federal reserve banks are authorized by law to close.

**1.13 Business Entity** means a corporation, a general or limited partnership, a limited liability company or any other type of approved business entity.

**1.14 Brand Standards Manuals** means all then-current manuals, policies, guidelines, bulletins, directives, memoranda and other written or electronic communications prepared by Company or at its request and disseminated through any available means that contain policies, procedures and standards for the operation of a Market Center, the conduct of a Market Center's owners, management and activities for the operation of Market Centers and for all other aspects of the System. Our Brand Standards Manuals currently include, but are not limited to, the Franchise Systems Orientation Manual, the Policy and Guidelines Manual and the Identity & Style Guide.

**1.15 Charter Documents** means a corporation's articles of incorporation, bylaws and shareholders agreement (if any); a partnership's partnership agreement and, in the case of a limited partnership, also its articles of limited partnership; a limited liability company's articles of association and regulations or operating agreement; and comparable governing documents of these or any other types of business entity.

**1.16 Client** is a real estate buyer or seller who purchases or sells, or considers purchasing or selling, real estate through a Market Center and/or its Associates.

**1.17 Client Information** means any information that: (i) can be used (alone or when used in combination with other information) to identify, locate or contact an individual; or (ii) pertains in any way to an identified or identifiable individual. Client Information can be in any media or format, including computerized or electronic records as well as paper-based files.

**1.18 Commission(s)** means revenue earned when a third party contracts for an Associate to act as a real estate agent or broker. This revenue can take the form of money, real or personal property, or other things of value received or receivable, constituting payment for such services.

**1.19 Company** is defined in the preamble and includes its divisions and departments.

**1.20 Controlling Principal** means and includes, collectively and individually, each Licensee's Principal who has at least 20% of the direct or indirect ownership interests in Licensee, who has been designated by Company as a Controlling Principal and who is required to execute this Agreement and guarantee Licensee's obligations under this Agreement. Company may in its discretion designate one or more of Licensee's Principals as a Controlling Principal based on their interest in an entity with a controlling interest in the Licensee entity. A list of Licensee's initial Controlling Principals appears in the Information Summary.

**1.21 Copyrighted Material** means the Brand Standards Manuals, the MC Operating Software, and any other software licensed to Licensee, newsletters to Licensees or customers; any advertising and marketing materials, including newspaper and magazine advertisements, radio and television commercials, promotional materials, merchandising materials, sales aids, sales brochures, and information on the Company's websites, or, if applicable, reproduced on an approved website on the internet with changes that the Company authorizes; any educational or training materials created by Company; and any other original materials created by or on behalf of Company or Licensee or another Licensee based on materials relating to the System, whether or not the copyrights are registered.

**1.22 Core Profit** means an amount obtained by reducing Licensee's Monthly Profit by Other Income. Company may permanently or temporarily include certain sources or levels of revenues to Core Profit by policies that apply uniformly to all Market Centers as further described in the Brand Standards Manuals.

**1.23 Delinquent Licensee** means any Market Center Licensee that is in default of its obligation to pay its Profit Sharing Contribution, Royalty or any fees when due or fails to make a timely transmittal.

**1.24 Depository Account** means any account opened and maintained by Licensee pursuant to Section 6.01(k), at a bank or other financial institution that is a participating member of the Automated Clearinghouse network or such other network or system as may be directed or approved by Company.

**1.25 Effective Date** means the date that Company indicates in the Information Summary to this Agreement.

**1.26 Event of Default** is defined in Article 15.

**1.27 Force Majeure** means any act of God, strike, lock-out or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire or other catastrophe, act of any government and any other similar cause not within the control of the party affected thereby.

**1.28 Franchise Systems Orientation** means initial and on-going required training in System standards and operations provided by Company or its designee.

**1.29 Gross Commissions** means the total Commissions received by Licensee during the period for which a determination of Gross Commissions is to be made.

**1.30 Gross Market Center Income** means Gross Commissions, less Associate Commissions and the Production Royalty for the relevant period.

**1.31 Gross Revenues** means all money and other things of value received directly or indirectly by Licensee or its Affiliates from or in connection with the operation of the Market Center and without deducting any of Licensee's costs, expenses or disbursements. Company may permanently or temporarily exclude certain sources or levels of revenues from Gross Revenues by policies that apply uniformly to all Market Centers as further described in the Brand Standards Manuals.

**1.32 KW Commercial Division** means the division Company has developed to assist Market Center Licensees and Associates in the education and training of Associates involved in commercial real estate.

**1.33 KW Luxury Division** means the division Company has developed to assist Market Center Licensees and Associates in the education and training of Associates involved in the buying and selling of high-end residential properties.

**1.34 KW Worldwide** means an affiliated business authorized to develop the System outside of the United States and Canada.

**1.35 Late Payment Fee** means an amount payable in connection with the late payment of any Production Royalty, Profit Sharing and any other continuing fees owed to Company.

**1.36 Licensee** means the entity with whom Company has entered into this Agreement to conduct business as a Keller Williams Realty Market Center, and also means other entities with whom Company has entered into license agreements to conduct business as a Keller Williams Realty Market Center.

**1.37 Licensee's Group** means Licensee, each Controlling Principal, Operating Principal, each Licensee's Principal, each of their respective Affiliates, successors, and assigns and each of their respective directors, officers, shareholders, members, managers, partners, attorneys, employees, associates, independent contractors, and representatives.

**1.38 Licensee's Principals** means all officers, directors and managers of Licensee and all holders of a direct or indirect ownership interest in Licensee (and in any entity that directly or indirectly holds an ownership interest in Licensee) including Controlling Principals. A list of Licensee's Principals as of the Effective Date are listed in the Information Summary.

**1.39 Loss Carry Forward** with respect to a particular month means the amount by which Approved Budget Expenses for the month exceeds Gross Market Center Income for the month as further described in the Brand Standards Manuals.

**1.40 Market Center** means the approved facility from which a Licensee conducts the business of brokering the sale and purchase of real estate, and the offering of any other approved services under the System. For purposes of Section 2.01(d), "Market Center" includes any office facility that is permanently or temporarily identified by or associated with the Keller Williams Realty trade name, for example, by signs located anywhere on the building premises, by telephone or internet directory listings, or by letterheads, business cards or other business forms. However, a temporary yard sign that displays the telephone number of a Market Center shall not indicate that the premises is a Market Center.

**1.41 Market Center Administrator** or **MCA** means an individual designated by Licensee to manage the Market Center's administrative and financial functions under the supervision of the Team Leader.

**1.42 MC Operating Software** means an integrated system of software developed, assembled and, as between Company and Licensee, owned by Company, which Licensee is required to use in the operation of the Market Center. Company reserves the right to upgrade and modify the software designated as the MC Operating Software at any time and to replace any of its components with other software that performs comparable functions. We have currently designated the M.O.R.E. and Keller Cloud as the current MC Operating Software, but we are in the process of transitioning to updated MC Operating Software.

**1.43 Mega Associate** means a real estate associate who has developed a business system, brand image and marketing tools that enable the associate to close real estate transactions and earn brokerage commissions far in excess of industry averages.

**1.44 MLS** means a Multiple Listing Service or comparable trade organization or government agency that tracks statistics relating to residential real estate brokerage at the local level.

**1.45 Monthly Profit** means an amount obtained by reducing Licensee's monthly Gross Market Center Income by (i) Licensee's Approved Budget Expenses and (ii) Licensee's cumulative, allowable Loss Carry Forward, if any.

**1.46 Opening Date** means the date that Licensee opens the Market Center for business.

**1.47 Operating Principal** means the individual Licensee has designated and Company has approved as the individual who is responsible for management and supervision of the Market Center.

**1.48 Other Income** means a Market Center's Gross Revenues, less Gross Commissions. Company may permanently or temporarily exclude certain sources or levels of revenues from Other Income by policies that apply uniformly to all Market Centers as further described in the Brand Standards Manuals.

**1.49 Person** means an individual or a Business Entity.

**1.50 Privacy Laws** means any international, national, federal, provincial, state, or local law, code, rule or regulation that regulates the processing of Client Information in any way, including data protection laws such as EU General Data Protection Regulation 2016/679 ("GDPR"), the California Consumer Protection Act of 2018 and other similar laws, rules or regulations, laws regulating marketing communications and/or electronic communications such as the CAN-SPAM Act and "Do Not Call" laws rules and regulations, information security regulations, the most current Payment Card Industry Data Security Standard, ISO 27001, ISO 27002, and security breach notification rules.

**1.51 Production Royalty** means the monthly royalty payment that Licensee must pay Company for the continuing use of the Company's Trademarks and the System.

**1.52 Profit Sharing Account** means a record-keeping entry account maintained by Company to record Market Center Licensees' payments of Profit Sharing Contributions and Company's administration of the Profit Sharing Plan.

**1.53 Profit Sharing Contribution** means an amount determined as a percentage of Licensee's Monthly Profit pursuant to the following table:

Profit Sharing Contribution Percentages Table

| Monthly Profit | Contribution |
|---|---|
| Up to $2,990 | 25% of Monthly Profit |
| Over $2,990 but not over $11,240 | $747.50 plus 35% of the excess of Monthly Profit over $2,990 |
| Over $11,240 | $3,635.00 plus 50% of Monthly Profit over $11,240 |

Case 2:23-bk-11467-WB Doc 38 Filed 04/07/25 Entered 04/07/25 17:30:41 Desc
Main Document Page 16 of 100


**1.54 Profit Sharing Plan** means the program developed by Company to compensate Associates in the Keller Williams system for recruiting producing Associates to profitable Market Centers in the US and Canada.

**1.55 Publicly-Held Corporation** means a corporation that has securities registered under Section 12 of the Securities Exchange Act of 1934, as amended, or a company subject to the reporting requirements of Section 15 of that Act.

**1.56 Regional Representative** means the independent representative of Company who is authorized to perform certain duties on Company's behalf, as set forth in Section 4.02.

**1.57 Sponsor** means the individual who directly or indirectly recruits producing Associates into Market Centers. The determination of the Level One Sponsor for each Associate is made by the Associate being sponsored, and the determination is final and binding. Each Associate has different levels of Sponsors. The level one Sponsor is the individual who directly recruited the Associate to become affiliated with a Market Center; the level two Sponsor is the individual who directly recruited the Associate's level one Sponsor, and so on. The number of levels of Sponsors who may receive Sponsor Distribution Percentages is currently seven. The number of levels of distribution and the Sponsor Distribution Percentages may be changed at any time on a prospective basis by the International Associate Leadership Council, as more specifically described in the Brand Standards Manuals.

**1.58 Sponsor Distribution Percentage** means that portion of the Profit Sharing Contribution that is paid to an Associate who is the Sponsor of a producing Associate in a profitable Market Center. The percentage of Licensee's Profit Sharing Contribution for a given month, if any, attributable to each producing Associate is first determined by calculating the percentage of the Gross Commissions attributable to sales closed by that Associate for the month. Company then pays that percentage of the month's Profit Sharing Contribution from the Profit Sharing Account in accordance with the procedure set forth in the Brand Standards Manuals. The number of levels of distribution and the Sponsor Distribution Percentages may be changed by the International Associate Leadership Council on a prospective basis as set forth in the Brand Standards Manuals.

**1.59 Start Up Costs or Conversion Costs** means those capital investments and expenses incurred in establishing a Market Center. The Market Center shall either be viewed as a "Start Up" if it is a new business or a "Conversion" if the business is already in operation as a real estate office before becoming a Licensee.

**1.60 System** means the then-current comprehensive business system prescribed by Company that Licensees use to organize and administer their Market Centers' to market and provide real estate brokerage services, and any other approved services, as more specifically described in the License Agreement and the Brand Standards Manuals. Distinguishing characteristics of the System include distinctive methods and techniques for attracting Associates; the high moral and ethical standards that Licensees are expected to observe in dealing with their Associates, other Licensees and the public; Associate recruitment methods; uniform standards and specifications; quality and uniformity of services; procedures for training, consulting and assistance; the Associate Leadership Council program; Keller Williams University; Company's profit sharing plan; Company's business philosophy and culture; and advertising and promotional programs, all of which Company may change, improve and further develop from time to time.

**1.61 Team Leader** means the individual who Licensee has designated and Company has approved as the individual who is responsible for managing the Market Center's Associate recruiting, training and consulting activities and performing such other duties as described in the Brand Standards Manuals.

**1.62 Temporary New Homes Sales Location** describes a situation where Licensee has obtained an exclusive listing to sell all, or substantially all, of the new homes in a specific new home development and, as a condition of obtaining that listing, Licensee (or the Associate holding the listing) has agreed to occupy a model home or other facility in the development solely for the purpose of selling new homes in that development for a limited, specified period of time.

**1.63 Term** means the aggregate of the initial term of this Agreement and any term of a renewal term, as provided in Sections 3.01 and 3.02.

**1.64 Trade Dress** means decorative, non-functional components of a Market Center that provide the establishment a distinctive, memorable appearance.

**1.65 Trademarks** means the proprietary trademarks, service marks, trade names, logos, insignias, designs, trade dress, and other commercial symbols (and associated color palates), both registered and unregistered, that Company now or later designates in the Brand Standards Manuals to identify the System or the source of products and services that Market Centers offer, sell and market. The Information Summary lists the principal Trademarks that Licensee is authorized to use.

**1.66 Transmit** means to submit to Company, via the MC Operating Software or, if expressly permitted in a particular section of this Agreement, through other electronic means directed by Company, any statement or report this Agreement obligates Licensee to submit.

**1.67 Transmittal Date** means the date on which Licensee initially submits the reports that Section 10.01(b) requires, which is not more than 90 days after the Effective Date, and subsequently submits reports monthly no later than the dates indicated in Section 10.01(b).

**1.68 Transmittal Fee** means an amount payable in connection with the late transmittal of a Gross Revenues statement, Production Royalty statement or Profit Sharing Contribution report owed to Company.

## 2.
## GRANT OF LICENSE

**2.01 <u>Grant of License</u>.**

(a) Subject to the terms and conditions of this Agreement, Company grants to Licensee the right and license to use the System and the Trademarks in the operation of a Market Center only at the Approved Location, and to market and provide real estate brokerage services, and other approved services throughout the Awarded Area. Licensee accepts the license and undertakes the obligation to establish and operate a Market Center at the Approved Location in accordance with this Agreement and any of its amendments or addenda, and the Brand Standards Manuals.

(b) Company retains the right to adjust the boundaries of the Awarded Area at any time during the term of this Agreement if, in Company's reasonable business judgment, the Awarded Area is found to encompass an area that holds an annual sales potential equivalent to substantially more than 1,000 sold units times the average sales price of residential property in the Awarded Area during the 12 months preceding the measurement date as reported by the local MLS. Company shall give Licensee reasonable advance notice of its decision to adjust the boundaries of the Awarded Area. Also, if Licensee qualifies as a multi-Market Center operator under the standards then set forth in the Brand Standards Manuals, Company shall offer Licensee an option, exercisable for 60 days after Company gives notice of its decision to adjust the boundaries of the Awarded Area's size, to acquire a license for a Market Center located in the part of the Awarded Area that Company excluded from the original Awarded Area if the excluded area independently qualifies for a new Market Center Awarded Area. Company shall describe in the option notice the boundaries of the area it intends to award for a new Market Center. It shall describe the boundaries of the adjusted Awarded Area in a new Information Summary, or some other form of addendum to this Agreement. In no case shall the adjusted Awarded Area hold an Annual Sales Potential of less than 1,000 sold units times the average sales price of residential property in the adjusted Awarded Area during the 12 months preceding the measurement date, as reported by the local MLS.

(c) Licensee may not relocate the Market Center or other approved office such as a Business Center without prior written approval and unless Licensee complies with the site selection requirements set forth in Section 2.02 with respect to the new location. In no case may the Approved Location of a relocated Market Center lie outside the Awarded Area. If Licensee loses possession of the original Market Center premises on account of eminent domain proceedings, Licensee must initiate the relocation and site selection approval procedure in time to lease, build-out and open the new Market Center for business within 60 days after the original Market Center closes. If Licensee's lease is terminated on account of a fire or other casualty, Licensee must initiate the relocation and site selection approval procedure in time to lease, build-out and open the new Market Center for business within 120 days after the lease for the original Market Center terminates. At Licensee's request and in compliance with this Section and Section 2.02, Licensee may relocate to a temporary site. During the period in which the Market Center is not fully in operation, Company may require Licensee to pay a minimum fee in lieu of Production Royalty.

(d) Until the termination, cancellation, expiration or transfer of this Agreement, Company shall not establish nor authorize any Person other than Licensee to establish a Market Center in the Awarded Area. However, Company, any other Market Center Licensee and any other authorized Person at any time (i) may advertise or promote the Keller Williams® brand, system and the Trademarks in the Awarded Area, (ii) may solicit or accept listings of and show property located in the Awarded Area and otherwise act as a real estate broker for customers and properties located in the Awarded Area, (iii) may operate Temporary New Home Marketing Locations in the Awarded Area, and (iv) may recruit real estate brokers and associates in and from the Awarded Area, except those people who are currently affiliated with a Keller Williams Realty Market Center. Further, Company may offer and provide (and may authorize others to offer and provide) at and from locations in the Awarded Area products and services that may be the same as or similar to those offered by Market Centers.

(e) Company reserves all rights and opportunities that are not expressly granted to Licensee pursuant to this Agreement.

**2.02 Site Selection.**

(a) Licensee assumes full responsibility for locating and acquiring a site for the Market Center and for developing a Market Center only at the Approved Location. The Approved Location must be selected by Licensee, approved by Company in writing in advance and acquired by Licensee in accordance with the standards and procedures set forth in the Brand Standards Manuals and Company's instructions. Licensee acknowledges that Company's rendering assistance in the selection of a site and approval of a site does not constitute a representation, warranty or guarantee by Company that a Market Center operated at that site shall be profitable.

(b) Licensee shall configure, build out, equip, furnish, and maintain the Market Center in accordance with Company's then-current specifications, as set forth in the Brand Standards Manuals. Licensee agrees that Licensee may not open the Market Center for business without Company's express written authorization, and that Company's authorization to open shall be conditioned upon Licensee's compliance with Company's Market Center license approval process and Company's standards and procedures for building out, furnishing, and equipping a Market Center. If at any time Licensee fails to comply with any of these standards and procedures, Company shall have the right to prohibit Licensee from commencing or continuing business.

(c) Company may, in its reasonable discretion, require that Licensee select a temporary site for the operation of the Market Center, or may approve a temporary site upon Licensee's request. Approval of a temporary site must be given in writing by Company. All other terms and conditions of this Agreement shall apply to the operation of a Market Center at a temporary site. Subject to any extension of time approved by Company in writing, Licensee may not operate the Market Center from a temporary site for more than six months.

(d) Within 90 days after the Effective Date, Licensee shall open the Market Center and commence business either at the Approved Location or at a temporary location that Company approves in accordance with Section 2.02(c).

**2.03 KW Luxury Division.**

Company has developed the KW Luxury Division to assist Market Center Licensees and Associates in the education and training of Associates involved in the buying and selling of high-end residential properties. Only associates who meet the KW Luxury production, experience and education qualifications as set forth in the Brand Standards Manuals and pay monthly membership dues may participate in the program and use the luxury marketing materials, trademarks and logos. Company requires Market Center Licensees to monitor usage of the marketing materials, trademarks and logos by their affiliated Associates and enforce KW Luxury standards so that only qualified and paid KW Luxury Division members have the benefit of the program.

**2.04 KW Commercial Division.**

Company has developed the KW Commercial Division to assist Market Center Licensees and Associates in the education and training of Associates involved in commercial real estate.

(a) Company offers Associates two levels of participation in the KW Commercial Division. First, a Director membership, referred to as "Director," in which the Associate must meet production, experience, and educational qualifications, and must pay membership dues, as set forth

in the Brand Standards Manuals. Company also offers an Associate membership, referred to as "Associate Member," in which the Associate must provide Company written approval from the Associate's Operating Principal or Team Leader and commit to completing educational programs and any other requirement set forth in the Brand Standards Manuals.

(b) Company requires Market Center Licensees to monitor usage of the KW Commercial marketing materials, educational materials, trademarks, trade names and logos by the KW Commercial members affiliated with the Market Center Licensee and enforce KW Commercial's standards as set forth in the Brand Standards Manuals so that only qualified and paid KW Commercial members have the benefit of the KW Commercial program.

## 3. TERM AND RENEWAL TERMS

**3.01 <u>Term of Agreement</u>.**

Unless sooner terminated pursuant to Article 15, the term of this Agreement shall be designated as set forth in the Information Summary Page.

**3.02 <u>Renewal Terms</u>.**

(a) If, upon the expiration of the initial term and any consecutive renewal term of a Market Center license agreement, Licensee is in full compliance with Licensee's agreements and obligations under this Agreement, and each member of the Licensee's Group is in full compliance with their respective agreements and obligations under any other agreements with Company or its Affiliates, and the following terms are met, then Licensee may apply to enter into a consecutive Market Center license agreement for a renewal term of 10 years (each a "renewal term"):

(1) Licensee must give Company written notice of Licensee's election to seek a renewal term not less than 210 days nor more than 365 days prior to the end of the initial term or each renewal term;

(2) The Market Center must have been making Profit Sharing Contributions on a regular basis in at least 4 out of each consecutive 5-month periods during the 24 months before the Renewal Date;

(3) The Market Center must currently be and have been under the management and supervision of an Operating Principal and a Team Leader whom Company has unconditionally approved and not subsequently disapproved at all times between the date of Licensee's renewal notice and the Renewal Date;

(4) No member of the Licensee's Group shall be in default of: any provision of this Agreement; or any regional representative agreement, any license agreement, or any other agreement between any member of the Licensee's Group and Company, its Affiliates, or any Regional Representative; and each member of the Licensee's Group shall have fully complied with all the terms and conditions of such agreements during their terms;

(5) Each member of the Licensee's Group shall have satisfied all monetary obligations they owe to Company and its Affiliates and to any business creditors of each member of the Licensee's Group, and shall have timely met those obligations throughout the initial term and any term under a renewal term;

(6) Before the next renewal term begins, Licensee shall renovate the Market Center premises to the extent Company reasonably requires, which may include renovation of signs, computer systems and other equipment, furnishings, fixtures, décor and Trade Dress, to reflect the then-current standards and image of the System;

(7) Licensee shall present satisfactory evidence that Licensee has the right to remain in possession of the Approved Location for the duration of the next renewal term or, if this is not the case, Licensee has acquired a replacement Approved Location that is satisfactory to Company;

(8) Licensee must execute, in the time prescribed by Company, Company's then-current form of Market Center license agreement, which shall supersede this Agreement in all respects (except for those covenants that expressly survive the termination, cancellation, expiration or transfer of this Agreement). The terms of the then-current form of Market Center license agreement may differ from the terms of this Agreement, including, without limitation, provision for a higher percentage Production Royalty. However, Licensee shall pay, in lieu of an initial license fee, a renewal fee equal to 10% of the then-current initial license fee being charged to prospective Licensees generally or $5,000, whichever is less.

(9) Licensee, each Controlling Principal, Operating Principal and each Licensee's Principal shall have executed a general indemnification and release, in a form prescribed by Company, of all claims against Company and its Affiliates, and their respective officers, directors, shareholders, members, managers, partners, employees, independent contractors, Regional Representatives, representatives and agents, in their corporate and individual capacities, covering, without limitation, claims arising under this Agreement and any other agreement between any member of the Licensee's Group and Company and its Affiliates and under federal, state and local laws, rules and ordinances, which indemnification and release shall be effective against all members of the Licensee's Group regardless of whether such members of the Licensee's Group have executed the indemnification and release and which indemnification and release shall cause Licensee, each Controlling Principal and each Licensee's Principal to indemnify Company and its Affiliates with respect to claims brought by any such members of the Licensee's Group; and

(10) Licensee's Group shall comply with Company's then-current qualification and training requirements.

(b) Licensee's failure or refusal to comply with any of the conditions to execute Company's then-current form of Market Center license agreement for renewal as stated in Section 3.02(a) shall be interpreted as a conclusive, irrevocable election on Licensee's part not to enter into a renewal Market Center license agreement.

(c) If Licensee does not qualify to enter into a renewal term, or elects not to do so, immediately after expiration of the Term of this Agreement, Licensee must comply with the requirements of Section 16.01, and Company shall have the rights and remedies provided in Sections 16.02 through 16.06.

**3.03 <u>Notice of Non-Renewal Required by Law</u>.**

If applicable law requires that Company give notice of non-renewal to Licensee prior to the expiration of the initial term or any renewal term, and if Company does not give the required number of days' notice before expiration, this Agreement shall remain in effect on a temporary basis until the required notice period expires.

LICENSEE Initials/Date RC _____

## 4.
## COMPANY'S SERVICES

**4.01 <u>Company's Services</u>.**

(a) Company shall provide to Licensee site selection criteria for Market Centers and may provide an on-site evaluation of the Approved Location(s) for which Licensee furnishes the information that Section 2.02(b) requires. Company may also provide to Licensee, on loan, a set of prototype design plans and specifications for a Market Center (as contained in the Brand Standards Manuals or otherwise in writing), which Licensee must adapt for construction or remodeling of the Market Center.

(b) Company shall provide initial and certain ongoing access to Company's Franchise Systems Orientation for the Operating Principal, the Team Leader and the Market Center Administrator at times designated in the Brand Standards Manuals or otherwise by Company in writing. Prior to the Opening Date, the Operating Principal, the Team Leader and the Market Center Administrator shall attend Franchise Systems Orientation, which will be offered for the standard registration fee Company charges for that course. Company shall also provide Franchise System Orientation for each of Licensee's Principals for the standard registration fee Company charges for that course, which each of Licensee's Principals must attend at least once every 3 calendar years during the Term or as otherwise required in the Brand Standards Manuals to afford attendees the opportunity to keep abreast of ongoing standards, evolving systems, trends and market research. If any Licensee's Principal has successfully completed any of the required courses in connection with another Market Center's development, Company may in its discretion, either substitute another training program of its choice or provide supplemental consulting in accordance with Section 4.01(c). All training provided by Company shall be subject to Section 6.01(h) and as designated by the Brand Standards Manuals or otherwise by Company in writing.

(c) Company shall provide up to 90 minutes of consulting via telephone to the Market Center's leaders each month during the first 12 months the Market Center is open and shall provide such continuing advisory assistance to and training of Licensee in the operation of the Market Center as Company deems advisable.

(d) Company shall make available, from time to time, research data relating to merchandising, marketing, and advertising Market Center services.

(e) Company shall provide Licensee the Brand Standards Manuals in such format as deemed appropriate at Company's discretion, which may be electronic format.

(f) Company shall make one copy of the MC Operating Software available for installation in Licensee's computer. Company from time to time shall also provide certain maintenance services for the MC Operating Software pursuant to the terms of the Software License attached as Attachment D.

(g) Company shall provide to Licensee, from time to time as Company deems appropriate, advice and written materials concerning techniques of managing and operating the Market Center, and training and materials related to residential real estate sales, including new developments and improvements in residential real estate sales techniques and other services.

(h) Company shall maintain and administer the Profit Sharing Plan in accordance with Article 12 and related policies adopted by the International Associate Leadership Council.

(i) Company shall establish and maintain guidelines in the Brand Standards Manuals for such Local, City, Regional and International Associate Leadership Councils as Company deems appropriate from time to time.

(j) Company shall provide or make available to Licensee from time to time revised lists of the approved vendors of Company, in paper or electronic format, as described in Section 6.01(p).

(k) If Company establishes an advertising cooperative in the region in which the Market Center is located, Company shall administer such cooperative in accordance with Section 11.01(b), and if Company establishes a national advertising fund, Company shall administer such fund in accordance with Section 11.01(c).

(l) Company shall seek to maintain the high standards of quality, appearance and service of the System, and to that end shall conduct, as it deems advisable, inspections of the Market Center and evaluations of the Market Center's products and services.

(m) Company may organize an annual convention on behalf of all Market Center Licensees in good standing. Company may assess an annual sponsorship fee of up to $1,000 per Market Center to cover the costs of organizing and putting on the convention. Licensee shall be responsible for all costs that its personnel and other guests incur to attend the convention, including registration fees, transportation, lodging, meals and wages.

**4.02 Regional Representative.**

Company may authorize a Regional Representative to perform any of Company's duties under Section 4.01 or otherwise specified by this Agreement or the Brand Standards Manuals. Licensee must cooperate with the Regional Representative that Company assigns to the Market Center and must comply with the requirements of this Agreement at all times in a manner that permits the Regional Representative to perform the duties, obligations and services of Company in accordance with this Agreement. Nothing in this Agreement constitutes a Regional Representative as an associate, joint venture partner, partner, employee or servant of Company or Licensee for any purpose. Company shall be relieved of any obligation to perform any duties under this Agreement for as long as a Regional Representative continues to serve in such capacity and to provide such services to Licensee in accordance with this Agreement.

## 5.
## FEES

**5.01 Initial License Fee.**

Licensee shall pay to Company an initial license fee of $35,000 upon execution of this Agreement, which initial license fee is fully earned upon execution of this Agreement and, except as provided in Section 6.01(h)(1), is not refundable. The initial license fee includes approximately $7,400 allocated to a subscription plan allowing the Operating Principal, the Team Leader and the Market Center Administrator to attend training pursuant to this Agreement. Any initial training fees not used by Licensee within 18 months from the Effective Date shall be fully and finally forfeited to Company.

**5.02 <u>Production Royalty</u>.**

In consideration for the continuing use of the System and the Trademarks, Licensee shall pay Company a continuing Production Royalty of 6% of monthly Gross Revenues. Licensee authorizes Company to deduct the Production Royalty from the account that Licensee maintains in accordance with Section 6.01(k) at any time on the 7th Business Day of each month with respect to Gross Revenues for the preceding month. It is our Company's current policy to set an annual cap on Production Royalty, a maximum of $3,000 per Associate in Production Royalty per Region. The percentage of the GCI that is used currently to calculate the Production Royalty amount is 6%. Company reserves the right to modify or eliminate this cap in its discretion.

**5.03 <u>Other Fees and Charges</u>.**

Also in consideration for the continuing use of the System and the Trademarks, Licensee shall pay Company or its designee the other fees and charges listed and described in this Section 5.03 through electronic funds transfer or as otherwise specified by Company in accordance with Section 5.04. This Section lists the current amount of the fees and charges, but Company reserves the right to make reasonable adjustments in the amount of any such fee or charge in writing or by a supplement or amendment to the Brand Standards Manuals. Company also reserves the right to charge Licensee any applicable sales tax for fees and charges set forth herein.

(a) <u>New Associate Fee</u>, payable at the rate of up to $30 per Associate (currently $25 per Associate) who affiliates with a Market Center to cover the administrative costs of establishing a file and entering initial data for the Associate.

(b) <u>Associate Renewal Fee</u>, payable annually at the rate of $25 per Associate (of which the Licensee retains $5 after the initial year) as a fee for establishing and maintaining affiliation with the Keller Williams System.

(c) <u>Accounting Software Upgrade and Maintenance Fees</u>, payable at the rate of up to $1,000 (currently $325 per year plus sales tax) as a charge for accounting software upgrades, maintenance fees, and support.

(d) <u>M.O.R.E. Multi-User Software Upgrade Fee</u>, payable at the rate of up to $1,500 per year as a license fee for any proprietary software that Company provides.

(e) <u>Technology Fee</u>, payable at the rate of up to $250 upon signing this Agreement and monthly at a rate up to $300 per month (currently $79 per month) to cover the cost of providing the Market Center with access and permissions to Company's technology systems.

(f) <u>Associate Technology Fee</u>, payable at a rate of up to $45 per month (currently $25 per month) per Associate for developing and supporting technology initiatives. This may be charged as two separate fees so long as it does not exceed the maximum per month, per associate identified above.

(g) <u>KPA Fee</u>, payable at the then-current rate, currently $500 per month for a subscription service to administer behavioral assessments to Associates and candidates proposed for the Operating Principal, Team Leader and Market Center Administrator positions.

(h) Late Transmittal Fee, payable at the rate of $500 for each day that Licensee fails to Transmit on time a Gross Revenues statement, a Production Royalty statement or a Profit Sharing Contribution report. Licensee acknowledges that the administration of the Profit Sharing program, the fulfillment of Company's commitments to its Regional Representatives, and other aspects of System administration require the timely reporting of information regarding payment of Production Royalty and Profit Sharing Contributions. Licensee therefore agrees that the amount of the Transmittal Fee reasonably and appropriately compensates Company for the disruption of System administration that late reporting and late payments cause.

(i) KWConnect Fee, payable at the then-current rate, currently $500 per month per Market Center, but subject to increase up to $1,000 per month.

**5.04 Terms of Payment.**

The fees and charges that this Agreement requires, including without limitation those related to reimbursement of expenses and costs of collection, for which no terms of payment are specified, shall be payable by electronic transfer of funds in accordance with Section 6.01(k), on demand or receipt of any billing statement or invoice therefore, whichever is earlier; provided that all continuing, monthly payments set forth in Section 5.03 shall be payable on the 7th Business Day of each month with respect to fees owed for the preceding month. Pursuant to Section 6.01(k), Company shall deduct payments directly from Licensee's bank account by electronic funds transfer to cover all fees, costs, taxes and expenses described in this Agreement, including the costs of electronic funds transfer. Licensee must sign all authorizations required, and Licensee must adequately fund Licensee's bank account.

**5.05 Late Payment Fee.**

If Company does not receive good funds representing payment of any month's Production Royalty in accordance with Section 5.02, or if Licensee becomes habitually late or materially delinquent in the payment of any other continuing fee that Section 5.03 imposes, Licensee shall pay Company, in addition to the overdue amount, a Late Payment Fee in the amount of $500 each day the Production Royalty or other continuing fee remains unpaid. The Late Payment Fee is reasonably related to Company's costs, is not a penalty, and is in addition to any other remedy available to Company under this Agreement for Licensee's failure to pay Production Royalties and other continuing obligations in accordance with the terms of this Agreement. If for any reason the Late Payment Fee is deemed to be interest in excess of the maximum rate allowed by applicable law, any such excess shall be applied as a payment and reduction of any other amounts that may be due under this Agreement, and if no such amounts are due, such excess shall be repaid to Licensee in a timely manner.

**5.06 No Right for Licensee to Withhold.**

Licensee shall not be entitled to withhold payments due to Company on grounds of alleged non-performance by Company. Any payment or report not actually received by Company on or before its due date shall be deemed overdue. Except as provided in Section 12.03(b), if any such payment is overdue, Licensee shall pay Company, in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of 18% per annum, or the maximum rate permitted by law, whichever is less, from the date due until paid. If for any reason interest in excess

of the maximum rate allowed by applicable law shall be deemed charged, required or permitted, any such excess shall be applied as a payment and reduction of any other amounts which may be due hereunder, and if no such amounts are due, then such excess shall be repaid to the party that paid such interest. Entitlement to such interest shall be in addition to any other remedies Company may have in law or in equity, arising under this Agreement or otherwise.

**5.07 Company's Right to Apply Payments**.

If any member of Licensee's Group owes monies to Company, its Affiliates or representatives under any Regional Representative Agreement, License Agreement or other agreement among some or all of the parties, then Company may withhold payment of any amounts due to Licensee and apply such payments to the outstanding amounts owed to Company or its Affiliates under such Regional Representative Agreement, License Agreement or other agreements among some or all of the parties. In no case shall Company be required to account for different ownership interests among any members of the Licensee's Group with respect to any such application of amounts owed under any such Regional Representative Agreement, License Agreement or other agreements.

## 6.
## DUTIES, REPRESENTATIONS, WARRANTIES AND COVENANTS OF LICENSEE

**6.01 Duties, Representations, Warranties and Covenants of Licensee.**

(a) Licensee understands and acknowledges that all material aspects of the operation of the Market Center are important to Company, Licensee and other Licensees who use the Trademarks and the System in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all Market Center Licensees, and to protect Company's reputation and goodwill. Licensee therefore agrees to adhere to the requirements of the System as further described herein.

(b) Licensee represents, warrants and covenants that:

(1) Licensee at its sole expense is duly organized Business Entity validly existing under the law of the jurisdiction of its formation and is duly qualified to conduct business under approved trade names or DBA's in each jurisdiction in which its business activities or the nature of its properties require such qualification(s);

(2) Licensee is a newly-formed Business Entity that has no indebtedness, contractual obligations or other liabilities whatsoever that were incurred prior to the Effective Date of this Agreement other than any written agreements directly related to the start up of the Market Center that have been provided to Company;

(3) Licensee's Charter Documents shall at all times provide that the sole purpose of Licensee and the activities of Licensee are limited exclusively to operating the Market Center;

(4) The execution of this Agreement and the performance of the transactions contemplated hereby are within Licensee's statutory power, or if Licensee is a partnership, permitted under Licensee's partnership agreement, and have been duly authorized by Licensee;

(5) Fully executed copies of Licensee's Charter Documents and the resolution or consent authorizing Licensee to enter into and perform this Agreement have been furnished to Company;

(6) A list of all beneficial owners of any ownership or voting interests in Licensee as of the Effective Date is set forth in the Information Summary;

(7) As of the Effective Date, no member of the Licensee's Group owns, maintains, operates, engages in, or has any interest in, or will own, maintain, operate, engage in, or have an interest during the Term of this License Agreement in any real estate business that competes with Company, including any real estate business that involves (i) the real estate brokerage business; or (ii) the offer, sale or operational support of businesses in the real estate brokerage business (whether as a franchisor, licensor, regional representative, area director or other similar service provider capacity);

(8) Licensee's Charter Documents shall include a provision or provisions whereby any owner of the Licensee agrees to relinquish or transfer his, her or its ownership interest in the Licensee upon affiliating with a competitor that maintains, operates, engages in or holds any interest in any real estate brokerage business other than a Keller Williams office or upon affiliating with a company that diverts or attempts to divert any business or customer of a Keller Williams Licensee to any competitor so that Licensee and Licensee's Principals may comply with the transfer and non-competition covenants contained in Sections 14.02 and 17.02.

(9) Each certificate that evidences an ownership interest in Licensee shall have conspicuously endorsed upon its face a statement in a form satisfactory to Company that it is held subject to, and that its assignment or transfer is subject to, all restrictions imposed upon assignments by this Agreement; except that the requirements of this Section 6.01(b)(9) shall not apply to a Publicly-Held Corporation;

(10) If any officer or director of Licensee shall cease to serve as such or any individual shall be elected as an officer or director of Licensee subsequent to the execution of this Agreement, Licensee agrees to notify Company within 10 days subsequent to such change. Any newly elected officer or director shall execute an addendum to this Agreement as one of Licensee's Principals agreeing to be individually bound by all obligations of Licensee's Principals;

(11) All of the Controlling Principals shall jointly and severally guarantee Licensee's performance hereunder and shall bind themselves to the terms of this Agreement pursuant to the terms and conditions of the Agreement and Guaranty of Controlling Principals attached to this Agreement and described herein. Further, all Licensee's Principals who do not sign the Agreement and Guaranty of Controlling Principals attached to this Agreement shall bind themselves to certain personal obligations in the Undertaking of Licensee's Principals' attached to this Agreement and described herein;

(12) Licensee shall at all times maintain sufficient working capital to fulfill its obligations under this Agreement in an amount not less than three times the monthly expenses of the Market Center, or as otherwise described in the Brand Standards Manuals. Further, at the time Licensee executes this Agreement, Licensee shall have on deposit in its own name in a federally insured bank unrestricted funds in the minimum amount of $150,000, and shall provide evidence thereof to Company in a manner satisfactory to Company; and

(13) Licensee shall, at its cost, obtain upon execution of this Agreement and maintain in a timely and proper manner any and all licenses, permits, and bonds as may be required in order for Licensee to operate the business of the Market Center under federal, state or local laws, regulations and ordinances.

(c) Licensee acknowledges and agrees that the representations, warranties and covenants set forth in Sections 6.01(b)(1) through (13) are continuing obligations of Licensee and that any failure to comply with such representations, warranties and covenants shall constitute a material Event of Default under Section 15.02, pursuant to which Company may terminate this Agreement. Licensee shall cooperate with Company in any efforts made by Company to verify Licensee's compliance with such representations, warranties and covenants.

(d) Prior to the Opening Date, Licensee shall comply with all pre-opening requirements set forth in this Agreement, the Brand Standards Manuals, or elsewhere in writing by Company.

(e) Upon execution of this Agreement, Licensee shall designate and retain an individual to serve as the Operating Principal, which individual must meet Company's qualifications and approval prior to serving in such capacity. The Operating Principal shall have substantial authority and control over the management and operation of the Market Center, including the authority to execute the License Agreement and any other agreements or documents related to the Market Center on Licensee's behalf. The Operating Principal shall be fully authorized without further approval of any member of Licensee's Group to take or omit any action that Licensee is required or authorized to take or not take under the License Agreement and/or with regard to the management and operation of the Market Center. The Operating Principal shall be the designated representative and spokesperson of Licensee on all matters pertaining to this Agreement, and Licensor shall have the right to rely on written and other statements from the Operating Principal. The Operating Principal shall in all cases meet the following qualifications, and those qualifications and criteria noted in the Brand Standards Manuals or as otherwise stated by Company in writing, and otherwise be acceptable to Company in its discretion:

(1) Unless otherwise approved in writing by Company, the Operating Principal shall devote his or her substantial energy and best efforts to the supervision and operation of the Market Center.

(2) Unless Licensee has otherwise secured the services of a real estate broker, as the broker of record for Licensee the Operating Principal shall be a real estate broker duly licensed under the laws of the state in which the Market Center is located.

(3) The Operating Principal shall meet the qualifications and criteria established for the position as set forth in this Agreement, the Brand Standards Manuals and as otherwise specified in writing, and shall be acceptable to Company in its discretion. Prior to serving in the capacity of and holding himself or herself out to be the Operating Principal, Company must provide its written approval to Licensee. Company may evaluate the Operating Principal's performance and qualifications in its discretion. Company may revoke approval of an Operating Principal at any time, including but not limited to revoking approval of an Operating Principal where an Operating Principal is causing disruption or potential disruption in the Market Center. If Company revokes its approval of the Operating Principal, or if the Operating Principal is unable to continue serving in such capacity or no longer qualifies to act as an Operating Principal, Licensee shall promptly (and in any case within 60 days) designate a replacement Operating Principal who possesses the qualifications listed above; provided that in all cases Licensee must obtain Company's prior written approval of any such replacement Operating Principal. Licensee shall provide for Company-approved interim management of the Market Center until a suitable replacement is approved in writing by Company. If the Operating Principal has an ownership interest in Licensee, any sale,

transfer or assignment of the Operating Principal's interest in Licensee shall be subject to the restrictions on transfer described in Article 14.

(f) Upon the execution of this Agreement, Licensee shall designate and retain an individual to serve as the Team Leader. The Team Leader shall meet the qualifications and criteria established for the position set forth in this Agreement and in the Brand Standards Manuals or as otherwise stated by Company in writing and shall otherwise be acceptable to Company in its discretion. Licensee must obtain Company's written approval of a Team Leader prior to allowing the individual to serve in such capacity. A Team Leader is required to head the Market Center's associate recruiting efforts and to perform such other duties as described in the Brand Standards Manuals. The Team Leader shall devote his or her substantial energy and best efforts to his or her responsibilities as Team Leader and may not engage in the sale of real estate or any other business activity. Company may evaluate the Team Leader's performance and qualifications in its discretion. Company may revoke approval of a Team Leader in its discretion at any time, including but not limited to, revoking approval of a Team Leader where a Team Leader is causing disruption or potential disruption in the Market Center. If Company revokes its approval of the Team Leader, if a Team Leader resigns, is discharged, or no longer qualifies to act as a Team Leader, Licensee shall promptly (and in any case within 60 days) designate a replacement Team Leader who possesses the qualifications listed above; provided that in all cases Licensee must obtain Company's prior written approval of any such replacement Team Leader.

(g) Upon the execution of this Agreement, Licensee shall designate and retain an individual to serve as the Market Center Administrator. The Market Center Administrator shall meet the qualifications and criteria established for the position set forth in this Agreement and in the Brand Standards Manuals or as otherwise stated by Company in writing and shall be acceptable to Company in its discretion. Company may revoke approval of a Market Center Administrator in its discretion at any time, including but not limited to, revoking approval of a Market Center Administrator where a Market Center Administrator is causing disruption or potential disruption in the Market Center. The Market Center Administrator shall assist the Team Leader in conducting the day-to-day operation of the Market Center and shall have all of the duties set forth for such position in the Brand Standards Manuals. The Market Center Administrator shall devote his or her substantial energy and best efforts to his or her responsibilities as Market Center Administrator and shall not engage in the sale of real estate or any other business activity. If any Market Center Administrator is not able to continue to serve in such capacity or no longer qualifies to act as such, Licensee must promptly notify Company and within 60 days designate a replacement who possesses the required qualifications; provided that in all cases Licensee must obtain Company's prior written approval of any such replacement Market Center Administrator.

(h) Licensee agrees that it is important to the operation of the Market Center that Licensee, Licensee's Principals and Licensee's employees receive such training as Company may require, and to that end agrees:

(1) Prior to the Opening Date, the Operating Principal, the Team Leader, the Market Center Administrator, the Licensee's Principals and each other designated members of the Licensee's Group shall each attend Franchise Systems Orientation, an approved Investor Workshop session, and the other training courses described in Section 4.01(b). Company shall provide the instructors and training materials for those courses included as part of the pre-paid training fee subscription exclusively for the Operating Principal, the Team Leader and the Market Center Administrator, either at the Market Center, at Company's corporate offices or at such other location

as Company shall determine. If the Operating Principal, Team Leader and Market Center Administrator do not attend Franchise Systems Orientation, Company shall have the right to terminate this Agreement upon (i) giving notice of termination to Licensee within a reasonable time, not to exceed 7 days after the last Franchise Systems Orientation preceding the Opening Date, and (ii) returning Licensee's initial license fee, less Company's reasonable out-of-pocket expenses incurred in connection with this Agreement and Franchise Systems Orientation. Company shall not permit Licensee to open the Market Center until the Operating Principal, Team Leader, Market Center Administrator, the Licensee's Principals and each other designated member of the Licensee's Group completes Franchise Systems Orientation.

(2) Not later than 30 days after the Opening Date, and annually prior to December 10th, the Operating Principal shall determine monthly production goals for the Market Center and submit such goals to Company electronically as directed. Licensee shall also submit to Company, annually prior to December 10th, a business plan for the on-going financing and operation of the Market Center, incorporating the Approved Budget Expenses and Market Center Production Goals in a form satisfactory to Company (the "Annual Business Plan"). If Licensee fails to meet its production goals or fails to submit the required Annual Business Plans, in addition to any other remedy Company may have under this Agreement, Company may require the Operating Principal, Team Leader, Market Center Administrator, Licensee's Principals or other employees to repeat all or a portion of the Franchise Systems Orientation or such alternative training as Company may require pursuant to Section 6.01(h).

(3) Any individual subsequently designated by Licensee in the position of Operating Principal, Team Leader or Market Center Administrator or Persons who subsequently become a Licensee's Principal shall attend Franchise Systems Orientation prior to becoming a Licensee's Principal, and subsequently at least once every three years thereafter. Licensee shall pay Company a reasonable fee for such training, including training of any replacement individual for any position described in Section 6.01(h)(1).

(4) Members of the Licensee's Group (including but not limited to the Operating Principal, Team Leader, Market Center Administrator and such other designated Licensee's Principals) shall attend and complete to Company's satisfaction such additional courses, seminars, conferences and other training or coaching programs, including, refresher courses, as Company may require from time to time and as stated in the Brand Standards Manuals or as otherwise stated by Company in writing. Members of the Licensee's Group may also attend such optional courses, seminars, conferences and training or coaching programs as Company may offer from time to time. Licensee shall pay Company a reasonable fee for each course, seminar, conference or other training program, which shall generally represent the then-current cost to Company of providing such training, including the administrative cost to Company of providing instructors.

(5) Licensee or its employees shall be responsible for all other expenses incurred by them in connection with any training programs, including the costs of transportation, lodging, meals and wages.

(6) Licensee shall train its Associates in accordance with the procedures set forth in the Brand Standards Manuals or as otherwise stated by Company in writing. Such training shall acquaint both newly-licensed and experienced Associates with general requirements concerning, and Company's recommended methods and techniques for, real estate sales.

(i) (1) Licensee shall obtain from Company and install each component of the software system that Company from time to time designates as the MC Operating Software.

Licensee shall use the MC Operating Software in accordance with the instructions, formats and procedures prescribed by Company in the Brand Standards Manuals or otherwise in writing. Licensee shall obtain compatible hardware prior to the opening of the Market Center. Any computer hardware shall comply with all of Company's specifications set forth in the Brand Standards Manuals or as otherwise stated by Company in writing from time to time, and all computer hardware and software shall be operated with adequate computer virus protection approved by Company. Licensee shall install the MC Operating Software in its computer no later than 30 days after the Effective Date, unless Company consents otherwise in writing. Licensee shall permit Company or its designee access to Licensee's computer system at all reasonable times and otherwise cooperate with Company in the installation and maintenance of the MC Operating Software. Licensee shall maintain computer hardware compatible with the MC Operating Software in good operating condition at all times during the term of this Agreement. Concurrently with the execution of this Agreement, Licensee shall execute the Software License attached as Attachment D and shall comply at all times with the terms and conditions of the Software License.

(2) Licensee shall maintain communication devices at the Market Center that meet Company's specifications to facilitate communications between the MC Operating Software located at the Market Center and Company. The communication devices shall remain in operation at all times throughout the term of this Agreement, twenty-four hours every day, and all costs associated with the operation and maintenance of such communication device shall be borne by Licensee. Licensee acknowledges that Licensor may electronically poll the MC Operating Software to obtain Gross Commission Income data, as well as other financial and operating information through the communication devices.

(j) Prior to opening the Market Center, at its sole expense, Licensee shall obtain and maintain computer hardware and software meeting Company's standards and specifications for the operation of the Market Center as set forth in the Brand Standards Manuals or as otherwise required by the Company. Such hardware and software shall include, but not be limited to:

(1) Hardware and software necessary to communicate with Company's systems. Licensee shall pay to Company its reasonable then-current initial connection and monthly support fees to establish and maintain access to the systems. Licensee shall pay the initial connection fee on execution of this Agreement and shall pay the monthly support fee concurrently with the other monthly payments due. Licensee shall follow all rules, regulations and protocol that Company establishes for communication and shall be responsible for all claims, costs or injury resulting from Licensee's communications or use of the internet. Any such claims shall be covered by the indemnification provisions of Section 19.02.

(2) The approved Associate software and online services, including KW Command, shall be obtained from Company, Company's designee or such other source Company approves in writing, and shall be used in a competent manner and in accordance with the instructions, formats and procedures prescribed by the Software License and the Brand Standards Manuals. Licensee shall maintain computer hardware and software meeting Company's standards and specifications compatible with the approved Associate software and online services in good operating condition at all times during the term of this Agreement.

(3) Licensee shall obtain from an approved supplier back-up software and pay the approved supplier directly.

(k) Licensee shall establish and maintain a Depository Account at a bank that is a participating member of the Automated Clearinghouse or such other network or system as may be specified or approved by Company. Licensee shall execute and deliver to Company and the bank an authorization agreement in the form of Attachment C to this Agreement or any other form the bank requires to authorize the bank to honor requests from Company to transfer funds electronically from the Depository Account to Company for the purpose of paying Production Royalties, Profit Sharing Contributions, and all other fees, costs or reimbursements set forth in this Agreement. Licensee shall continuously maintain a minimum balance in the Depository Account as Company shall deem reasonably necessary and specify in the Brand Standards Manuals. Licensee shall reimburse Company for all costs incurred by Company in collecting or attempting to collect funds due Company from the Depository Account, including charges for insufficient funds, uncollected items or other discrepancies in deposits or maintenance of the Depository Account balance, and Company may collect such reimbursable amounts though electronic transfer or such other available means as directed by Company. The Depository Account shall be established and maintained solely for the purposes set forth in this Section 6.01(k).

(l) Licensee shall provide Company with full access rights to Licensee's real estate listings data. Company's full access rights to Licensee's real estate listings data shall remain in effect at all times throughout the term of this Agreement.

(m) Licensee shall use the Approved Location solely for the operation of the Market Center and other services approved by Company in writing, and shall maintain at least the minimum business hours and days of operation as well as the physical standards as Company may specify in the Brand Standards Manuals from time to time.

(n) Licensee agrees to maintain competent, conscientious, trained employees and Associates and shall take such steps as are necessary to ensure that such individuals preserve good customer relations. Licensee agrees to cause each of its Associates to enter into a form of independent contractor agreement with Licensee. Company may provide its then-current sample form of independent contractor agreement and/or mandatory or suggested terms and conditions in the Brand Standards Manuals, but Licensee is solely responsible for the form it selects, including if Licensee elects to start with Company's sample form, and for adapting any such form for use in Licensee's jurisdiction, including for compliance with applicable laws, rules and regulations in Licensee's jurisdiction. Licensee additionally agrees to take all necessary action to ensure that its employees and Associates conduct their activities in accordance with the requirements of the System and with all applicable laws, rules and regulations.

(o) Licensee shall operate the Market Center in strict compliance with the methods, standards and specifications that Company from time to time prescribes in the Brand Standards Manuals or as otherwise stated by Company in writing. To that end, Licensee agrees:

(1) To maintain in sufficient supply, and to use at all times, only such products, materials, and supplies that conform to Company's then-current standards and specifications.

(2) To sell or offer for sale only such products and services as have been expressly approved for sale in writing by Company; to sell or offer for sale all types of products and services specified by Company and provide such products and services in the manner and style

prescribed by Company; and to discontinue selling and offering for sale any products or services that Company may, in its sole discretion, disapprove in writing at any time.

(3) To purchase or lease and install, at Licensee's expense, all fixtures, furnishings, equipment, including computer hardware and software, signs and such other items as Company may reasonably direct from time to time in the Brand Standards Manuals or otherwise in writing; and to refrain from installing or permitting to be installed on or about the Market Center premises, without Company's prior written consent, any fixtures, furnishings, equipment, including computer hardware and software, decor, signs or other items not previously approved as meeting Company's standards and specifications. Licensee shall obtain all approvals as to selection and design required by Company prior to purchasing, leasing or installing such fixtures, furnishings or equipment.

(p) Licensee shall, unless otherwise authorized by Company, obtain all proprietary supplies, materials, equipment and other products used or offered for sale at or from the Market Center from suppliers who demonstrate, to Company's continuing reasonable satisfaction, the ability to meet Company's then-current standards and specifications for such items and who possess adequate quality controls and capacity to supply Licensee's needs promptly and reliably. Company shall have the right to require that its representatives be permitted to inspect the prospective supplier's facilities, and that product samples from the supplier be delivered to Company. A charge not to exceed the reasonable cost of the inspection shall be paid by Licensee or the supplier. Company reserves the right, at its option, to re-inspect the facilities and products from time to time of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Company's then-current criteria. Nothing in the foregoing shall be construed to require Company to approve any particular supplier.

(q) Licensee shall require all advertising and promotional materials, websites, signs, decorations, paper goods (including all forms and stationery used in the operation of the Market Center) and other promotional items (including electronic marketing) that may be designated by Company to bear the Trademarks in the form, color, location and manner prescribed by Company in the Brand Standards Manuals or otherwise in writing, while maintaining compliance with all applicable state and local laws and applicable regulatory trade associations and governing boards.

(r) Licensee shall maintain the Market Center in first class condition and shall, at its expense, make such repairs and replacements as may be required for that purpose. In that regard, Licensee shall conduct such periodic repainting, replacement of obsolete signs, furnishings, and equipment and décor as Company may reasonably direct. Except as expressly provided in the Brand Standards Manuals, no alterations or improvements or changes of any kind in design, equipment, signs, decor, fixtures or furnishings shall be made in or about the Market Center premises without Company's prior express written approval.

(s) Upon Company's reasonable request, Licensee shall make all improvements and alterations that Company may determine to be necessary for the Market Center to conform with the System image as it may be prescribed by Company at that time. However, Licensee shall not be required to make any such improvements and alterations more than once during the initial term of this Agreement. Licensee shall, at its expense, undertake and complete such improvements and alterations within the reasonable times specified by Company. Licensee acknowledges Company's right to make changes in the System image as Company reasonably deems appropriate.

(t) Licensee shall allow Company and its representatives to enter upon the Market Center premises at any time for the purpose of conducting inspections, shall cooperate with Company's representatives in such inspections by rendering such assistance as they may reasonably request, and, upon notice from Company or its representatives and without limiting Company's other rights under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Should Licensee fail to correct such deficiencies within a reasonable time as determined by Company, Company shall have the right and authority without, however, any obligation, to correct such deficiencies and to charge Licensee a reasonable fee for Company's expenses associated with the correction, payable by Licensee immediately upon demand.

(u) Licensee shall participate at all times in the Profit Sharing Plan and the Associate Leadership Council and shall comply with all obligations and requirements of Market Center Licensees relating to the Profit Sharing Plan and the Associate Leadership Council that are set forth in Article 12 of this Agreement and in the Brand Standards Manuals.

(v) If Company shall require upon the establishment of Market Centers in at least 75% of the geographic areas allocated to the metropolitan area described in the Information Summary (or as such metropolitan area may be adjusted by Company in its discretion as a result of changes to its geographic boundaries) in which Licensee's Awarded Area is located, Licensee shall pay to Company or its designee an amount up to $300 per month, as determined by Company, upon the terms and conditions established by Company at such time, and from time to time thereafter as stated below. Company or its designee shall use the funds collected from the Market Centers to pursue residential relocation business for the Market Centers located in such metropolitan area. In obtaining or referring residential relocation business, Company and its designees shall be under no obligation to refer relocation business to Licensee which is equivalent or proportionate to Licensee's contribution and there is no assurance that any Licensee in the metropolitan area shall benefit directly or *pro rata* from such relocation business. Company shall make such contributions on the same basis as Licensee with respect to any Company-operated Market Centers in the same metropolitan area. The metropolitan area in which the Licensee's Awarded Area is located is shown on the Information Summary to this Agreement.

(w) Upon execution of this Agreement and during the term of the license, Licensee shall execute such forms and documents as Company deems necessary to appoint Company its true and lawful agent and attorney-in-fact for the purpose of: (i) assigning to Company all rights to the telephone numbers of, or any advertising relating to, the Market Center and any directory listings, other business listings and advertising, including internet domain names, URLs and websites relating to the Market Center or referring to Keller Williams or any Trademarks, upon termination, cancellation, expiration or transfer of this Agreement; and (ii) obtaining all returns and reports filed by Licensee with any state and/or federal taxing authority that Licensee does not furnish to Company upon request.

(x) If Company shall require, in each month following a month in which the Market Center achieves at least $90,000 in Gross Commissions, Licensee shall contribute an amount between $100 and $150, as determined by Company, to a research and development program approved by Company. Licensee shall report to Company the results of such research and development program within 30 days after the program is implemented in a format approved by

Company. Licensee may combine its research and development contributions with those of other Market Center Licensees with the written approval of Company.

(y) Licensee, each Controlling Principal and each Licensee's Principal represents and warrants to Company that no member of the Licensee's Group is identified, either by name or an alias, pseudonym or nickname, on the lists of "Specially Designated Nationals" or "Blocked Persons" maintained by the U.S. Treasury Department's Office of Foreign Assets Control (texts currently available at **www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx**). Further, Licensee, each Controlling Principal and each Licensee's Principal represents and warrants that neither no member of the Licensee's Group has violated, and each of them agrees not to violate (and to cause the members of the Licensee's Group not to violate), any law prohibiting corrupt business practices, money laundering or the aid or support of Persons who conspire to commit acts of terror against any Person or government, including acts prohibited by the U.S. Patriot Act (text currently available at **http://www.epic.org/privacy/terrorism/hr3162.html**), USA Executive Order 13224 (text currently available at **http://www.treasury.gov/resource-center/sanctions/programs/documents/terror.pdf**, or any similar law. The foregoing constitute continuing representations and warranties, and Licensee, each Controlling Principal and each Licensee's Principal shall immediately notify Company in writing of the occurrence of any event or the development of any circumstance that might render any of the foregoing representations and warranties false, inaccurate or misleading.

(z) Notwithstanding Sections 6.01(e) to 6.01(h) hereof, Licensee bears sole liability for the hiring, firing and personnel decisions, and the terms and conditions of employment, for the Operating Principal, Team Leader, Market Center Administrator and other Market Center personnel and staff. Company and Licensee acknowledge and agree that Company shall not, and shall have no right or authority to, control the employees of the licensed Market Center or Licensee's employees. Company shall have no right or authority with respect to the hiring, termination, discipline, work schedules, pay rates or pay methods of employees of the licensed Market Center or of Licensee. Licensee acknowledges and agrees that all employees of the licensed Market Center and of Licensee shall be the exclusive employees of Licensee and shall not be employees of Company nor joint employees of Licensee Company. Company neither dictates nor controls labor or employment matters for licensees and their employees and Company is not responsible for the safety and security of Market Center employees or customers.

(aa) Unless otherwise required by applicable law, all Client Information that Company obtains from Licensee and/or that Company, Licensee or any of Licensee's Associates collects from the Market Center and Associate Clients and all revenues Company derives from such Client Information will be Company's property and Company's confidential information that Company may use for any reason without compensation to Licensee or its Associates, including making a financial performance representation in Company's franchise disclosure documents. For and in consideration of the grant of the license in this Agreement, Licensee assigns, and will be deemed to have assigned, all rights in Client Information to Company. Licensee will provide copies of all Client Information to Company upon request. At Licensee's sole risk and responsibility, Company grants Licensee the right to use such Client Information that Licensee acquires from its Clients and its Associates' Clients and other third parties solely in connection with operating the Market Center at any time during the term of this Agreement, to the extent that Licensee's use is permitted by applicable law; provided that unless otherwise stated by Company in the Brand Standards Manual, Company will permit the Market Center's Associates to retain and use Client Information for its

own Clients at such Associate's sole risk and responsibility both during and after their association with the Market Center and/or the term of this Agreement. Upon expiration of the term of this Agreement, all of Licensee's copies of Client Information must be returned to Company and removed from Licensee's MC Operating System unless otherwise permitted in the Brand Standards Manual or required by applicable law; subject to the Market Center Associate's rights related to Client Information for their own Clients in accordance with this Agreement and the Brand Standards Manuals.

(ab) Licensee will take all necessary actions to independently: (i) learn and comply with all applicable Privacy Laws; (ii) learn and comply with the Brand Standards Manuals as they relate to Privacy Laws and the privacy and security of Client Information; (iii) learn and comply with any posted privacy policy and other representations made to the individual identified by Client Information that Licensee processes, and communicate any limitations required thereby to any authorized receiving party in compliance with all Privacy Laws; (iv) refrain from any action or inaction that could cause Company or its Affiliates to breach any Privacy Laws; (v) maintain, and cause adherence by Licensee's Group and Licensee's Associates to, all reasonable physical, technical and administrative safeguards and related policies for Client Information that is in Licensee's possession or control in order to protect such Client Information from unauthorized processing, destruction, modification, or use that would violate this Agreement, the Brand Standards Manual (which may include a non-exhaustive list of the minimum types of policies that must be implemented) or any Privacy Law; (vi) do and execute, or arrange to be done and executed, each act, document and thing Company deems necessary in its business judgment to keep Company and its Affiliates in compliance with the Privacy Laws; and (vii) immediately report to Company the breach of any requirements in this Agreement or the Brand Standards Manual regarding Client Information or any Privacy Law, or the theft or loss (or any apparent or alleged theft of loss) of Client Information (other than the Client Information of Licensee's own officers, directors, shareholders, employees or service providers). Licensee will, upon request, provide Company with information, reports, and the results of any audits performed regarding Licensee's data security policies, security procedures, or security technical controls related to Client Information. Licensee will, upon Company's request, provide Company or its representatives with access to Licensee's MC Operating Systems, records, processes and practices that involve processing of Client Information in order to mitigate a security incident or so that an audit may be conducted. Licensee will indemnify, defend and hold Company and its Affiliates, Regional Representatives, and their respective officers, directors, shareholders, members, managers, partners, employees, servants, independent contractors, attorneys, representatives, agents and associates harmless in connection with any claim or action arising out of or relating to: (i) any theft, loss or misuse (including any apparently or alleged theft, loss or misuse) of Client Information; and (ii) Licensee's breach of any of the terms, conditions or obligations relating to data security, Privacy Laws or Client Information set forth in this Agreement. Licensee will immediately notify Company upon discovering or otherwise learning of any theft, loss or misuse of Client Information. Licensee will, at Company's direction, but at Licensee's sole expense, (i) undertake remediation efforts on its own in concert with Company's directions, (ii) reasonably cooperate with any remediation efforts undertaken by Company and (iii) undertake efforts to prevent the recurrence of the same type of incident, including by paying for any remediation and post-breach monitoring process deemed appropriate by Company. Licensee will not make any public comment regarding and data security incident without Company's approval. Any notifications to the media or to Market Center Clients regarding theft or loss of Client Information will be handled exclusively by Company at Company's election and neither Licensee nor its Associates may contact Clients relating to such theft or loss unless Licensee

or is Associates are under a legal obligation to do so, in which case (i) Licensee must notify Company in writing promptly after concluding that Licensee or its Associate has the legal obligation to notify any Clients and (ii) Licensee and its Associates will limit the notices to Clients to those required by the legal obligation or as pre-approved by Company. Licensee will reasonably cooperate in connection with any notices to Clients regarding theft or loss and Licensee will assist with sending such notices upon request by Company.

## 7.
## TRADEMARKS AND COPYRIGHTED MATERIAL

**7.01 Trademarks.**

(a) Company grants Licensee a license to use the Trademarks during the term of this Agreement in accordance with the System and the related standards and specifications, as prescribed by the Company in writing from time to time.

(b) Licensee agrees that:

(1) Licensee shall use only the Trademarks designated by Company and shall use them only in the manner prescribed by Company in the Brand Standards Manuals or as otherwise stated by Company in writing.

(2) Licensee shall use the Trademarks only for the operation of the Market Center at the Approved Location, and in advertising and promoting the business conducted at or from the Market Center.

(3) Licensee agrees that at all times and in all advertising, promotions, other display materials, on its letterheads, business forms, and at the Market Center it shall identify the Market Center under an Assumed Name (d/b/a or tradename), that is approved by Company, together with the words "EACH OFFICE IS INDEPENDENTLY OWNED AND OPERATED" prominently displayed or such similar designation as shall be prescribed by Company. Licensee shall comply with Company's instructions in filing and maintaining the requisite trade name or fictitious name registrations and shall execute any documents deemed necessary by Company or its counsel to obtain protection for the Trademarks or to maintain their continued validity and enforceability.

(4) Licensee's right to use the Trademarks is limited to uses that are expressly authorized under this Agreement, and any unauthorized use shall constitute an infringement of Company's rights.

(5) Licensee shall not use the Trademarks to incur any obligation or indebtedness on behalf of Company or Licensee.

(6) Licensee shall not use the words "Keller," "Williams," "Keller Williams," "Keller Williams Realty," "Keller Williams Realty International," "KW," "KWR," "KWRI," "Keller Williams Commercial," "KW Commercial," "Keller Williams Luxury," "KW Luxury," "Keller Williams Luxury International," "KW Luxury International," "KW Worldwide," "KWW," or any other Trademark as part of its legal Business Entity name or the name of any sub-entity,

domain names, online postings, blogs, or social media accounts without Company's express prior written consent. Company shall condition such consent upon Licensee's execution of such powers of attorney, assignments, domain name agreements or other documents Company deems necessary to protect the Trademarks. Licensee shall take all reasonable efforts to ensure that its Associates comply with these Trademark requirements. Company consents to Licensee using the domain name identified in the Information Summary during the Term of this Agreement.

(c) Licensee expressly understands and acknowledges that:

(1) As between Company and Licensee, Company is the owner of all right, title and interest in and to the Trademarks and the goodwill associated with and symbolized by them.

(2) The Trademarks are valid and serve to identify the System and those who are authorized to operate under the System.

(3) Licensee's use of the Trademarks pursuant to this Agreement does not give Licensee any ownership interest or any other interest in or to the Trademarks, except the limited trademark license granted by this Agreement.

(4) As between Company and Licensee, all goodwill arising from Licensee's use of the Trademarks shall inure exclusively to Company's benefit, and upon termination, cancellation, expiration or transfer of this Agreement, no value shall be assigned to Licensee's business as attributable to any goodwill associated with Licensee's use of the System or the Trademarks.

(5) Licensee shall use best efforts and take all appropriate actions deemed necessary by Company at Company's request to cause Licensee's Associates to cease or to refrain from any infringement or unapproved use of the Trademarks.

(d) Licensee shall not directly or indirectly contest the validity or Company's ownership of or right to use the Trademarks.

(e) Subject to this Section 7.01, the right and license of the Trademarks granted hereunder to Licensee is non-exclusive, and Company retains the rights, among others:

(1) To use the Trademarks themselves in connection with selling products and services, including, without limitation, real estate products and services;

(2) To grant other licenses for the Trademarks, in addition to those licenses already granted to existing Licensees;

(3) To develop and establish other systems using the same or similar Trademarks, or other proprietary marks, and to grant licenses or franchises thereto without obligation to Licensee; and

(4) To engage, directly or indirectly, through its employees, representatives, Licensees, assigns, agents, and others, at wholesale, retail, or otherwise, in (1) the production, distribution, license, and sale of products and services, including, without limitation, real estate products and services, and (2) the use in connection with such production, distribution, license and

sale, of the Trademarks and any and all other trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs, and other identifying characteristics as may be developed or used from time to time by Company.

(f) Company reserves the right to substitute different Trademarks for use in identifying the System and the business operating thereunder if Company's currently owned or used Trademarks no longer can be used, or if Company, in its discretion, determines that substitution of different Trademarks shall be beneficial to the System. In such event, Company may require Licensee, at Licensee's sole expense, and within the time period designated by Company to discontinue or modify Licensee's use of any of the Trademarks or to use one or more additional or substitute Trade Dress, trade names, service marks, trademarks, symbols, logos, emblems, and indicia of origin.

**7.02 Copyrighted Material**.

(a) Licensee shall not modify, copy, distribute or otherwise disseminate any of the Copyrighted Materials in violation of the restrictions and limitations imposed by this Agreement. Licensee shall observe all requirements for affixing copyright notices to any materials as Company may require and shall use other appropriate notices of ownership, registration and copyright required by Company. Licensee may not incorporate the Copyrighted Materials into any materials it creates without the prior express written consent of Company.

(b) Company may require Licensee to enter into a KWU Materials License Addendum to this Agreement that provides Licensee electronic access to certain educational materials specifically designated by Company. Such materials provided pursuant to the KWU License Addendum specifically do not include educational materials developed by the MAPS Coaching Division of Company. Company reserves the right to charge a fee for its educational materials and reserves the right to modify the KWU Materials License Addendum in the future. As of the date of this Agreement, Company provides its educational materials to Licensee without charge as long as Licensee signs the KWU Licensing Addendum.

**7.03 Infringement**.

Licensee shall immediately notify Company of any infringement of the Trademarks or any Copyrighted Material or challenge to its use of any of the Trademarks or claim by any Person of any rights in any of the Trademarks or the Copyrighted Material. No member of the Licensee's Group shall communicate with any Person other than Company and Company's counsel in connection with any such infringement, challenge, or claim. Company shall have discretion to take such action as it deems appropriate and the right to exclusively control any litigation and any Patent and Trademark Office or Copyright Office proceeding or other proceeding arising out of any infringement, challenge, or claim or otherwise relating to any of the Trademarks or the Copyrighted Material. Licensee agrees to execute all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of Company or Company's counsel, be necessary or advisable to protect and maintain Company's interests in any such litigation or proceeding or otherwise to protect and maintain Company's interest in the Trademarks and the Copyrighted Material.

## 8.
## CONFIDENTIAL INFORMATION

**8.01 Confidential Brand Standards Manuals.**

(a) In order to protect the reputation and goodwill of Company and to maintain high standards of operation under the Trademarks, Licensee shall conduct its business in accordance with the Brand Standards Manuals or as otherwise stated by Company in writing.

(b) The Licensee's Group shall at all times treat the contents of the Brand Standards Manuals as confidential and shall use all reasonable efforts to maintain such information as such. The Licensee's Group shall not at any time copy, duplicate, publish electronically, record or otherwise reproduce the Brand Standards Manuals, in whole or in part, nor otherwise make available to any unauthorized Person.

(c) The Brand Standards Manuals shall at all times remain the sole property of Company. Hard copies of the then-current Brand Standards Manuals shall at all times be kept in a secure place on the Market Center premises (if applicable); and electronic versions of the Brand Standards Manuals shall be safeguarded with appropriate electronic and physical protections as generally available or as otherwise stated by Company in writing.

(d) Company may from time to time revise, supplement or replace the Brand Standards Manuals, directly and independently or in consultation with the International Associate Leadership Council, and Licensee expressly agrees to comply with each new or changed standard. Company may distribute the Brand Standards Manuals to its Licensees in hardcopy or electronic form.

(e) Licensee shall at all times ensure that its copy of the Brand Standards Manuals is kept current, and Licensee acknowledges that Company shall have no obligation to notify Licensee of each and every update or modification to the Brand Standards Manuals. In the event of a dispute as to the contents of the Brand Standards Manuals, the contents of the master copy of the Brand Standards Manuals maintained by Company shall control.

(f) Company reserves the right to impose a reasonable fee, which Licensee must promptly pay, for any upgrade or modification to the Brand Standards Manuals or any replacement set of Brand Standards Manuals or specific Manual requested by Licensee.

(g) The Brand Standards Manuals shall supplement and are incorporated by reference into this Agreement and shall form a part of the agreement between Licensee and Company.

(h) The System does not include any personnel policies or procedures or security-related policies or procedures that Company (at its option) may make available to Licensee in the Brand Standards Manuals or otherwise for Licensee's optional use. Licensee will determine to what extent, if any, personnel or security-related policies and procedures might apply to operations at the Market Center.

**8.02 Confidential Information.**

(a) No member of the Licensee's Group shall communicate, divulge or use for the benefit of any other Person any confidential information, knowledge or know-how concerning the

Case 2:23-bk-14467-WB Doc 38 Filed 04/07/25 Entered 04/07/25 19:02:47 Desc


methods of operation of a Market Center or the System. Licensee, each Controlling Principal and each Licensee's Principal shall divulge such confidential information only to such members of the Licensee's Group and Associates as must have access to it to conduct the business of the Market Center. All information, knowledge, know-how and techniques used in or related to the System that Company communicates to members of the Licensee's Group in writing or otherwise including, but not limited to, the MC Operating Software, the Brand Standards Manuals, its training concepts, materials and techniques, the structure and operation of the Associate Leadership Councils and the Profit Sharing Plan and such other information Company designates as confidential, shall be deemed confidential for purposes of this Agreement. No member of the Licensee's Group shall copy, duplicate, record or otherwise reproduce such materials or information, in whole or in part, nor otherwise make them available to any unauthorized Person. The covenants in this Section 8.02 shall be perpetually binding upon the members of the Licensee's Group, and shall survive the termination, cancellation, expiration or transfer of this Agreement.

(b) Licensee shall require its Operating Principal, Team Leader, Market Center Administrator, Licensee's Principals and any other member of the Licensee's Group who has received or shall have access to any confidential information of Company (and who have not executed the Agreement and Guaranty of Controlling Principals or Undertaking of Licensee's Principals) to execute covenants stating that they shall maintain the confidentiality of information that they receive in connection with their relationship with Licensee beyond the termination, cancellation, expiration or transfer of this Agreement. Such covenants shall be substantially in the form of Attachment E. Furthermore, all of Licensee's Associates shall enter into an agreement with Licensee that includes a covenant that requires the Associates to maintain the confidentiality of the lists of customers or Associates and any other similar confidential information that such Associates receive in connection with their relationship with Licensee. Licensee shall promptly notify Company of any breach or anticipated breach of a confidentiality covenant. Licensee shall indemnify, defend and hold Company, its Regional Representatives and/or Affiliates harmless for any breach of these covenants by such individuals.

(c) If any member of the Licensee's Group develops any new concept, process, literature, or improvement in the operation or promotion of the Market Center based on information provided to them by Company or otherwise developed for use in the System, Licensee agrees to promptly notify Company and provide Company with all necessary information concerning same, without compensation. Licensee, each Controlling Principal and each Licensee's Principal acknowledges on their behalf and on behalf of each member of the Licensee's Group that any such concept, process, literature, or improvement shall become the property of Company and Company may utilize or disclose such information to other Licensees as it determines to be appropriate. However, if any member of the Licensee's Group develops any new concept, process, or improvement in the development, operation, or promotion of Market Centers independently, not based on or related to any information provided to them by Company or otherwise developed for use in the System, such concept, process, or improvement shall remain the property of Licensee or such related party, but Company shall have a royalty-free license to use and to allow other participants in the System to use such concept, process or improvement throughout the remaining term of this Agreement and any renewal terms.

(d) Licensee, each Controlling Principal and each Licensee's Principal acknowledge on their behalf and on behalf of each member of the Licensee's Group that any failure to comply with the requirements of this Section 8.02 shall constitute a material event of default under Section 15.04

(d) and shall cause Company irreparable injury for which no adequate remedy at law may be available. Licensee, each Controlling Principal and each Licensee's Principal accordingly consent on their behalf and on behalf of each member of the Licensee's Group to the issuance of an injunction prohibiting any conduct by any member of the Licensee's Group in violation of this Section 8.02. Licensee, each Controlling Principal and each Licensee's Principal agree to pay all expenses (including court costs and reasonable attorneys' fees) incurred by Company in enforcing this Section 8.02 (including obtaining specific performance, injunctive relief, or any other equitable or other remedy available to Company for any violation of the requirements of this Section 8.02).

## 9.
## INTERNET USAGE

**9.01 <u>Internet Usage</u>.**

(a) Except as set forth in this Section 9.01, Licensee shall have no authority to, and shall not, display or use any of the Trademarks in connection with any advertisement, listing or transaction on the internet except as part of the approved DBA Name specified in the Information Summary to this Agreement. Licensee agrees that the domain names www.kellerwilliams.com, www.kellerwilliamsrealty.com, www.kw.com, and www.kwworldwide.com are Company's sole property, and agree not to register or use any domain name, online postings, blogs, URLs, or social media accounts that contains the words "Keller Williams," "Keller Williams Luxury," "KW Luxury," "Keller Williams Luxury International," "KW Luxury International," "Keller Williams Commercial," "KW Commercial," "KW Worldwide," "KWW," the initials "KW," "MAPS" or any other words or symbols designated by Company. Licensee's use of the Trademarks on the internet shall be governed by the provisions of Article 7 and Section 11.02 that govern the use of the Trademarks in advertising and by this Section 9.01(a) through (f). Licensee shall use best efforts and take all appropriate actions deemed necessary by Company to cause Licensee's Associates to cease or to refrain from any improper or unapproved usage of the internet.

(b) Licensee must obtain Company's prior written approval of any domain name, blog, URLs, or social media account name that Licensee or any of Licensee's Associates proposes to use. At Company's option, the domain name, URL, or social media account shall be registered in Company's name and licensed by Company to Licensee during the term of this Agreement. The form, content and appearance of Licensee's or any Associate's website shall comply with the standards stated in the Brand Standards Manuals and shall be approved by Company in writing before Licensee or its Associates posts the website on the internet.

(c) Licensee (or Licensee's Associate) shall install a hypertext link to Company's website in the form Company requires. Any change to or modification of Licensee's or any Associate's website as they relate to Company's standards and specifications must have Company's prior written approval (which shall not be unreasonably withheld).

(d) Licensee (or Licensee's Associate) must obtain independent legal advice concerning the content of Licensee's or any Associate's website and ensure at all times that it complies with all relevant legal requirements. Company is not responsible for any content contained on Licensee's or any of Licensee's Associates websites that violates state, federal or local laws and regulations, fails to provide appropriate disclaimers or notices, or that contains misrepresentations or inaccurate information, and Licensee will indemnify Company with respect to any such websites.

(e) Licensee agrees that electronic commerce remains a rapidly developing field and that the provisions of this Section 9.01(a) through (f) may need to be modified in the future or that guidelines on use of the internet may be introduced in the Brand Standards Manuals or otherwise by Company in writing. In the event that Company makes such modifications or issues such guidelines, Licensee agrees that they shall be legally binding on Licensee (or Licensee's Associate) to the extent permitted by applicable law.

(f) On termination, cancellation, expiration or transfer of this Agreement, any license of a domain name to Licensee (or Licensee's Associate) shall automatically terminate, and Licensee shall undertake all actions that Company requires to disassociate Licensee (or Licensee's Associate) from the website and the domain name.

## 10.
## ACCOUNTING AND RECORDS

**10.01 Accounting and Records.**

(a) Licensee shall maintain during the term of this Agreement, and shall preserve for at least seven years from the termination, cancellation, expiration or transfer of the license, full, complete and accurate books, records and accounts relating to the operation of the Market Center. Licensee shall retain all listing agreements, sales contracts, HUD statements, green sheets (formerly blue sheets), purchase orders, payroll records, bank statements, sales tax records and returns, cash receipts and disbursement statements, journals and ledgers in the form and manner prescribed by Company from time to time in the Brand Standards Manuals or otherwise in writing.

(b) Licensee shall Transmit to Company the following statements and reports on the initial Transmittal Date and subsequently not later than the dates indicated in this Section (or as otherwise requested by Company):

(1) A monthly statement of Gross Revenues and Production Royalty, which Licensee shall prepare and Transmit not later than midnight Central time on the 3rd Business Day of each month with respect to the Market Center's results for the preceding month;

(2) A monthly statement setting forth Licensee's Profit Sharing Contribution, calculated as set forth in Section 12.01, which Licensee shall prepare and Transmit not later than midnight Central time on the 3rd Business Day of each month with respect to the Market Center's results for the preceding month;

(3) A monthly balance sheet and fiscal year-to-date profit and loss statement for the Market Center, which Licensee shall prepare and Transmit not later than midnight Central time on the 3rd Business Day of each month with respect to the Market Center's condition and operating results for the period ending the last day of the preceding month;

(4) A monthly production report for all of Licensee's Associates, which Licensee shall prepare and Transmit not later than midnight Central time on the 3rd Business Day of each month with respect to the Associates' production for the preceding month;

(5) A monthly report setting forth Licensee's contributions to any Cooperative described in Section 11.01(b), which Licensee shall prepare and Transmit not later than midnight

Case 23-31174-mvl11 Doc 341 Filed 04/07/25 Entered 04/07/25 17:30:41 Desc Main Document Page 58 of 125

Central time on the 3rd Business Day of each month with respect to Licensee's contributions for the preceding month; and

(6) An Annual Business Plan no later than December 10th, of each year during the term of this Agreement, which Licensee shall prepare and Transmit as directed by Company in accordance with Section 6.01(h)(2).

(c) Licensee shall retain a copy of all federal and state sales and excise tax returns for the Market Center, which Licensee shall provide as directed by Company upon Company's request.

(d) Licensee acknowledges that Company operates as an "open book" organization and agrees that Company shall have the right, at any time and for any reason, to use any financial report or statement, or any information derived therefrom, relating to the Market Center or the services Licensee and its Affiliates provide.

(e) Licensee shall promptly create, prepare, execute and submit to Company, for review or auditing, such other forms, graphs, reports, records, information and data as Company may reasonably designate, in the form and at the times and places reasonably required by Company. Licensee shall furnish Company a copy of all such documents without cost to Company.

(f) Company or its designee shall have the right at all reasonable times to examine and copy, at Company's expense, the books, records and tax returns of Licensee. Company shall also have the right, at any time, to have an independent audit made of the books of Licensee. If an inspection reveals that any payments have been understated in any report to Company, then Licensee shall immediately pay to Company the amount understated upon demand, in addition to interest from the date such amount was due until paid at the highest lawful rate permitted by applicable Texas and federal law, except as otherwise provided herein with respect to Profit Sharing Contributions. If an inspection discloses an understatement in any report of 2% or more in any 12-month period, or if Licensee's financial records require a substantial restatement (as determined in the sole judgment of Company) to be readily reviewed or audited, Licensee shall, in addition, reimburse Company for all costs and expenses connected with the inspection (including transportation, meals, lodging, wages, expenses and reasonable accounting and legal costs). If an inspection reveals that Licensee has overstated amounts due to Company and Licensee has made an overpayment of fees to Company, the amount of overpayment, without interest, shall be credited toward Licensee's future fees or payment on future invoices. If at any time Licensee is required to furnish any Licensee's Principal, lender, lessor, government agency or other Person audited financial statements with respect to Licensee or the Market Center, Licensee shall concurrently furnish Company with a copy of such audited financial statements.

(g) Licensee authorizes (and agrees to execute any other documents deemed necessary to effect such authorization) all banks, financial institutions, businesses, suppliers, manufacturers, contractors, vendors and other persons or entities with which Licensee does business to disclose to Company any requested financial information in their possession relating to Licensee or the Market Center. Licensee authorizes Company to disclose data from Licensee's reports, if Company determines, in its discretion, that such disclosure is necessary, advisable or useful to promote Company's or Licensee's business and the System, which disclosure may include disclosure to prospective or existing Licensees or other third parties.

# 11.
# ADVERTISING

**11.01 <u>Advertising</u>.**

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

(a) Licensee shall be obligated to spend or contribute the following sums in the manner provided below:

(1) If Company requests, Licensee shall pay Company or its designee up to $1,000 per calendar year for the development of literature, public relations programs, marketing and advertising materials and activities for the benefit of the System. However, Licensee shall not be required to pay more than $250 for any specific project, unless Licensee otherwise agrees.

(2) If Company requests, Licensee shall pay the cost of a website for the Market Center.

(b) Company shall have the right (subject to consultation with the Regional Associate Leadership Council for the region in which the Market Center is located) to designate any geographic area (*e.g.,* a designated marketing area (DMA) or an area of dominant influence (ADI)) as a region for purposes of establishing a regional advertising cooperative ("Cooperative"). A Cooperative may be composed of two or more Market Centers and shall consist of all Market Centers in the area. If a Cooperative has been established for the area in which the Market Center is located at the time Licensee commences business, or if a Cooperative applicable to Licensee's Market Center is established at any later time during the term of this Agreement, Licensee shall immediately execute such documentation as required by Company and become a contributing member of the Cooperative.

(1) Each Cooperative shall be organized and governed in a form and manner, and shall commence operation on a date, approved in advance by Company.

(A) Each Cooperative shall be organized for the purposes of, and all payments pursuant to Section 11.01(b)(1)(D) and any earnings thereon shall be used exclusively to meet the costs of maintaining, directing and preparing advertising or promotional activities, including the cost of preparing and conducting electronic, online, television, radio, or print advertising campaigns; direct mail and outdoor billboard advertising; marketing surveys and other public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other marketing materials to Market Centers in the region.

(B) Each Cooperative shall be Company's designee for maintaining and administering advertising and promotional programs in its region. Licensee shall submit to the Cooperative and to Company such statements and reports as may be required by Company or the Cooperative. All contributions to the Cooperative shall be collected, administered and disbursed solely in accordance with the documentation governing the Cooperative and for the purposes outlined above.

(C) No advertising or promotional plans or materials may be used by a Cooperative or furnished to its members without the prior written approval of Company. All such plans and materials shall be submitted to Company in accordance with Section 11.02(a).

Case 22-13422-WB Doc 38 Filed 04/07/22 Entered 04/07/22 17:30:21 Desc Exhibit A Page 60 of 125

LICENSEE Initials/Date RC _____

(D) Licensee shall make contributions to the Cooperative at the rate or in the amount specified in the related Cooperative Advertising Agreement, payable not later than the 7th Business Day of each month, for the preceding month. However, subject to the restriction in Section 11.01(c)(1), Licensee shall not be required to pay a Cooperative contribution of more than ½% of Licensee's Gross Revenues for the preceding month unless otherwise agreed by the members of the Cooperative and subject to Company's approval. Licensee shall submit to the Cooperative and to Company such statements and reports as may be required by Company or by the Cooperative with Company's approval. Licensee's obligation to provide such statements or reports shall be subject to Article 10.

(2) Company, in its discretion, may grant an exemption to any Licensee for any length of time from the requirement of membership in a Cooperative, upon written request of such Licensee stating reasons supporting such exemption. Company may require as a condition of granting such exemption that the Licensee expend on local advertising, in a manner approved in advance by Company, and supported by such proof of expenditures as Company may require, at least the amount that the Licensee would have contributed to a Cooperative. Company's decision concerning such request for exemption shall be final.

(c) Company reserves the right to establish and administer an International Advertising Fund (the "Fund") in coordination with the International Associate Leadership Council for the advertising and promotion of the Trademarks and Market Centers as a group as follows:

(1) Licensee shall, not later than the 7th Business Day of each month contribute to the Fund an amount up to ½% of Licensee's Gross Revenues for the preceding month. Licensee shall allocate its contributions as Company may designate between the Fund and any Cooperative designated for Licensee's region. However, Licensee shall not be obligated to expend or contribute more than ½% of Licensee's monthly Gross Revenues to the Fund and Cooperative, combined.

(2) Licensee shall make contributions to the Fund as required under Section 11.01(c)(1), and further agrees that the Fund shall be maintained and administered by Company or its designee, as follows:

(A) Company shall oversee all advertising and promotional programs with discretion to approve or disapprove the creative concepts, materials and media used in such programs, and the placement and allocation thereof. Licensee agrees and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Trademarks for the benefit of the System.

(B) The Fund, all contributions thereto, and any earnings thereon shall be used exclusively by Company to meet any and all costs of maintaining, administering, directing and preparing advertising and promotional activities including, among other things, the cost of preparing and conducting electronic, online, television, radio, or print advertising campaigns; direct mail and outdoor billboard advertising; marketing surveys, and other public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other marketing materials to the market centers operated under the System. In administering the Fund, Company and its designees undertake no obligation to make expenditures for Licensee which are equivalent or proportionate to its contribution or to ensure that any particular Licensee benefits directly or *pro rata* from the placement of advertising. Company shall contribute to the Fund on the same basis as Licensee with respect to any Company-operated market centers.

(C) Except as may be otherwise provided in Section 6.01(k), Licensee

shall contribute to the Fund by electronic fund transfer or in such other manner as directed by Company. All sums paid by Licensee to the Fund shall be maintained in an account separate from the other monies of Company and shall not be used to defray any of Company's expenses, except for such reasonable administrative costs and overhead as Company may incur in activities reasonably related to the administration or direction of the Fund and advertising programs for Licensees and the System as set forth in Section 11.01(c)(2)(B).

(D) The Fund shall not be an asset of Company or its designee. The Fund and its earnings shall not otherwise inure to the benefit of Company. The Fund is operated solely as a conduit for the collection and expenditure of the advertising fees for the purposes outlined above. Company or its designee shall maintain separate bookkeeping accounts for the Fund. A statement of the operations of the Fund as shown on the books of Company or its designee shall be prepared annually by Company and shall be made available to Licensee upon Licensee's request.

(E) Although the Fund is intended to be of perpetual duration, Company maintains the right to terminate the Fund. The Fund shall not be terminated, however, until all monies in the Fund have been expended for advertising or promotional purposes.

(d) Licensee's obligations to the Cooperative and the Fund shall be in addition to and not in lieu of, except as expressly provided above in Section 11.01(b)(1)(D) and (c)(1), any obligations of Licensee described in Sections 11.01(a)(1) and (2).

**11.02 Advertising Approval and Procedures.**

(a) All advertising, marketing and promotion to be used by Licensee shall be of such media and of such type and format as Company may approve, shall be conducted in a dignified manner and shall conform to the standards and requirements of Company as set forth in the Brand Standards Manuals or otherwise in writing. Licensee shall obtain Company's prior written approval of all advertising and promotional plans and materials that Licensee desires to use that either do not meet the standards and specifications set forth in the Brand Standards Manuals or that have not been designed or previously approved by Company. Licensee shall submit such unapproved plans and materials to Company, and Company shall approve or disapprove such plans and materials within 14 days from the date of their receipt by Company. Licensee shall use no such plans or materials until they have been approved by Company and shall promptly discontinue use of any advertising or promotional plans or materials upon notice from Company. In all cases, Company has sole discretion and control over any profiles using or relating to the Trademarks, or that display the Trademarks, that are maintained on social media outlets. Company may (but need not) establish guidelines pursuant to which Licensee may establish profiles or otherwise establish a presence on social media. In such event, Licensee shall comply with the standards, protocols and restrictions that Company imposes from time to time on such use, and Company shall have the right to revoke any prior permissions as it deems appropriate due to any violations thereof. Company may use part of the Fund monies it collects under this Agreement to pay or reimburse the costs associated with the development, maintenance and update of such profiles. Company may, but need not, establish guidelines pursuant to which Licensee may establish profiles or otherwise establish a presence on such social media outlets. In that event, Licensee shall comply with the standards, protocols and restrictions that Company imposes from time to time on such use.

(b) Company shall from time to time develop and administer advertising and company promotion programs designed to promote, inform and enhance the collective success of all Market Centers. Licensee shall have the right to participate actively in all such advertising and promotion

programs, but only in accordance with such terms and conditions as may be established for each such program. The standards and specifications established by Company shall be final and binding upon Licensee in all aspects of such advertising and promotion programs.

(c) Licensee shall have the right to sell its products and offer services at any price it may determine and shall in no way be bound by any price that may be recommended or suggested by Company.

## 12.
## PROFIT SHARING PLAN

**12.01 Profit Sharing Contribution.**

Company shall license or lease to Licensee the MC Operating Software, which was designed in part to assist Licensee in calculating its monthly Profit Sharing Contribution, pursuant to the Software License Agreement attached as Attachment D. The method of determining Licensee's Profit Sharing Contribution is described in the Profit Sharing Contribution Calculation set forth in Attachment F to this Agreement. Licensee shall calculate and pay the appropriate percentage of monthly profit as the Market Center's Profit Sharing Contribution and shall submit a monthly report to Company with the Profit Sharing Contribution setting forth the Profit Sharing Contribution calculation for such month as described in Section 10.01(b).

**12.02 Sponsor Distribution.**

Company administers the Profit Sharing Account and uses the Profit Sharing Account each month to pay Sponsor Distribution Percentages to recruiting Sponsors of producing Associates in profitable Market Centers. The method of determining Sponsor Distribution Percentages, the standards for determining a Sponsor's eligibility and vesting rights to share in Sponsor Distribution Percentages, and the procedures for resolving questions and disputes regarding sponsorships and Associate downline structures are described in the Brand Standards Manuals.

**12.03 Profit Sharing Plan Procedures.**

(a) Company shall have no responsibility or liability to any Person arising out of or in connection with the administration of the Profit Sharing Account other than (1) determining the Sponsor Distribution Percentages earned by recruiting Sponsors based on the standards stated in the Brand Standards Manuals and relying upon data furnished to it by Licensee and other Licensees operating under the System, (2) distributing such Sponsor Distribution Percentages, to the extent that funds are available in the Profit Sharing Account, to recruiting Sponsors on or before the 21st day following the close of the month or as soon thereafter as is practicable following receipt of all Licensee data for the month, and (3) providing to Licensee and other Licensees monthly reports of Profit Sharing Contributions received and Sponsor Distribution Percentages paid in a form designated and approved by Company, within a reasonable period of time. Funds held in the Profit Sharing Account are general assets of Company and subject to claims of its creditors.

(b) In the event that Licensee fails to pay its Profit Sharing Contribution for any month to Company not later than the 7th Business Day of the following month (a "Delinquent Licensee"), Company shall assess a Late Payment Fee, payable to the Profit Sharing Account, against each Delinquent Licensee of $500 for each day that it fails to pay its Profit Sharing Contribution. Sponsor

Distribution Percentages for recruiting Sponsors attributable to the Monthly Profit of a Delinquent Licensee, when paid, the Delinquent Licensees' Profit Sharing Contribution may be added to all other Profit Sharing Contributions for purposes of calculating Sponsor Distribution Percentages for the applicable month in which it is received (or the preceding month, if the Delinquent Licensees' Profit Sharing Contribution is received within seven days following the last day of a month) and the Gross Commissions to which such Delinquent Licensee's late Profit Sharing Contribution relates shall be included in such later month's Gross Commissions for purposes of calculating Sponsor Distribution Percentages.

(c) In its administration of the Profit Sharing Account, Company, at the direction of the International Associate Leadership Council, shall have the authority and discretion to adopt guidelines and policies to determine Profit Sharing Contributions, Sponsor Distribution Percentages, and to make adjustments and set-offs as necessary to correct any errors or to reflect adjustments necessary in the case of a Delinquent Licensee. Licensee agrees to take any actions reasonably necessary to assist Company in order to correct any overpayment of a Profit Sharing Distribution made to a Sponsor who is an Associate of Licensee, including deducting the amount of such overpayment from subsequent Associate Commissions earned by such Sponsor and paying Company the amounts so deducted.

(d) Following the monthly Sponsor Distribution Percentages distribution, Company shall determine whether any funds remain on hand in the Profit Sharing Account arising from earnings on the Profit Sharing Account, fees paid by any Delinquent Licensee, or arising under the Sponsor Distribution Percentages calculation. If any funds remain on hand, Company shall retain such funds in an interest-bearing account until the International Associate Leadership Council shall direct the use of such funds pursuant to procedures set forth in the Brand Standards Manuals.

## 13.
## INSURANCE

**13.01 <u>Insurance</u>.**

(a) Before the Opening Date, Licensee shall obtain and continuously carry during the term of this Agreement insurance of the types (including worker's compensation and various special liability coverage), in the amounts and with the coverage specified in the Information Summary and as may be designated or modified from time to time in the Brand Standards Manuals and in any lease for the Market Center. Unless the Brand Standards Manuals specify otherwise, Licensee shall carry insurance with the policy limits specified in the Information Summary. Each policy must (1) be primary and non-contributory; (2) be issued by an admitted insurance company(ies) with a rating of not less than "AVII" in the current Best Insurance Guide or approved by Company; (3) name Company, Representatives and such Affiliates of Company as Company may designate as "additional insureds" and shall contain an "Additional Insured-Designated Person or Organization" endorsement (or equivalent), except for workers' compensation insurance only, without any qualifying language; (4) provide that the insurance cannot be canceled or non-renewed, except upon 30 days advance written notice to Company; (5) contain a waiver of subrogation rights of the insurer(s) in favor of Company and its designated Affiliates, which waiver shall be effective regardless of whether any loss is caused by the act, omission or negligence of Company and its designated Affiliates, and (6) shall contain a "Waiver of Transfer Rights of Recovery Against Others" endorsement (or its equivalent).

(b) Licensee shall furnish Company certificates of insurance, all insurance policy endorsements and a copy of the insurance policies, both prior to the opening of Licensee's Market Center and thereafter and as requested by Company (but in no event less than once per calendar year). Renewal insurance certificates of insurance shall be delivered to Company 30 days prior to the expiration date of each insurance policy. All deductible amounts on all insurance policies required hereunder shall be disclosed in writing to and approved in advance by Company and noted on the applicable insurance certificate. If Licensee fails to maintain the required insurance, Company may, but shall not be obligated to, obtain coverage on Licensee's behalf and charge the cost to Licensee. Licensee agrees to reimburse Company for the premium costs it incurs to provide such coverage, plus interest at the lower of 10% per annum or the maximum amount permitted by applicable law, within 10 days after Company submits a statement for its costs.

(c) Licensee may, with the prior written consent of Company, elect to have reasonable deductibles in connection with the coverage required under Section 13.01(b).

(d) Licensee's obligation to obtain and maintain the policy or policies in the amounts specified shall not be limited in any way by reason of any insurance that may be maintained by Company, nor shall Licensee's performance of that obligation relieve it of liability including costs of Company's defense under the indemnity provisions set forth in Section 19.02. Each of the foregoing policies shall contain a contractual coverage endorsement specifically insuring the performance of Licensee of the indemnity provisions set forth in Section 19.02.

## 14.
## TRANSFER OF INTEREST

**14.01 Transfer by Company.**

Company in its sole discretion shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations hereunder to any Person at any time without Licensee's consent. Specifically, and without limiting the foregoing, Company may sell its assets, the Trademarks or the System to a third party; may merge with or acquire other corporations or be acquired by another corporation; and may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring. With regard to any such sales, assignments and dispositions, Licensee expressly and specifically waives any claims, demands or damages arising from or related to the loss of the Trademarks or System against Company. If Company transfers or assigns its rights in this Agreement, such transfer or assignment shall constitute a novation as to Company and Company shall be released from all further liability to Licensee under this Agreement after the effective date of such transfer or assignment, and the transferee or assignee shall be liable to Licensee as if it was the original party to this Agreement. Nothing contained in this Agreement shall require Company to remain in the business of franchising the operation of Market Centers or to offer any services or products, whether or not bearing the Trademarks, to Licensee, if Company exercises its rights to assign its rights.

**14.02 Transfer by Licensee.**

(a) Licensee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Licensee and that Company has granted this license in reliance on the business skill, financial capacity and personal character of Licensee, each Controlling Principal and

each Licensee's Principal. Accordingly, neither Licensee nor any successor to any part of Licensee's interest in this license, nor any Person that directly or indirectly owns any interest in Licensee shall transfer any direct or indirect interest in this Agreement, in the Market Center or in Licensee without Company's prior written consent. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Company required by this Section 14.02 shall be void and shall constitute a material breach of this Agreement. Upon request by Company, Licensee shall produce a complete list of Licensee's Principals and any other information related to ownership of Licensee to provide Company with complete transparency of Licensee's ownership at all times. Failure to comply with Company's request for ownership transparency not only will be considered a breach of Company's business philosophy, culture and values, but will also be a material default under this Agreement. For purposes of this Agreement, a "**transfer**" shall include, whether voluntary or involuntary, directly or indirectly: an assignment, sale, gift or pledge; the grant of a mortgage, charge, lien or security interest (including the grant of a collateral assignment); any change of a trust's trustee, beneficiary or similar designations under applicable laws; a merger or consolidation, or issuance of additional ownership interests or redemption of ownership interests; a sale of voting interests or of securities convertible to voting interests, or an agreement granting the right to exercise, or control the exercise of, voting rights of any holder of an Ownership Interest; and a transfer that occurs as a result of divorce, insolvency, or entity dissolution or, upon death, by will, intestate succession or by declaration of, or transfer to, a trust.

(b) Company may withhold its consent to a transfer of any interest in Licensee or this Agreement in its discretion, or require any or all of the following as conditions of its approval:

(1) Each member of the Licensee's Group shall have satisfied all monetary and legal obligations they owe to Company and its Affiliates and to any business creditors of each member of the Licensee's Group, and shall have timely met those obligations throughout the term of this Agreement;

(2) No member of the Licensee's Group shall be in default of any provision of this Agreement, any License Agreement or any other agreement between any member of the Licensee's Group and Company or its Affiliates; and each member of the Licensee's Group shall have fully complied with all the terms and conditions of such agreements during their terms;

(3) Licensee, each Controlling Principal, each Licensee's Principal, each transferor and/or each transferee (as directed by Company) shall have executed a general indemnification and release, in a form prescribed by Company, of all claims against Company and its Affiliates, Regional Representatives, and their respective officers, directors, shareholders, members, managers, partners, employees, servants, independent contractors, attorneys, representatives, agents and associates, in their corporate and individual capacities, covering, without limitation, claims arising under this Agreement and any other agreement between any member of the Licensee's Group, each transferor and each transferee and Company and its Affiliates and under federal, state and local laws, rules and ordinances, which indemnification and release shall be effective against all members of the Licensee's Group, each transferor and each transferee regardless of whether such members of the Licensee's Group or each such transferor and transferee have executed the indemnification and release and which indemnification and release shall cause Licensee, each Controlling Principal, each Licensee's Principal each transferor and each transferee to indemnify Company and its Affiliates with respect to claims brought by any such members of the Licensee's Group, each transferor and each transferee;

(4) Each transferee has demonstrated to Company's satisfaction that transferee meets the criteria considered by Company when reviewing a prospective Licensee's application for a license, including, but not limited to, Company's educational, managerial and business standards; transferee's good moral character, business reputation and credit rating; transferee's aptitude and ability to conduct the business of the Market Center (as may be evidenced by prior related business experience or otherwise); transferee's financial resources and capital for operation of the business; and the geographic proximity of other Market Centers operated by the transferee;

(5) Licensee and/or each proposed transferee shall establish to Company's satisfaction that the terms, conditions and structure of the sale are substantially commensurate with the fair market value for the purchased assets or interests and allow for sufficient cash flow after payment of all ordinary and necessary business expenses, including payment due to Company under this Agreement, to satisfy debt service including without limitation any assumed or existing debt, to satisfy or account for existing or potential liabilities, training costs and transferee's profit expectations; provided that Company's granting of consent to any such transfer shall not constitute any representations, warranties or guarantees by Company regarding the terms, conditions and structure of the sale. Company reserves the right to require Licensee and/or the proposed transferee to provide an appraisal of the purchased assets or interests reflecting a purchase price commensurate with the fair market value for the purchased assets or interests and to reject any transfer based on the debt service or existing or potential liabilities to be paid or assumed by the proposed transferee;

(6) Each transferee has executed, for a term ending on the expiration date of this Agreement and with such renewal terms as may be provided by this Agreement, the standard form License Agreement then being offered to new Licensees and such other ancillary agreements as Company may require for the Market Center; each transferee, the transferee's shareholders, members, managers, partners or other investors, shall execute such agreements as transferee's principals and shall guarantee the performance of all the transferee's obligations, contracts and agreements in writing in a form satisfactory to Company. Such agreements shall supersede this Agreement and its ancillary documents in all respects, except for surviving post-termination covenants and obligations, and the terms of such agreements may differ from the terms of this Agreement, including, without limitation, imposing higher Production Royalty and fees; provided, however, that the transferee shall not be required to pay any initial license fee in relation to the transfer;

(7) The transferee, at its expense, shall upgrade the Market Center to conform to the then-current standards and specifications of Market Centers, and shall complete the upgrading and other requirements within the time specified by Company;

(8) Each transferor shall remain liable for all of the obligations to Company in connection with the Market Center incurred prior to the effective date of the transfer and shall execute all instruments reasonably requested by Company to evidence such liability;

(9) At their own expense, each transferee and the Market Center's Operating Principal, Team Leader, Market Center Administrator, new Licensee's Principals and such other members of the Licensee's Group designated in the Brand Standards Manuals or otherwise in writing shall attend Franchise Systems Orientation and shall complete any other training programs then required for System Licensees upon such terms and conditions as Company may reasonably require;

(10) If Licensee sells or otherwise transfers its interests in this Agreement to a new licensee entity, Licensee shall provide evidence that the errors and omissions liability insurance

policy or policies required to be maintained pursuant to Section 13 of this Agreement, and as further specified in the Information Summary, has been either: (i) extended for a period of two (2) years beyond the date Company approves the transfer through the purchase of "tail" coverage; or (ii) replaced with a policy or policies maintained by the new licensee entity that expressly covers claims brought in connection with the operation of the Market Center prior to the transfer. Such policy or policies must name Company and its designated affiliates as additional insureds.

(11) Licensee or the new licensee entity shall pay a transfer fee in an amount up to $2,000 (currently $1,000) plus such actual amount necessary to reimburse Company for its costs and expenses associated with reviewing the application for transfer and effecting the transfer, including legal and accounting fees; and

(12) Licensee or the new licensee entity shall provide to Company evidence satisfactory to Company that the terms of Section 6.01(b) of this Agreement have been satisfied and are true and correct on the date of transfer.

(c) Licensee may grant a security interest in this Agreement to the limited extent permitted by Section 9-408 of the Uniform Commercial Code. Any such security interest may only attach to an interest in the proceeds of Licensee's business and may not under any circumstances entitle or permit the secured party to take possession of or operate Licensee's business or to transfer Licensee's interest in the rights under this Agreement without Company's express prior written consent. The grant of a security interest in a manner consistent with this Section shall not be subject to the prohibition in Section 14.02(a).

(d) Licensee acknowledges and agrees that each condition that must be met by the transferee is reasonable and necessary to assure such transferee's full performance of the obligations hereunder. If any member of the Licensee's Group fails to meet any condition of transfer, or if any member of the Licensee's Group misrepresents any statement to Company, Licensee must correct all elements of non-compliance, including misrepresentations, before the sale, assignment or transfer is completed (including correction of misrepresentations in time for Company to have a reasonable opportunity to consider and act on the corrected information). Licensee acknowledges that any such corrections will not guarantee Company's approval of the proposed transfer. Company does not waive any of its rights regarding defaults by consenting to a transfer.

**14.03 <u>Waiver of Tortious Interference Claims</u>.**

Licensee acknowledges that Company has legitimate reasons to evaluate the qualifications of potential transferees and to analyze and critique the terms of their purchase contracts and the proposed transfer with Licensee. Licensee also acknowledges that Company's contact with potential transferees for the purpose of protecting its business interests shall not constitute improper or unlawful conduct. Licensee expressly authorizes Company to investigate any potential transferee's qualifications, to analyze and critique the proposed purchase terms with the transferee, and to withhold consent to economically, operationally or other questionable transactions. Licensee waives on behalf of each member of the Licensee's Group any claim that action Company takes in relation to a proposed transfer to protect its business interests constitutes tortious interference with contractual or business relationships.

**14.04 Right of First Refusal.**

(a) Any Person holding any interest, including interests acquired upon death or permanent disability, in this Agreement or in Licensee who desires to accept any *bona fide* offer from a Person, including any Controlling Principal or Licensee's Principal, to purchase such interest shall promptly notify Company in writing of each such offer, and shall provide such information and documentation relating to the offer as Company may require. Company shall have the right and option, exercisable within 90 days after receipt of such written notification and all information and documentation related to the offer that Company requires, to send written notice to the seller that Company intends to purchase the seller's interest on the same material terms and conditions offered by the proposed transferee. In the event that Company elects to purchase the seller's interest, closing on such purchase must occur within 90 days from the date Company receives all information and documentation relating to the offer that Company deems necessary for its review of the offer. Any material change in the terms of any offer prior to closing constitutes a new offer subject to the same rights of first refusal by Company as in the case of an initial offer. The application of this Section shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Article 14, with respect to a proposed transfer.

(b) If an offer from any Person provides for payment of consideration other than cash or involves certain intangible benefits, Company may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash part of the consideration, an independent appraiser shall be designated by Company and approved by Licensee, which approval shall not be unreasonably withheld, to determine such amount. The appraiser's determination shall be binding on all parties.

(c) If Company elects not to exercise its right of first refusal during the 90-day period after receipt of all information and documentation relating to the offer that Company requires, or any additional 90-day period as a result of a material change in the terms of the offer, then, provided that the conditions set forth in Section 14.02 are satisfied, the party proposing to transfer the interest may do so upon the terms and conditions set forth in the written notification at any time during the period beginning on the day after the end of the 90-day period in which Company may exercise its right of first refusal described in Section 14.04(a) and ending and additional 90 days thereafter. If the terms and conditions of the Person's offer are materially changed, or if such additional 90-day period shall have expired, then Company again shall have such right of first refusal with respect thereto and Licensee again shall be required to comply with the procedure set forth in this Section 14.04.

**14.05 Transfer Upon Death or Permanent Disability.**

(a) Upon the death of any individual with an interest in this Agreement or in Licensee (the "Deceased"), the executor, administrator or other personal representative of the Deceased shall transfer such interest to a third party approved by Company within 12 months after the death. If no personal representative is designated or appointed or no probate proceedings are instituted with respect to the estate of the Deceased, then the distributee of such interest must be approved by Company. If the distributee is not approved by Company, then the distributee shall transfer such interest to a third party approved by Company within 12 months after the death of the Deceased.

(b) Upon the permanent disability of any individual with an interest in this Agreement or in Licensee, Company may, in its discretion, require such interest to be transferred to a third party in accordance with the conditions described in this Article 14 within 6 months after notice to Licensee. "Permanent disability" shall mean any physical, emotional or mental injury, illness or incapacity that would prevent an individual from performing the obligations set forth in this Agreement for at least 90 consecutive days and from which condition recovery within 90 days from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed physician selected by Company; or if the individual refuses to submit to an examination, such individual shall be automatically deemed permanently disabled as of the date of such refusal for the purpose of this Section 14.05. The costs of any examination required by this Section 14.05(b) shall be paid by Company.

(c) Upon the death or claim of permanent disability of any individual with an interest in this Agreement or in Licensee, Licensee or a representative of Licensee must promptly notify Company of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as described in this Article 14 for any other transfer. If an interest is not transferred upon death or permanent disability as required in this Section 14.05, in accordance with the terms and conditions of this Article 14, Company may exercise its remedies, including its right to terminate this Agreement.

**14.06 <u>Non-Waiver of Claims</u>.**

Company's consent to a transfer of any direct or indirect interest in the License for the Market Center shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Company's right to demand exact compliance with any of the terms of this Agreement by the transferee.

**14.07 <u>Offerings by Licensee/Indemnification</u>.**

Equity interests in Licensee may be offered by public or private offering only with Company's prior written consent, whether or not Company's consent is required under Section 14.02. Licensee shall submit all offering materials required to be registered with any federal or state agency to Company for its review not less than 15 Business Days prior to their being filed with any government agency, and shall submit any offering materials to be used in an exempt offering to Company for its review not less than 15 Business Days prior to the date Licensee proposes to begin using them. Licensee shall be responsible for engaging its own legal counsel for the preparation and issuance of any public or private offering in accordance with applicable law as well as any other corporate or securities related matters arising therefrom, and upon request shall provide to Company an opinion from Licensee's counsel regarding the legality of such offering. Company's review of any offering memorandum or prospectus shall be limited to the description of the Licensee's business, the relationship between Company and Licensee and Licensee's use of the Trademarks and the System, although Company may note and require that Licensee address any deficiency in the offering memorandum or prospectus that Company and/or its legal counsel identify. Any approval by Company shall not constitute an endorsement or ratification of the offering or the prospectus, either express or implied. No offering memorandum or prospectus shall suggest or imply (by use of the Trademarks or otherwise) that Company is sponsoring, endorsing or otherwise participating in the offering, nor shall any offering be structured or conducted in a manner that, in Company's good faith business judgment, might result in the Keller Williams name being associated with a fraudulent offering. Licensee's offering materials shall contain statements prescribed by Company disclaiming

Company's association with the offering. **Licensee and any other participants in the offering (including any members of the Licensee's Group participating in the offering) shall fully indemnify defend and hold Company, its Affiliates, successors and assigns and their respective officers, directors, shareholders, members, managers, partners, attorneys, servants, independent contractors, associates, agents representatives or employees, harmless from any Losses or Expenses including costs and expenses for separate counsel of Company's choice (as defined in Section 19.02(e) below) that arise out of or are based upon any public or private offering in which Licensee or any other participants in the offering engage, including for any securities law violations with which Company or its Affiliates may be held responsible as a result of any failure of Licensee or any participants to provide legally adequate disclosure.** For each proposed offering, prior to Company beginning its review, Licensee shall pay to Company in advance a non-refundable fee of $2,500, which shall be used in part to reimburse Company for its reasonable costs and expenses associated with reviewing the proposed offering, including legal and accounting fees. Notwithstanding, following such review, Company may request additional reimbursement for any incurred costs in excess of the advance fee.

**14.08 Ownership of Multiple Market Centers.**

Licensee acknowledges that Company does not allow any Licensee or group of affiliated Licensees to acquire the rights to operate more than one Market Center unless the acquirer satisfies Company's criteria for multiple Market Center ownership. Licensee, each Controlling Principal and each Licensees' Principal expressly agrees not to acquire, agree to acquire or participate in the acquisition of the business or assets of any existing Market Center without notifying Company in advance of the acquirer's intentions, complying with Company's standards for multiple Market Center ownership, and obtaining Company's prior written consent to the acquisition. Licensee further acknowledges that Company reserves the right to limit the total number of Market Centers a Licensee, Licensee's Principal or group of affiliated Licensees may own and that Company may require any Person that exceeds the limit to divest itself of the number of Market Centers in excess of the prescribed maximum number.

## 15. DEFAULT

**15.01 General.**

If any event or condition listed in this Article 15 (an "Event of Default") occurs, Licensee shall be in default under this Agreement, whether or not Company gives notice of the default. Company's failure to take prompt action with respect to a particular Event of Default shall not constitute a waiver of that or any subsequent Event of Default.

**15.02 Notice and Opportunity to Cure.**

Following are Events of Default that Licensee (or another responsible Person) may cure by taking and completing appropriate remedial action within the time specified in relation to the Event of Default. Unless Licensee (or another responsible Person) cures such an Event of Default before the end of the indicated remedial period, Company may terminate the license or take any of the other actions Article 16 permits. If the Event of Default is cured to Company's satisfaction before Company gives Licensee notice of termination, Company shall not proceed under Article 16.

(a) Following are Events of Default that Licensee must cure within 14 calendar days after delivery of written notice by Company specifying the Event of Default:

(1) Licensee fails to pay in full when due any Production Royalty, Profit Sharing Contribution or other payment due to Company pursuant to Sections 5.02, 5.03 and 5.05, Article 12, or any trade account payable, including those to Company or its Affiliates, or any related Transmittal Fee or Late Payment Fee.

(2) Licensee, any Controlling Principal or any Licensee's Principal fails or refuses to honor a request for indemnification under this Agreement, including under Section 19.02 of this Agreement or Article XII of the Software License Agreement.

(3) Any member of the Licensee's Group breaches any of its obligations under any amendment or addendum executed (or required to be executed) in connection with this Agreement.

(4) Any member of the Licensee's Group breaches any restriction or obligation set forth in Article 9 or any related terms of use agreement.

(5) Any member of the Licensee's Group breaches any covenant or obligation set forth in Sections 7.01, 7.02, 7.03, or otherwise makes any unauthorized use of a Trademark, Copyrighted Material or any other element of the System.

(6) Any member of Licensee's Group fails to fulfill any requirement, to perform any obligation, or to observe any restriction set forth in the Brand Standards Manuals in accordance with Section 8.01 of this Agreement, including without limitation, obligations or restrictions regarding the development, participation in initial training, opening and operations of the Market Center and offer and sale of approved products or services in connection with the Market Center, or any other condition or restriction contained in the Brand Standards Manuals or this Agreement and not otherwise addressed in this Section.

(7) Any member of the Licensee's Group fails to unconditionally withdraw any application or registration or assist Company with a claim adverse to Company's interests with respect to (i) any internet domain name registered in the name of Company or its Affiliates or any internet domain name registered in the name of any member of Licensee's Group or any Associates that integrates any Trademark, (ii) any Trademark, (iii) any Copyrighted Material, or (iv) any element of the System.

(8) Licensee fails to obtain or maintain the insurance coverage required by Article 13.

(9) Licensee fails to open the Market Center in compliance with Sections 2.02(b) and 2.02(d).

(10) Licensee fails to comply timely with its obligations under Sections 6.01(h)(2) to submit monthly production goals or the Annual Business Plan.

(11) Licensee fails to meet its obligations under the Profit Sharing Plan in accordance with Section 12.01.

(12) Licensee fails to submit when due any document or report required or requested by Company pursuant to Section 10.01.

(13) Licensee fails to enter into an Independent Contractor Agreement that is in a form approved for current use in the Region in which the Market Center is located; or Licensee fails to obtain execution of the covenants and related agreements required under Sections 8.02(b) or 17.02(g).

(14) Licensee opens or allows to be opened an unauthorized office

(15) Licensee fails to submit an application for and obtain approval of a Mega Associate Office within 90 days of a Mega Associate joining Licensee's Market Center.

(b) Following are Events of Default that Licensee must cure within 30 calendar days after delivery of written notice by Company specifying the Event of Default:

(1) Any member of the Licensee's Group fails to fulfill any requirement, to perform any obligation, to observe any restriction or makes a misrepresentation or breaches a warranty or covenant set forth in Sections 6.01(b), 6.01(d) through (i), (m), (n), (p) through (y), or in Article 7.

(2) The Operating Principal fails to fulfill any requirement, to perform any obligation, or to observe any restriction set forth in Section 6.01(e) or Sections 6.01(h)(2) through (4).

(3) The Team Leader fails to fulfill any requirement, to perform any obligation or to observe any restriction set forth in Section 6.01(f) or Sections 6.01(h)(3) and (4).

(4) The Market Center Administrator fails to fulfill any requirement, to perform any obligation, or to observe any restriction set forth in Section 6.01(g) or Sections 6.01(h)(3) and (4).

(5) Licensee fails to pay when due any tax arising from the operation of the Market Center, or fails to timely obtain or maintain any permit, certificate or license, required to operate the Market Center.

(6) Licensee fails to fulfill any requirement or to perform any obligation set forth in Article 11 with respect to advertising and promotions or in Section 8.02(a) with respect to ownership restrictions and reports.

(7) The Operating Principal, Team Leader, Market Center Administrator or any of Licensee's Principals fails to complete the training required by Section 6.01(h)(1) prior to the Opening Date.

(8) Any member of Licensee's Group's failure to timely cure an Event of Default under another Keller Williams License Agreement, Regional Representative Agreement, or any other agreement with Company or its Affiliates or Regional Representatives.

(9) Any Associate engaged in expansion activities and affiliated with the Licensee signing this agreement (the home Market Center) fails to comply with the local standards, policies and guidelines of any other Keller Williams Licensee (the new Market Center where the Associate is expanding).

(c) Following are Events of Default that Licensee must cure within 60 calendar days after delivery of written notice by Company specifying the Event of Default:

(1) Licensee fails to timely identify, screen and designate a qualified and acceptable replacement after Company has revoked approval of or declined to approve a candidate for an Operating Principal as required by Section 6.01(e)(5) or a Team Leader as required by Section 6.01(f).

(2) The lease for the Market Center expires or is terminated on account of Licensee's default, and Licensee fails to timely reopen the Market Center in another location approved by Company.

(d) Following is an Event of Default that Licensee must cure within 150 calendar days after delivery of written notice from Company specifying the Event of Default: the lease for the Market Center terminates because of fire or other casualty and Licensee fails to open a new Market Center for business in another location approved by Company.

**15.03 Termination Without Prior Notice.**

Following are Events of Default that Licensee can cure only by taking and completing remedial action prior to Company's issuance of notice of termination to Licensee. If Company issues a notice of termination to Licensee prior to Licensee's completion of the remedial action, then the default will be considered not cured and Licensee's termination will be effective according to the terms of the notice.

(a) Any member of the Licensee's Group (i) fails to observe or comply with the requirements of Sections 14.02 in connection with any sale, assignment or transfer, (ii) fails to offer Company the right of first refusal as required by Section 14.04, (iii) makes a material misrepresentation in any transfer request or document in support of a transfer request or (iv) fails to comply with Section 18.01(e).

(b) The Market Center ranks in the bottom 25% of all Market Centers in terms of Gross Market Center Income, Core Profit, or Profit Sharing Contributions for eight consecutive months or for 10 of any 12 consecutive months and has failed to complete to Company's satisfaction any performance enhancement program Company requires.

(c) Any member of the Licensee's Group opens or acquires more than the maximum number of Market Centers that Company permits a single Licensee or group of related Licensees to own.

(d) Licensee forfeits the right to transact business in the jurisdiction where the Market Center is located.

(e) The license of the real estate broker under whose license the Market Center operates is suspended or revoked.

(f) A direct or indirect interest in the license or in Licensee is not timely transferred upon death or permanent disability as required by Section 14.05.

(g) Licensee revokes Company's authorization to deduct Production Royalty, Profit Sharing contributions, any fees and other payments from Licensee's bank account as Section 6.01(k) requires, or closes the account to which the authorization agreement applies without first having established another account and having signed and delivered to Company a new Electronic Debit Authorization Agreement in the form of Attachment C or another form acceptable to Company's bank in its discretion.

(h) Licensee refuses to permit Company to examine, copy or conduct an audit permitted under Sections 10.01(d) and (e).

(i) Licensee fails to meet the following minimum performance standards and does not attain the required standard before Company gives Licensee notice of termination:

(i) During any three-month period, maintain the average monthly Gross Commission after the period indicated:

Opening Date + 6 months: in excess of $20,000

Opening Date + 13 months: in excess of $45,000

Opening Date + 25 months in excess of $125,000;

(ii) During any six-month period, pay not less than the indicated average Production Royalty after the date indicated:

Opening Date + 13 months: $1,200 per month

Opening Date + 25 months: $2,400 per month

Opening date + 37 months: $3,000 per month

(j) By the 36th month after the Opening Date, the Market Center has not begun making Profit Sharing Contributions on a regular basis (i.e., in at least four out of any five consecutive months).

(k) Any member of the Licensee's Group misuses or makes any unauthorized use of the Trademarks or the System.

(l) Any member of Licensee's Group's failure to comply with the dispute resolution procedures herein.

(m) The Market Center does not have Monthly Profit in any 5 of the prior 12 months (on a rolling basis) and has a net loss over the prior 12-month period (on a rolling basis) and fails to complete to Company's satisfaction any performance enhancement program Company requires.

**15.04 <u>Termination Without Opportunity to Cure.</u>**

Following are Events of Default that are irreversible and cannot be cured; Licensee shall have no opportunity to cure these Events of Default.

(a) Company receives credible evidence, which it verifies to its reasonable satisfaction, that any member of the Licensee's Group has sexually harassed or intimidated any individual; has intentionally engaged in racial, ethnic, religious, sexual or other offensive discrimination against any individual or group; has knowingly engaged in any other activity or business practice that Company reasonably considers detrimental to the reputation or public image of Company or its Affiliates or their owners, directors, officers or employees, the Keller Williams Realty name or the network of Market Centers; has acted in a manner that conflicts with Company's mission statement, Company's business philosophy and culture or with Licensees' best interests regardless of whether any member of the Licensee's Group benefitted; or has knowingly engaged in conduct that is grossly unethical in relation to the culture and business values on which the System is founded, whether or not the behavior or conduct constitutes a violation of federal, state or local law.

(b) Licensee maintains false books or records or submits a materially false report to Company.

(c) Licensee or any member of the Licensee's Group sells the Market Center's assets or relocates the Market Center without Company's express prior written permission, Abandons the Market Center, transfers possession of its premises, or transfers any direct or indirect ownership interests in Licensee in violation of Section 14.02.

(d) Any member of the Licensee's Group breaches the confidentiality covenants in Section 8.02, the non-competition covenants in Section 17.02(a)(1); the covenants concerning use of the System, the Brand Standards Manuals or access to and use of the internet in Sections 6.01(d),

6.01(i), (j), and (o), or Section 9.01; or misrepresents any of the statements or breaches any covenant stated in Section 6.01(y) with respect to terrorist activities and money laundering.

(e) On three or more occasions in any 12-month period, Licensee fails to pay Production Royalty, Profit Sharing Contributions or any fees on time, or any member of the Licensee's Group commits or allows to occur three or more Events of Default**,** whether or not the Events of Default are related types of default and whether or not they are cured.

(f) On three or more occasions in any 12-month period, Licensee fails to Transmit within five days of the deadlines stated in Sections 10.01(b)(1), (2), and (3) any statement or report those sections require.

(g) Licensee or any Licensee's Principal becomes insolvent, is unable to pay the monetary obligations of Licensee or a Licensee's Principal as they mature, is adjudicated a bankrupt, voluntarily files a petition for liquidation or reorganization under any provision of the United States Bankruptcy Code, makes an assignment for the benefit of creditors or takes any other action pursuant to any federal or state insolvency statute.

(h) A receiver or trustee is appointed to manage Licensee's or any Licensee's Principal's assets, or a final judgment against Licensee or any Licensee's Principal for an amount in excess of $15,000 remains unsatisfied or of record for 30 days or longer (unless Licensee or such Licensee's Principal files a supersedeas bond before the end of the 30-day period).

(i) A suit to foreclose any security interest or other lien against any of the Market Center's assets is instituted and not dismissed within 30 days, or a sheriff, marshal or constable levies execution against any of the Market Center's assets to enforce a judgment obtained by any of Licensee's creditors.

(j) Any member of the Licensee's Group is convicted of, or pleads guilty or no contest to, a crime punishable by imprisonment for more than one year or that involves an offense that Company reasonably believes is likely to have an adverse effect on the goodwill associated with the Keller Williams name or the network of Market Centers.

**15.05 <u>Effective Time of Termination</u>.**

Termination of the license shall ordinarily become effective upon Company's delivery of written notice of termination to Licensee. However, if (1) an Event of Default occurs and (2) before Company delivers notice of default and/or notice of termination, a voluntary or involuntary petition is filed under any chapter of the United States Bankruptcy Code by, on behalf of, or against Licensee or any Licensee's Principal, and (3) the Event of Default remains unremedied at the time the bankruptcy or reorganization petition is filed, no notice of default or termination shall be required. Instead, if Licensee or any Licensee's Principal files a voluntary petition for liquidation or reorganization under the United States Bankruptcy Code, termination shall automatically become effective the instant a petition is signed by or on behalf of Licensee or any Licensee's Principal. If an involuntary petition is filed, termination shall automatically become effective the instant the petition is submitted to the clerk of the Bankruptcy Court for filing.

## 16.
## TERMINATION; OTHER REMEDIES

**16.01 Termination; Other Remedies.**

(a) If Licensee commits or allows an Event of Default to occur and does not cure it before the related remedial period, if any, expires, Company may at its discretion, but subject to compliance with applicable statutory notice and/or hearing requirements, either terminate the license and Licensee's rights under this Agreement or compel Licensee to sell the Market Center in accordance with Section 16.02. Upon termination, cancellation, expiration or transfer of the license, Licensee's right and privilege to use the Trademarks, the Trade Secrets, the Copyrighted Materials and all components of the System and the Brand Standards Manuals shall absolutely and unconditionally cease. Licensee shall immediately:

(1) discontinue use of the Trademarks, the Copyrighted Materials, the System, the Brand Standards Manuals and the Trade Secrets;

(2) return to Company each of the Brand Standards Manuals and any other printed, graphic or audio/visual item designated by Company as containing Trade Secrets;

(3) remove from the Market Center's premises all interior and exterior signs that depict any of the Trademarks; and

(4) alter the Market Center's interior to remove all Trade Dress items and otherwise eliminate the distinctive features of the Market Center concept.

(b) Licensee, at Company's option, shall assign to Company all rights to the telephone numbers assigned to the Market Center and any related classified directory listings and other business listings and advertising. Licensee shall execute all forms and documents required by any telephone company or phone service provider to transfer such service and numbers to Company. Notwithstanding Section 6.01(w), Licensee appoints Company its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. Such power of attorney shall survive the termination, cancellation, expiration or transfer of this Agreement. Licensee shall thereafter use different telephone numbers at or in connection with any subsequent business conducted by Licensee. Pursuant to the power of attorney, Company may revoke any call-forwarding or similar instructions Licensee has given the telephone company or phone service provider. Company shall have no liability to Licensee on account of or arising from any action Company authorizes or takes to effect the transfers contemplated by and in accordance with this Section 16.01(b). In addition, Company shall be entitled to injunctive or similar relief, without bond, against any member of the Licensee's Group to enforce compliance with these requirements.

(c) If Licensee does not comply with the requirements of Section 16.01(a) within 7 days after the license's termination, cancellation, expiration or transfer, Company may, at Licensee's expense, enter the Market Center's premises and effect Licensee's compliance with all of that Section's requirements, including removal and storage of Licensee's signs, and alteration or removal and storage of Trade Dress items. Licensee irrevocably constitutes and appoints Company and its designees as Licensee's agent and attorney-in-fact to effect compliance with Section 16.01(a), and Company shall have no liability to Licensee, in trespass or otherwise, on account of or arising from any action it authorizes or takes to effect Licensee's compliance. In addition, Company shall be entitled to injunctive or similar relief, without bond, against any member of the Licensee's Group to enforce compliance with these requirements.

**16.02** **Mandate to Sell.**

In lieu of immediately terminating the license in accordance with Section 16.01(a), Company may order Licensee to sell the Market Center and transfer Licensee's rights under this Agreement to a purchaser designated by or acceptable to Company in its discretion. After Company orders Licensee to sell the licensed business, Licensee shall have no further right or opportunity to remedy a default or to reinstate Licensee's right to continue operating the Market Center. Except for Company's right to approve a proposed purchaser's financial and business qualifications, to ensure that all Production Royalties, Profit Sharing Contributions and other amounts due Company are paid at the closing of the sale, and to require that the purchaser enter into a new License Agreement with Company that supersedes this Agreement, Licensee shall be entitled to establish and negotiate the terms of sale. If Licensee does not negotiate definitive terms of sale with a qualified purchaser within 120 days after Licensee receives Company's demand to sell, or does not consummate the sale on terms Company approved within 45 days after negotiations are completed, Company may terminate the license under Section 16.01(a) without further notice.

**16.03** **Additional Rights and Remedies.**

(a) In addition to the preceding rights and remedies, Company may recover all of the fees described in Sections 5.03 and 5.05, with or without terminating the license. If any such obligation is referred to an attorney for collection or is collected in whole or in part through a judicial proceeding, Licensee agrees to pay Company's reasonable attorneys' fees and costs of collection, plus a reasonable charge for the staff and administrative time Company expends to enforce its claims.

(b) In addition to the preceding rights and remedies, Company may cancel the accounts of any member of the Licensee's Group on the Company's intranet and e-mail systems and deny those individuals further access to communication via the intranet, with or without terminating the license.

(c) In addition to the preceding rights and remedies, Company may obtain injunctive relief, without bond, against any member of the Licensee's Group restraining the unauthorized or violative use of any Trademark, any Copyrighted Material, any part of the System or any Trade Secret, with or without terminating the license.

**16.04** **Option to Purchase.**

In addition to the preceding rights and remedies, Company shall have an option (but no obligation) to purchase the Market Center's business and assets from Licensee for 90 days after the license expires or is terminated. The purchase price shall equal the Market Center's fair market value as a going concern as determined by negotiations between Company and Licensee. The purchase price shall be payable in cash (except that Company may, in its sole discretion, assume any note or lease covering signs, equipment or fixtures). Licensee agrees to provide Company the information necessary to value the business and establish the purchase price, to sign and deliver to Company a bill of sale or an assignment of lease, and otherwise to cooperate with Company in its taking title to and delivery of the Market Center's assets. If Licensee fails or refuses to comply with its obligations under this Section during the 90-day option period, Company's option shall be extended until 30 days after Licensee complies. If the parties cannot agree on the purchase price and complete the transaction before the option period ends, Licensee agrees to dispose of the Market Center's business

and assets in accordance with the auction procedure set forth in Section 16.05, and to that end appoints Company as Licensee's agent and attorney in fact to arrange and conduct the auction.

**16.05 Auction to Qualified Buyer.**

If Company elects to exercise its purchase option under Section 16.04 and the parties cannot agree on a purchase price, Licensee agrees to dispose of the Market Center's business and assets by auction to a qualified buyer in accordance with the following procedure:

(a) Company shall assemble a package of materials that contains information and data that Company considers relevant to a determination of the Market Center's fair market value (the "Data Package") and shall submit the Data Package to Licensee for review. Licensee may furnish Company additional information that Licensee considers relevant, and Company shall add the information to the final Data Package.

(b) Company shall prepare a list of Market Center Licensees who satisfy Company's standards for multiple Market Center ownership (the "Invitation List"), and shall send the Data Package to each Licensee on the Invitation List, inviting the Licensees to participate in a sealed-bid auction for the Market Center. Company shall furnish Licensee a copy of the Invitation List and the bidding instructions that Company distributes to the invitees.

(c) Company shall invite the Licensees who receive the Data Package to prepare written offers for the Market Center that include the price the bidder is prepared to pay, the payment terms the bidder offers, and a proposed closing date (a "Bid"). Company shall instruct the bidders to submit their Bids in sealed envelopes to Company's President by a deadline stated in the instructions, which shall be approximately 30 days after Company delivers the Data Package.

(d) Company shall accumulate the sealed Bids and hold them unopened until the day after the deadline for Bid submissions. On that day the Company's President shall open the bids in the presence of at least two credible witnesses and shall immediately deliver by electronic or other means copies of the Bids to Licensee. Licensee may accept any of the Bids it prefers, but unconditionally agrees to accept one of them and to notify Company of its choice within three days after Licensee receives the Bids. The closing of Licensee's sale of the Market Center shall occur in accordance with the Bid that Licensee accepts.

**16.06 Permission to Notify Associates of Pending Termination.**

Licensee acknowledges that the livelihoods and careers of Associates associated with the Market Center depend on the Associates' ability to affiliate with a licensed real estate broker and to have unrestricted access to their customers' buyer/seller profiles, listing agreements, purchase contracts and other transactional information. Licensee therefore expressly agrees that, to avoid disruption to the Associates' businesses that an impending closure of the Market Center or abandonment of the License Agreement would create, Company shall have the right and authority to notify the Market Center's Associates of an impending closure of the Market Center. Licensee agrees that Company's contact with the Market Center's Associates for the purpose of alerting them of an impending closure of the Market Center shall not constitute improper or unlawful conduct. Licensee expressly waives any claim that contact Company makes with the Market Center's Associates to notify them of an impending closure of the Market Center constitutes tortious interference with contractual or business relationships or any other similar claim.

# 17.
# ADDITIONAL COVENANTS

**17.01 Best Efforts.**

Licensee covenants that during the term of this Agreement, Licensee shall cause the Operating Principal, the Team Leader and the Market Center Administrator to devote their substantial energy and best efforts to the management and operation of Market Center.

**17.02 Non-Competition.**

(a) Licensee, each Controlling Principal and each Licensee's Principal specifically acknowledge that, pursuant to this Agreement, members of the Licensee's Group shall receive valuable specialized training, trade secrets and confidential information, including information regarding the operational, sales, promotional and marketing methods and techniques of Company and the System, which is beyond the present skills and experience of the Licensee's Group. Licensee, each Controlling Principal and each Licensee's Principal acknowledge that such training, trade secrets and confidential information provide a competitive advantage and shall be valuable to them in the development and operation of the Market Center, and that gaining access to such training, trade secrets and confidential information is, therefore, a primary reason why they are entering into this Agreement. Licensee, each Controlling Principal and each Licensee's Principal specifically acknowledge that such training, trade secrets and confidential information is provided by Company for the benefit of the System, and each Market Center, and that the System and each Market Center individually and mutually benefits from all Licensees' compliance with the covenants described below. In consideration for such training, trade secrets, confidential information and benefits, Licensee, each Controlling Principal and each Licensee's Principal covenant as follows:

(1) With respect to Licensee, during the term of this Agreement, and with respect to each of the Controlling Principals and Licensee's Principals, during the term of this Agreement for so long as such individual or entity satisfies the definition of Controlling Principal or Licensee's Principal, neither Licensee, any Controlling Principal nor any Licensee's Principals or their respective immediate family members, spouses, significant others, life partners with whom they reside, parents, step-parents, in-laws, siblings, children and step-children, shall, directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any member of the Licensee's Group or any other Person:

(A) Divert or attempt to divert any business or customer of the Market Center to any competitor of the Licensee or of Company, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Company's Trademarks and the System;

(B) Own, maintain, develop, operate, engage in, or have any direct or indirect interest in, or accept employment from or any consultancy with, any real estate business that operates in the United States, in Canada or anywhere else in the world that supports real estate agents that compete with Company, Company's Affiliates, and Licensees, including any real estate business that involves (i) the real estate brokerage business; or (ii) the offer, sale or operational support of businesses in the real estate brokerage business (whether as a franchisor, licensor, regional representative, area director, consultant, or other similar service provider capacity); or

(C) Establish in the Awarded Area assigned to any Keller Williams

Licensee's Market Center an office or any other physical presence that is identified by or associated with any of the Trademarks.

(2) With respect to Licensee, for a continuous uninterrupted period commencing upon the termination, cancellation, expiration or transfer of Licensee's interest in this Agreement or, with respect to each of the Controlling Principals and Licensee's Principals, commencing upon the earlier of: (i) the termination, cancellation, expiration or transfer of all Licensee's interest in this Agreement or (ii) the time such Person ceases to satisfy the definition of a Controlling Principal or Licensee's Principal, and continuing for two years thereafter, neither Licensee, any Controlling Principal nor any Licensee's Principal shall, directly or indirectly, for themselves, or through, on behalf of or in conjunction with any member of the Licensee's Group or any other Person:

(A) Divert or attempt to divert any business or customer of the Market Center to any competitor of the Licensee or of Company, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Company's Trademarks and the System;

(B) Employ or seek to employ any individual who is at the time employed by Company or any Representative or Licensee of Company, or employed by or retained as an Associate of Company, in the United States, Canada, or anywhere else in the world, or otherwise directly or indirectly induce such an individual to leave his or her employment or to stop serving as an Associate for such party; or

(C) Own, maintain, operate, engage in, or have any interest in any real estate brokerage business that is located (i) in the Awarded Area; (ii) within 5 miles of the Awarded Area; or (iii) within a 10-mile radius of any other Market Center in existence or under construction as of the earlier of: (i) the termination, cancellation, expiration or transfer of Licensee's interest in this Agreement; or (ii) the date the Controlling Principal or Licensee's Principal ceases to satisfy the definition of Controlling Principal or Licensee's Principal.

(b) Section 17.02(a) shall not apply to ownership of less than 1% beneficial interest in the outstanding ownership securities of any Publicly-Held Corporation.

(c) The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If any portion of a covenant in this Section 17.02 is held unreasonable or unenforceable by a court or agency in an unappealed final decision to which Company is a party, Licensee, each Controlling Principal and each Licensee's Principal expressly agree to be bound by (and to cause each member of the Licensee's Group to be bound by) any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 17.02.

(d) Licensee, each Controlling Principal and each Licensee's Principal understand and acknowledge that Company shall have the right, in its discretion, to reduce the scope of any covenant set forth in Section 17.02 without their consent, effective immediately upon notice to Licensee, and Licensee, each Controlling Principal and each Licensee's Principal agree that they shall comply with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 19.07.

(e) Licensee, each Controlling Principal and each Licensee's Principal expressly agree that the existence of any claims that any member of the Licensee's Group may have against Company, whether or not arising from this Agreement, shall not constitute a defense to the

enforcement by Company of the covenants in this Section 17.02. Licensee, each Controlling Principal and each Licensee's Principal agree to pay all costs and expenses (including reasonable attorneys' fees) incurred by Company in connection with the enforcement of this Section 17.02 against any member of the Licensee's Group.

(f) Licensee, each Controlling Principal and each Licensee's Principal acknowledge that a violation of the terms of this Section 17.02 would result in irreparable injury to Company for which no adequate remedy at law may be available, and Licensee, each Controlling Principal and each Licensee's Principal accordingly consent on their behalf and on behalf of the members of the Licensee's Group to the filing of an action for declarative relief and the issuance of an injunction by any court of competent jurisdiction (without first having to resort to mediation, arbitration or any other dispute resolution process set forth in this Agreement) prohibiting any conduct by any member of the Licensee's Group in violation of the terms of this Section 17.02. Licensee, each Controlling Principal and each Licensee's Principal consent to personal jurisdiction in any state or federal court located in Travis County, Texas.

(g) At Company's request, Licensee shall require and obtain execution of covenants similar to those set forth in this Section 17.02 (including covenants applicable upon termination of a Person's relationship with Licensee) from any member of the Licensee's Group (including but not limited to Licensee's Operating Principals, Team Leaders and Market Center Administrators) who have received or shall receive training or confidential information from Company. The covenants required by this Section 17.02(g) shall be substantially in the form contained in Attachment E.

(h) Failure by Licensee to obtain execution of agreements containing the covenants required by this Section 17.02 shall constitute an Event of Default under Section 15.02(a)(13).

## 18.
## TAXES, PERMITS AND INDEBTEDNESS

**18.01 Taxes, Permits and Indebtedness.**

(a) Licensee shall promptly pay when due all taxes levied or assessed against the licensed business and all accounts and other indebtedness of every kind incurred by Licensee in the conduct of the licensed business. Licensee shall pay to Company an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Company with respect to any payments to Company required under this Agreement, unless the tax is credited against income tax otherwise payable by Company.

(b) In the event of any *bona fide* dispute as to Licensee's liability for taxes assessed or other indebtedness, Licensee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law. However, in no event shall Licensee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the Market Center premises.

(c) Licensee shall comply with all federal, state and local laws, rules and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the licensed business, including real estate brokerage licenses, licenses to do business, fictitious name registrations, sales tax permits and fire clearances.

(d) Licensee shall notify Company in writing as soon as practicable, but no longer than five days after the commencement of any claim, action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other government instrumentality, which may adversely affect the operation or financial condition of the licensed business.

(e) Licensee must disclose in writing to Company a complete list of all sources of borrowing related to Licensee or its operations in advance of such borrowing. Upon request by Company, Licensee shall provide additional information on such borrowing and the sources of such borrowing to provide Company with complete transparency of the financing transaction and any of its potential effects on Licensee's business. Licensee shall not extend, renew, refinance, modify or amend any debt or liability permitted by this paragraph, except with the prior written consent of Company, which consent may be granted or denied. Failure to comply with this provision, including Company's request for complete financing transparency, will be a material default under Section 15.03 this Agreement for which Company may exercise its purchase rights set forth in Section 16.04 regardless of any exercise timing limitations contained therein.

## 19. GENERAL CONDITIONS AND PROVISIONS

**19.01 Independent Contractor.**

(a) The parties mutually agree that this Agreement does not create a fiduciary or other special relationship between them, that Licensee is an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venture partner, partner, employee or servant of the other for any purpose.

(b) Throughout the term of the license, Licensee shall hold itself out to the public as an independent contractor operating the Market Center pursuant to a license from Company. Licensee agrees to take such action as may be necessary to do so, including exhibiting a notice of that fact in a conspicuous place in the Market Center, the content of which Company reserves the right to specify.

**19.02 Indemnification.**

(a) **LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL INDEMNIFY AND AGREE TO DEFEND AND HOLD HARMLESS, INCLUDING FEES, COSTS AND EXPENSES FOR SEPARATE COUNSEL OF COMPANY'S CHOICE, TO THE FULLEST EXTENT PERMITTED BY LAW COMPANY, ITS AFFILIATES, SUCCESSORS, AND ASSIGNS AND THEIR RESPECTIVE DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS, ATTORNEYS, SERVANTS, EMPLOYEES, ASSOCIATES, INDEPENDENT CONTRACTORS, AGENTS, REGIONAL REPRESENTATIVES, AND REPRESENTATIVES FROM ALL "LOSSES AND EXPENSES" (AS DEFINED IN SECTION 19.02(e)), INCURRED IN CONNECTION WITH ANY ACTION, SUIT, PROCEEDING, CLAIM, DEMAND, INVESTIGATION OR INQUIRY (FORMAL OR INFORMAL), OR ANY SETTLEMENT THEREOF (WHETHER OR NOT A FORMAL PROCEEDING OR ACTION HAS BEEN INSTITUTED), WHICH ARISES OUT OF OR IS BASED UPON ANY OF THE FOLLOWING:**

(1) **THE INFRINGEMENT, ALLEGED INFRINGEMENT, OR ANY OTHER VIOLATION OR ALLEGED VIOLATION BY ANY MEMBER OF THE LICENSEE'S GROUP OF ANY PATENT, MARK OR**

COPYRIGHT OR OTHER PROPRIETARY RIGHT OWNED OR CONTROLLED BY THIRD PARTIES (EXCEPT WITH RESPECT TO ANY RIGHTS IN THE TRADEMARKS OR COPYRIGHTED MATERIAL GRANTED HEREUNDER);

(2) THE VIOLATION, BREACH OR ASSERTED VIOLATION OR BREACH BY ANY MEMBER OF THE LICENSEE'S GROUP OF ANY FEDERAL, STATE OR LOCAL LAW, REGULATION, RULING, STANDARD OR DIRECTIVE OR ANY INDUSTRY STANDARD;

(3) LIBEL, SLANDER OR OTHER DEFAMATION OF COMPANY, ANY REGIONAL REPRESENTATIVE, ANY OTHER KELLER WILLIAMS LICENSEE, THE SYSTEM, OR ANY OTHER THIRD PARTY BY ANY MEMBER OF THE LICENSEE'S GROUP;

(4) THE VIOLATION OR BREACH BY ANY MEMBER OF THE LICENSEE'S GROUP OF ANY WARRANTY, REPRESENTATION, AGREEMENT OR OBLIGATION IN THIS AGREEMENT OR IN ANY OTHER AGREEMENT BETWEEN OR AMONG ANY MEMBER OF THE LICENSEE'S GROUP AND COMPANY OR ITS AFFILIATES; AND

(5) ACTS, ERRORS, OR OMISSIONS OF ANY MEMBER OF THE LICENSEE'S GROUP IN CONNECTION WITH THE ESTABLISHMENT AND OPERATION OF THE MARKET CENTER, THE PERFORMANCE OF REAL ESTATE SERVICES OR CONDUCT ALLEGED TO CREATE VICARIOUS OR JOINT OR SEVERAL LIABILITY FOR COMPANY, ITS AFFILIATES OR THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, OR WITH THE PROVIDING OF ANY SERVICES ANCILLARY TO LICENSEE'S REAL ESTATE BUSINESS.

(6) A LAWSUIT OR ADMINISTRATIVE PROCEEDING BROUGHT BY LICENSEE, A CONTROLLING PRINCIPAL OR A LICENSEE'S PRINCIPAL AGAINST COMPANY IN WHICH THE LICENSEE, CONTROLLING PRINCIPAL OR LICENSEE'S PRINCIPAL DOES NOT PREVAIL.

(b) LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL AGREE TO GIVE COMPANY PROMPT NOTICE OF ANY SUCH ACTION, SUIT, PROCEEDING, CLAIM, DEMAND, INQUIRY OR INVESTIGATION. AT THE EXPENSE AND RISK OF LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL, COMPANY MAY ELECT TO ASSUME (BUT UNDER NO CIRCUMSTANCE IS OBLIGATED TO UNDERTAKE), AND ASSOCIATE COUNSEL OF ITS OWN CHOOSING WITH RESPECT TO, THE DEFENSE AND/OR SETTLEMENT OF ANY SUCH ACTION, SUIT, PROCEEDING, CLAIM, DEMAND, INQUIRY OR INVESTIGATION. SUCH AN UNDERTAKING BY COMPANY SHALL NOT DIMINISH IN ANY MANNER OR FORM THE OBLIGATION OF LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL TO INDEMNIFY COMPANY AND TO HOLD IT HARMLESS.

(c) IN ORDER TO PROTECT PERSONS OR PROPERTY, OR ITS REPUTATION OR GOODWILL, OR THE REPUTATION OR GOODWILL OF OTHERS, COMPANY MAY, AT ANY TIME AND WITHOUT NOTICE, AS IT, IN ITS JUDGMENT DEEMS APPROPRIATE, CONSENT OR AGREE TO SETTLEMENTS OR TAKE SUCH OTHER REMEDIAL OR CORRECTIVE ACTION AS IT DEEMS EXPEDIENT WITH RESPECT TO THE ACTION, SUIT, PROCEEDING, CLAIM, DEMAND, INQUIRY OR INVESTIGATION IF, IN COMPANY'S SOLE JUDGMENT, THERE ARE REASONABLE GROUNDS TO BELIEVE THAT:

(I) ANY OF THE ACTS OR CIRCUMSTANCES ENUMERATED IN SECTION 19.02(a) HAVE OCCURRED; OR

(II) ANY ACT, ERROR, OR OMISSION AS DESCRIBED IN SECTION 19.02(a)(5) MAY RESULT DIRECTLY OR INDIRECTLY IN DAMAGE, INJURY, OR HARM TO ANY PERSON OR ANY PROPERTY.

(d) ALL LOSSES AND EXPENSES INCURRED UNDER THIS SECTION 19.02 SHALL BE CHARGEABLE TO AND PAID BY LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL PURSUANT TO THEIR OBLIGATIONS OF INDEMNITY UNDER THIS SECTION 19.02, REGARDLESS OF ANY ACTIONS, ACTIVITY OR DEFENSE UNDERTAKEN BY COMPANY OR THE SUBSEQUENT SUCCESS OR FAILURE OF SUCH ACTIONS, ACTIVITY OR DEFENSE.

(e) THE PHRASE "LOSSES AND EXPENSES" MEANS AND INCLUDES, WITHOUT LIMITATION, ALL LOSSES, COMPENSATORY, EXEMPLARY OR PUNITIVE DAMAGES, FINES, CHARGES, COSTS, EXPENSES, LOST PROFITS, ATTORNEY'S FEES, COURT COSTS, SETTLEMENT AMOUNTS, AND JUDGMENTS.

(f) THE PERSONS INDEMNIFIED PURSUANT TO THIS SECTION 19.02 DO NOT ASSUME ANY LIABILITY WHATSOEVER FOR ACTS, ERRORS, OR OMISSIONS OF THOSE WITH WHOM ANY MEMBER OF THE LICENSEE'S GROUP MAY CONTRACT, REGARDLESS OF THE PURPOSE. LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL SHALL HOLD HARMLESS AND INDEMNIFY THE PERSONS INDEMNIFIED PURSUANT TO THIS SECTION 19.02 FOR ALL LOSSES AND EXPENSES THAT MAY ARISE OUT OF ANY ACTS, ERRORS OR OMISSIONS OF ANY MEMBER OF THE LICENSEE'S GROUP, AND ANY SUCH THIRD PARTIES WITHOUT LIMITATION AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF OR THE NEGLIGENCE OF COMPANY OR ANY OTHER PARTY OR PARTIES ARISING IN CONNECTION THEREWITH, AND WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

(g) UNDER NO CIRCUMSTANCES SHALL THE PERSONS INDEMNIFIED PURSUANT TO THIS SECTION 19.02 BE REQUIRED OR OBLIGATED TO SEEK RECOVERY FROM THIRD PARTIES OR OTHERWISE MITIGATE THEIR LOSSES IN ORDER TO MAINTAIN A CLAIM AGAINST LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL. LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL AGREE THAT THE FAILURE TO PURSUE SUCH RECOVERY OR MITIGATE LOSS SHALL IN NO WAY REDUCE THE AMOUNTS RECOVERABLE FROM LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL BY THE PERSONS INDEMNIFIED PURSUANT TO THIS SECTION 19.02. LICENSEE, EACH CONTROLLING PRINCIPAL AND EACH LICENSEE'S PRINCIPAL AGREE THAT THE TERMS OF THIS SECTION 19.02 SHALL SURVIVE THE TERMINATION, CANCELLATION, EXPIRATION, OR TRANSFER OF THIS AGREEMENT OR ANY INTEREST IN LICENSEE.

**19.03 Approvals and Waivers.**

(a) Whenever this Agreement requires the prior approval or consent of Company, Licensee shall make a timely written request to Company therefor. To be effective, Company's approval or consent must be in writing.

(b) Company makes no warranties or guarantees upon which any member of the Licensee's Group may rely, and assumes no liability or obligation to any member of the Licensee's Group, by providing any waiver, approval, consent, or suggestion to any member of the Licensee's Group in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

(c) No delay, waiver, omission or forbearance on the part of Company to exercise any right, option, duty or power arising out of any breach or default by any member of the Licensee's Group under any of the terms, provisions, covenants or conditions hereof, shall constitute a waiver by Company to enforce any such right, option, duty or power as against any member of the Licensee's Group, or as to any subsequent breach or default. Subsequent acceptance by Company

of any payments due to it hereunder shall not be deemed to be a waiver by Company of any preceding breach by any member of the Licensee's Group of any terms, provisions, covenants or conditions of this Agreement.

**19.04 Notices.**

All notices permitted or required to be delivered pursuant to the provisions of this Agreement shall be delivered in writing to the addresses listed on the Information Summary for Company and Licensee (which shall apply for each member of the Licensee's Group) or such other address as the parties shall specify by written notice, and shall be deemed so delivered: (a) at the time delivered by hand; (b) 1 day after transmission by email, provided that there is no error delivery message; (c) 2 days after being placed in the hands of a commercial courier service for expedited delivery, provided there is proof of receipt; or (d) 3 days after placement in the United States Mail by certified mail, return receipt requested, postage prepaid; and must be addressed to the party to be notified at the addresses as described above for Company and Licensee, or such other address as the parties shall specify by written notice.

**19.05 Entire Agreement.**

This Agreement, any amendments, any addenda and any other attachments hereto, and the Brand Standards Manuals constitute the entire, full and complete agreement between Company and Licensee concerning the subject matter hereof, and supersede all prior or contemporaneous agreements between the parties with respect to such subject matter; provided that nothing contained in this Agreement shall be deemed a waiver of Licensee's reliance on any representations made by Company in the disclosure document provided to Licensee and referenced in Section 21.01(a) below.

**19.06 Exclusion of Third Party Beneficiaries.**

Nothing in this Agreement is intended, nor shall be deemed, to confer upon any Person other than Licensee, Company and Company's Affiliates, officers, directors, shareholders, members, managers, partners and employees any rights, benefits, claims or remedies under or by reason of this Agreement, including but not limited to any members of the Licensee's Group other than Licensee itself.

**19.07 Amendment.**

Except for those permitted to be made unilaterally by Company, no amendment, change, or variance from this Agreement shall be binding on any party unless mutually agreed to in writing by the parties and executed by their authorized officers or agents.

**19.08 Severability and Construction.**

(a) Except as expressly provided to the contrary herein, each portion, section, part, term, and provision of this Agreement shall be considered severable. If, for any reason, any court or government agency determines that any section, part, term, or provision herein is invalid and contrary to, or in conflict with, any existing or future law or regulation, such determination shall not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms, or provisions of this Agreement as may remain otherwise intelligible; and the latter shall continue to

be given full force and effect and bind the parties. All invalid portions, sections, parts, terms and provisions shall be deemed not to be a part of this Agreement.

(b) Licensee, each Controlling Principal and each Licensee's Principal, as applicable, expressly agree to be bound by any promise or covenant imposing the maximum duty permitted by law that is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions that a court may hold to be unreasonable and unenforceable in a final decision to which Company is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

(c) All captions in this Agreement are intended solely for the convenience of all parties, and none shall be deemed to affect the meaning or construction of any provision of this Agreement.

(d) Any obligation of any member of the Licensee's Group that contemplates performance after termination, cancellation, expiration or transfer of this Agreement or the interest of any Controlling Principal or Licensee's Principal, shall be deemed to survive such termination, cancellation, expiration or transfer.

(e) All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable.

(f) Notwithstanding any contrary provisions contained in this Agreement, Company, Licensee, each Controlling Principal and each Licensee's Principal acknowledge and agree that (a) this Agreement (and the relationship of the parties which arises from this Agreement) grants Company the discretion to make decisions, take actions and/or refrain from taking actions not inconsistent with Licensee's explicit rights and obligations hereunder that may affect favorably or adversely Licensee's interests; (b) Company shall use its business judgment in exercising such discretion based on Company's assessment of Company's own interests and balancing those interests against the interests, promotion and benefit of the System generally (including Company, and its Affiliates and other Licensees), and specifically without considering Licensee's individual interests or the individual interests of any other particular representative or Licensee (examples of items that shall promote or benefit the System generally include, without limitation, enhancing the value of the Trademarks, improving customer service and satisfaction, improving project quality, improving uniformity, enhancing or encouraging modernization, and improving the competitive position of the System); (c) Company shall have no liability to Licensee, any Controlling Principal or any Licensee's Principal for the exercise of its discretion in this manner and (d) even if Company has numerous motives for a particular action or decision, so long as at least one motive is a reasonable business justification no trier of fact in any legal action shall substitute its judgment for Company's judgment so exercised and such action or decision shall not be subject to challenge for abuse of discretion. IF COMPANY TAKES ANY ACTION OR CHOOSES NOT TO TAKE ANY ACTION IN ITS DISCRETION WITH REGARD TO ANY MATTER RELATED TO THIS AGREEMENT AND ITS ACTION OR INACTION IS CHALLENGED FOR ANY REASON, THE PARTIES EXPRESSLY DIRECT THE TRIER OF FACT THAT COMPANY'S RELIANCE ON A BUSINESS REASON IN THE EXERCISE OF ITS DISCRETION IS TO BE VIEWED AS A REASONABLE AND PROPER EXERCISE OF ITS DISCRETION, WITHOUT REGARD TO WHETHER OTHER REASONS FOR COMPANY'S DECISION MAY EXIST AND WITHOUT REGARD TO WHETHER THE TRIER OF FACT WOULD INDEPENDENTLY ACCORD THE SAME WEIGHT TO THE BUSINESS REASON.

## 20.
## DISPUTE RESOLUTION

**20.01** **Governing Law.**

(a) Except as otherwise provided in this Article 20, the Agreement and any dispute between or among Licensee, each Controlling Principal, each Licensee's Principal, and each other member of Licensee's Group and Company, its Affiliates, Regional Representatives, Successors and Assigns and their Respective Directors, officers, shareholders, members, managers, partners, attorneys, servants, employees, associates, independent contractors, agents, and representatives shall be governed by and interpreted and enforced in accordance with the internal laws of the State of Texas, excluding its conflicts of law principles. Notwithstanding the above, Licensee, each Controlling Principal and each Licensee's Principal agree on their own behalf and on behalf of the members of the Licensee's Group that the Texas Business Opportunity Act and any successor laws, rules or regulations thereto do not apply to the transactions contemplated by this Agreement.

(b) Licensee hereby represents and warrants that (a) Licensee is not in a significantly disparate bargaining position with respect to this Agreement, and (b) Licensee has been represented by legal counsel of its own selection with respect to this Agreement (or has had the opportunity to be represented by legal counsel) and such legal counsel has not been directly or indirectly identified, suggested or selected by Company or an agent of Company; therefore:

**WAIVER OF CONSUMER RIGHTS**

**LICENSEE WAIVES ANY RIGHTS IT MAY HAVE UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ., TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS. AFTER CONSULTATION WITH AN ATTORNEY OF REPRESENTATIVE'S OWN SELECTION, LICENSEE VOLUNTARILY CONSENTS TO THIS WAIVER.**

**20.02** **Mediation.**

(a) The parties (together with the Controlling Principals and Licensee's Principals on their individual behalf and on behalf of the Licensee's Group) agree to use their best efforts to resolve and settle by direct, private negotiation any claim, controversy or dispute (a "Dispute") that arises under or in relation to this Agreement or arises between or among any member of Licensee's Group and Company, its Affiliates, Regional Representatives, Successors and Assigns and their Respective Directors, officers, shareholders, members, managers, partners, attorneys, servants, employees, associates, independent contractors, agents, Regional Representatives, and representatives. Except as otherwise provided in Sections 17(f) related to the issuance of an injunction, or filing of an action for declarative relief, in any court of competent jurisdiction without first having to resort to mediation, arbitration or any other dispute resolution process set forth in this Agreement and 20.05, if the parties cannot resolve and settle a Dispute by private negotiation within 60 days after one party gives the other written notice that a Dispute exists, the parties mutually agree to submit the Dispute to non-binding mediation, as follows:

(1) Mediation shall occur in Austin, Texas before a single mediator, using the facilities and mediation rules of a professional dispute-resolution organization selected by Company

and reasonably acceptable to Licensee (the "Mediation Organization"). If the parties cannot agree on a Mediation Organization, they shall use the facilities and mediation rules of the National Franchise Mediation Program.

(2) The parties shall jointly select a mediator from the panel of mediators maintained by the Mediation Organization. The mediator must be either a retired judge or a trained mediator experienced in the resolution of disputes between franchisors and franchisees who has no prior familial relationship with any party to the Dispute. If the parties are unable to agree on a mediator within 30 days after the Dispute is submitted to mediation, the Mediation Organization shall select a mediator who possesses the indicated qualifications.

(3) The parties to the mediation shall share the mediation filing fee equally, but shall otherwise separately bear their own costs and expenses (including legal fees) of participating in the mediation process. Each party agrees to send at least one representative to the mediation conference who has authority to enter into binding contracts on that party's behalf. Each party further agrees to sign a confidentiality agreement that exempts the mediator from disclosing, orally or in writing, any information the other party discloses to the mediator in confidence at any stage of the mediation process.

(4) If any party fails or refuses to participate in mediation in accordance with this Section 20.02, the other parties shall be entitled to submit the Dispute to binding arbitration immediately in accordance with Section 20.03.

**20.03 <u>Arbitration</u>.**

If the parties (together with the Controlling Principals and Licensee's Principals or any member of Licensee's Group) cannot fully resolve and settle a Dispute through mediation within 30 days after the mediation conference concludes, all unresolved issues involved in the Dispute, except those excluded under Sections 17(f) related to the issuance of an injunction, or filing of an action for declarative relief, in any court of competent jurisdiction without first having to resort to mediation, arbitration or any other dispute resolution process set forth in this Agreement and 20.05, shall be submitted to binding arbitration, as follows:

(a) Any party may make a demand for arbitration.

(b) Arbitration proceedings shall be conducted in Austin, Texas before a single arbitrator, using the facilities and commercial arbitration rules of the Mediation Organization or another professional dispute-resolution organization selected by Company and reasonably acceptable to Licensee (the "Arbitration Organization"). If Company selects an Arbitration Organization other than the Mediation Organization and Licensee reasonably objects to Company's choice, the parties shall use the American Arbitration Association's facilities and commercial arbitration rules.

(c) The Arbitration Organization's expedited arbitration procedure shall apply to the arbitration proceedings. To the greatest extent permitted by law, Company and Licensee waive the application of all rules of discovery and evidence the Arbitration Organization's expedited procedure does not expressly make applicable.

(d) The parties shall jointly select an arbitrator from the panel of arbitrators maintained by the Arbitration Organization. The arbitrator must be either a retired judge or an attorney experienced in the practice of franchise law who has no familial relationship with either party and who agrees to follow and apply the express provisions of this Agreement in determining his or her award. If the parties are unable to agree on an arbitrator within 30 days after the arbitration demand

is filed, the Arbitration Organization shall select an arbitrator who possesses the indicated qualifications.

(e) The arbitrator's award shall be final and binding on all parties, and neither party shall have any right to contest or appeal the arbitrator's award except on the grounds expressly provided by the United States Arbitration Act (the "Arbitration Act"). The party who demands arbitration shall pay the arbitration filing fee, but the parties shall otherwise separately bear their own costs and expenses (including legal fees) of participating in the arbitration process. Responsibility for the arbitrator's fees and expenses shall be determined as part of the arbitrator's award.

(f) The arbitrator shall not extend, modify or suspend any term of this Agreement or the reasonable standards of business performance and operation established by Company in good faith.

(g) Notice of or demand for arbitration shall not stay, postpone or rescind the effectiveness of any termination of this Agreement. However, a demand for arbitration shall stay any lawsuit that was filed in contravention of this Article 20.

(h) The procedures contemplated by and the enforceability of this Section 20.03 shall be governed by the Arbitration Act and shall be interpreted and enforced in accordance with United States federal judicial interpretations of the Arbitration Act.

(i) The parties agree that any actions related to a Dispute will be conducted on an individual basis, and not as part of a common, consolidated or class action.

**20.04 Internal Dispute Resolution.**

(a) The Company has created an informal, non-binding arbitration program (the "Internal Program") for the benefit of all Keller Williams Licensees and Regional Representatives. The nature and limits of the Disputes to which the Internal Program applies and the procedures that govern the Internal Program's use are described in the Brand Standards Manuals.

(b) Use of the Internal Program is currently optional. If Company makes the Internal Program mandatory, Licensee, each Controlling Principal, each Licensee's Principal and Company agree to submit any Disputes to which the Internal Program applies for resolution in accordance with its standards and procedures prior to seeking a Dispute's resolution in the manner prescribed in Sections 20.02 and 20.03, except as permissible under Sections 17(f) and 20.05. If a Dispute relates to another Keller Williams Licensee or a Regional Representative, Licensee, each Controlling Principal and each Licensee's Principal agrees to submit the Dispute in accordance with the Internal Program's standards, specifications and procedures prior to seeking the Dispute's resolution by any other means.

**20.05 General.**

(a) No right or remedy conferred upon or reserved to Company or Licensee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy provided in this Agreement by law or in equity, but each right and remedy shall be cumulative of every other right or remedy.

(b) Notwithstanding Sections 20.02, 20.03 and 20.04(b), Company may at any time file suit in any court of competent jurisdiction (i) to enjoin any infringement or misappropriation of its rights in the Trademarks, the Copyrighted Material, the System or its other intellectual property, (ii) to collect any Production Royalty, Profit Sharing Contribution or other monetary obligation payable by Licensee, or (iii) to seek declarative relief relating to, or enjoin, any conduct by any member of

the Licensee's Group in violation of the terms of the covenants against competition in Section 17.02. Licensee, each Controlling Principal and each Licensee's Principal consent to personal jurisdiction in any state or federal court located in Travis County, Texas.

(c) Company and Licensee (including each Controlling Principal and each Licensee's Principal on their own behalf and on behalf of each member of the Licensee's Group) acknowledge that the parties' agreement regarding governing law and forum set forth in this Article 20 provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of the parties' relationship. Licensee, Company, each Controlling Principal and each Licensee's Principal further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

(d) Company and Licensee (including each Controlling Principal and each Licensee's Principal on their own behalf and on behalf of each member of the Licensee's Group) acknowledge that Company's acceptance of this Agreement occurred in Austin, Texas and further acknowledge that the performance of certain obligations of Licensee, each Controlling Principal and each Licensee's Principal under this Agreement, including the payment of monies due hereunder and the satisfaction of certain training requirements of the Company, shall occur in Austin, Travis County, Texas.

(e) Except with respect to Licensee's, each Controlling Principals' and each Licensee's Principals' obligation to indemnify Company pursuant to Section 19.02 hereof and claims Company brings for any member of the Licensee's Group's unauthorized use of the Trademarks or unauthorized use or disclosure of any confidential information, the parties waive to the fullest extent permitted by law any right to or claim for any punitive, exemplary, special and consequential damages against the other and agree that, in the event of an action or claim arising from a dispute between the parties, the parties bringing an action or claim shall be limited to equitable relief and to recovery of any direct or general damages it sustains; provided, however that Company shall have the right to recover lost profits in the event of termination of this Agreement.

(f) Except for actions or claims arising from Licensee's nonpayment or underpayment of amounts Licensee owes Company pursuant to this Agreement, or actions or claims related to any member of the Licensee's Group's unauthorized use of the Trademarks, any and all actions or claims arising out of or relating to this Agreement or the relationship created hereby shall be barred unless such action or claim is commenced within 2 years from the date on which the party asserting such action or claim knew or should have known of the facts giving rise to such action or claim.

(g) **THE PARTIES IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION OR CLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER PARTY RELATING TO THE RELATIONSHIP BETWEEN THE PARTIES OR ARISING UNDER OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR ANY RIGHT OR CURE HEREUNDER.**

RC ___ **[LICENSEE'S INITIALS]**

**20.06 <u>Force Majeure</u>.**

(a) If the performance of any obligation by any party under this Agreement is prevented, hindered or delayed by reason of Force Majeure, which cannot be overcome by use of normal commercial measures, the parties shall be relieved of their respective obligations to the extent the

parties are necessarily prevented, hindered or delayed in such performance during the period such Force Majeure continues, provided that Company may condition its approval upon the payment of agreed minimum fees to Company during the period in which the Market Center is not fully in operation.

(b) The party whose performance is affected by an event of Force Majeure shall give prompt notice of such Force Majeure event to the other party by telephone with confirmation in writing, email or other writing in which receipt is confirmed, setting forth the nature thereof, an estimate as to its duration, and a plan for resuming full compliance with this Agreement. A party that fails to provide the required notice shall be liable for failure to give such timely notice only to the extent of damage actually caused.

**20.07** **<u>Company's Damages, Costs and Expenses.</u>**

(a) If Licensee fails to cure a default, following notice, within the applicable cure period, or brings a claim, lawsuit or arbitration against Company in which Licensee does not prevail, Licensee shall pay to Company its damages, costs, and expenses, including without limitation, the reasonable attorney's fees incurred by Company.

## 21.
## ACKNOWLEDGMENTS

**21.01** **<u>Acknowledgments</u>.**

(a) Licensee acknowledges that it received a copy of this Agreement, with all blanks filled in, at least 7 days prior to the date on which Licensee signed this Agreement. Licensee further acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising" at least 14 calendar days prior to the date on which Licensee signed this Agreement. The actual dates of delivery are set forth on the Information Summary.

(b) Licensee either is, or has secured the services of, a duly licensed real estate broker under the laws of the state within which the Market Center is situated and is in compliance with all applicable law, rules and regulations of cognizant authorities applicable to the operation of the Market Center.

(c) Licensee, each Controlling Principal and each Licensee's Principal acknowledge that they have conducted an independent investigation of the licensed business. Each recognizes that the business venture contemplated by this Agreement involves business risks and that Licensee's success shall be largely dependent upon the ability of Licensee, each Controlling Principal and each Licensee's Principal as independent businesspeople. Company expressly disclaims the making of, and Licensee, each Controlling Principal and each Licensee's Principal acknowledges on their own behalf and on behalf of each member of the Licensee's Group not having received, any warranty or guarantee, express or implied as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

(d) Licensee, each Controlling Principal and each Licensee's Principal acknowledge that they have read and understand this Agreement, the Attachments hereto, and other agreements relating hereto, and that Company has accorded Licensee, each Controlling Principal and each Licensee's Principal ample time and opportunity to consult with advisors of their own choosing about the potential benefits and risks of entering into this Agreement.

[COMPLETED AND EXECUTED ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement in duplicate as of the Effective Date.

**KELLER WILLIAMS REALTY, INC.**

By: DocuSigned by: Darrell King 56BDBFE598E241C...

Name: Darrell King
Title: Chief Compliance Officer
Date: 03/24/2021

**LICENSEE:**

**R & LS INVESTMENTS, INC.**

By: DocuSigned by: Rick Cunningham 519E9FB03F9448E...

Name: Rick Cunningham
Title: Operating Principal
Date: 01/28/2021

## ATTACHMENT A

### AGREEMENT AND GUARANTY OF CONTROLLING PRINCIPALS

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of the preceding License Agreement and acknowledges that the execution of this Agreement and Guaranty and the undertakings of the Controlling Principals in the License Agreement are in partial consideration for, and a condition to, the granting of the license, and that Company would not have granted the license without the execution of this Agreement and Guaranty and the other undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principal";

(3) Each jointly and individually makes and agrees to perform all of the covenants, representations, warranties and agreements of the Controlling Principals set forth in the License Agreement and accepts the obligation to perform such covenants, representations and agreements on their individual behalf and on behalf of each member of the Licensee's Group; and

(4) Each jointly and severally, absolutely and unconditionally guarantees to Company and its successors and assigns:

(a) The payment in full when due of all Production Royalties, Profit Sharing Contributions and other contractual obligations and trade accounts payable by Licensee to Company or its Affiliates; and

(b) The payment in full when due of any and all amounts for which Licensee may become obligated pursuant to Articles 5, 11, 12, 16 and 20 and of Sections 6.01(*l*), 14.07, 17.02 and 19.02 of the License Agreement and pursuant to any real estate related services approved by Company.

The monetary obligations described in clauses (a) and (b) are called "Debts".

This is a continuing Guaranty and applies to all Debts for or with respect to which Licensee may become obligated, whether during the initial term of the license, any renewals, extensions or renewal terms thereof, or, with respect to Debts described in clause (b) above, after the license's termination, cancellation, expiration or transfer. This Guaranty shall be binding upon each of the undersigned's heirs, executors, administrators, guardians, successors and assigns, and under no circumstances shall any Person's obligations under this Guaranty be released or extinguished without Company's written consent and release or until all Debts have been paid in full, whether or not a Guarantor's interest in Licensee is transferred, sold or otherwise surrendered.

Each of the undersigned expressly waives demand and diligence on the part of the Company in the collection of any of the Debts and agrees to all extensions that may be granted to Licensee by Company. Company shall be under no obligation to notify the undersigned of any sales or extensions of credit to Licensee in reliance on this Guaranty, or of the failure of Licensee to pay any of the

Debts when due, or to use diligence in preserving the liability of any Person on the Debts or in bringing suit or in taking other action to enforce collection of the Debts.

If Licensee's status should change through merger, consolidation or otherwise, this Guaranty shall cover the Debts of Licensee under its new status, according to the terms of this Guaranty.

Company shall not be required to pursue or exhaust any remedies against Licensee, to foreclose its interest in any collateral now or hereafter held by Company as security for the payment of the Debts, to terminate the License Agreement or to take any other action before requiring payment under this Guaranty. Without in any manner impairing or diminishing the obligations of the undersigned under this Guaranty, Company may elect to pursue any legal or equitable remedy available against Licensee or against any collateral held by Company, even though the exercise by Company of such remedy results in loss to the undersigned of any right of subrogation or right to proceed against Licensee for reimbursement. If Licensee is not liable on any of the Debts because the act of their creation is *ultra vires*, or if the officers or persons incurring any of the Debts acted in excess of their authority, and therefore the Debts cannot be enforced against Licensee, the undersigned shall nevertheless be liable under this Guaranty.

If for any reason Company is required to refund a payment made by Licensee to pay the amount thereof to any other Person, such payment by Licensee shall not constitute a discharge of the undersigned from any liability under this Guaranty, and the undersigned agree to pay such amount to Company upon demand.

The undersigned agree that any obligation of Licensee to the undersigned shall be subordinate to the payment of the Debts.

Each of the undersigned represents that he or she owns a substantial ownership interest in Licensee and that he or she is receiving consideration from the Debts that is a material, direct benefit.

The undersigned agree to pay Company's reasonable attorneys' fees and costs if this Guaranty is placed in the hands of an attorney for collection, or if it is collected through a proceeding in any court.

**CONTROLLING PRINCIPAL**

DocuSigned by:
Rick Cunningham ____________
519E9FB03F9448E...
Rick Cunningham

LICENSEE Initials/Date RC ____

**ATTACHMENT B**

**UNDERTAKING OF LICENSEE'S PRINCIPALS**

Each of the undersigned acknowledges and agrees:

(1) That he or she has read this preceding Agreement in its entirety and acknowledges that the undertakings by Licensee's Principals under this Agreement and as stated below, and the execution of the attached Agreement and Guaranty of Controlling Principal's, are made and given in partial consideration of, and as a condition to, Company's granting of rights to Licensee as described in this Agreement;

(2) That he or she meets the definition of a Licensee's Principal; and

(3) That he or she individually makes all of the covenants, representations, warranties and agreements of Licensee's Principal set forth in this Agreement (including, without limitation, those regarding ownership and rights in the Trademarks and Copyrighted Material in Article 7; use of the Confidential Information in Article 8; in-term and post-term non-competition and non-solicitation, ownership of improvements to the System in Article 17; indemnification (including indemnification with respect to the acts, errors or omissions of the members of the Licensee's Group) in Section 19.02; and choice of law and dispute resolution in Article 20) and any Attachments or amendments thereto, and individually undertakes the obligation to perform thereunder for so long as he or she qualifies as such and thereafter to the extent expressly provided by the terms of this Agreement; and

(4) That the direct or indirect interest of the undersigned in Licensee is subject to the transfer restrictions in Article 14 of this Agreement.

**LICENSEE'S PRINCIPAL**

DocuSigned by:
Rick Cunningham ____________
519E9FB03F9448E...
Rick Cunningham

LICENSEE Initials/Date RC ____

# ATTACHMENT C

## ELECTRONIC DEBIT/CREDIT AUTHORIZATION

**Authorization Agreement for Direct Withdrawals (ACH Debits) & Deposits (ACH Credits)**

***FOR MARKET CENTER AND REGIONAL BANK ACCOUNTS ONLY***

| | |
|---|---|
| Company Name<br>**Keller Williams Realty, Inc.**<br>**1221 South Mopac Expressway, Suite 110**<br>**Austin, TX 78746** | Market Center Number:<br>**549** |

I (we) hereby authorize KELLER WILLIAMS REALTY, INC. hereinafter called **COMPANY**, to initiate debit entries or credit adjustments for any debit entries in error to my (our) ☐ **Checking** ☐ **Savings** Account (select one) indicated below at the Financial Institution named below, and to debit or credit the same to such account. I (we) acknowledge that the authority will remain in effect until I have (or either of us has) cancelled it in writing and that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

| | |
|---|---|
| Financial Institution Name: | Branch: |
| City: State: | Zip Code: |
| ACH Routing Number: | Account Number: |
| Account Name: | Tax ID Number: |

This authority is to remain in full force and effect until **COMPANY** has received written notification from me (or either of us) of its termination in such time and in such manner as to afford **COMPANY** and Financial Institution a reasonable opportunity to act on it.

_______________________________ _______________________________
Signature Date

_______________________________
Printed Name

****Warning**: A $500 late payment fee is assessed daily for ACH drafts returned to KWRI for ANY reason. Incorrect **ACH** Routing number and Account number are common errors when completing this form. PLEASE verify both numbers with your financial institution before submitting the completed form to KWRI. An "**ACH**" routing number can be different than a "Wire" routing number and a "Paper Deposit" routing number.

** Changes to your bank account information should only be faxed to: 512-597-9376

LICENSEE Initials/Date RC _____

# ATTACHMENT D

## SOFTWARE LICENSE

This Software License ("Software License") is entered into between KELLER WILLIAMS REALTY, INC. ("Company") and R & LS INVESTMENTS, INC. ("Licensee"), on the Effective Date of that certain Market Center License Agreement between Company and Licensee ("License Agreement"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the License Agreement. To the extent of any conflict between the terms of this Software License and any clickthrough terms and conditions that appear within the MC Operating Software itself, the clickthrough terms and conditions shall govern.

**NOTE: A LIMITED WARRANTY AND DISCLAIMER APPEAR IN PARAGRAPHS 5.01 AND 5.02 OF THIS LICENSE AGREEMENT.**
1

## I.

## SOFTWARE LICENSE; SCOPE OF USE

1.01 Company hereby grants to Licensee a nontransferable, non-assignable license ("License") to use the MC Operating Software, solely as provided in this Software License.

1.02 Licensee shall not assign or otherwise transfer the MC Operating Software or this Software License without the express prior written approval of Company.

1.03 Licensee shall not use the MC Operating Software in connection with the operation of any business except the business of the Market Center, unless Company has given its prior written consent to such use.

1.04 Licensee shall not make copies of the MC Operating Software except with Company's express written consent. The MC Operating Software, as well as all such copies, shall be the sole property of Company and shall remain so throughout and after the termination, cancellation, expiration or transfer of the term of this Software License.

1.05 Licensee shall not modify or engage anyone else to modify the MC Operating Software in any manner whatsoever.

1.06 Neither Licensee nor any other party shall install or use any software other than the MC Operating Software in the operation of the Market Center without the express prior written approval of Company.

1.07 Upon the commencement of any renewal term of the license granted under the License Agreement, this Software License shall be renewed for a renewal term equal to the term of the renewal term of the License Agreement. Company reserves the right to charge a renewal fee of up to $1,500 for renewal of this Software License.

1.08 Upon reasonable notice, during the term of this Software License, Licensee shall, at Licensee's sole expense, purchase, install and maintain whatever computer hardware and other equipment as is necessary for the proper operation of the MC Operating Software as it may from time to time be configured by Company.

## II.

## DELIVERY

2.01 Company shall provide Licensee with one copy of the MC Operating Software.

Case 2:23-bk-14467-WB Doc 3841 Filed 04/07/25 Entered 04/07/25 17:30:21 Desc
Exhibit A Page 83 of 100


2.02 Company may also provide Licensee with proprietary documentation needed for operation and use of the MC Operating Software.

## III.

## LIMITED WARRANTY AND DISCLAIMER OF WARRANTIES

**3.01 COMPANY EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY AND SUITABILITY OR FITNESS FOR A PARTICULAR USE WITH RESPECT TO THE MC OPERATING SOFTWARE. IN CASE ANY COMPONENT OR FUNCTION OF THE MC OPERATING SOFTWARE FAILS OR MALFUNCTIONS, LICENSEE'S SOLE AND EXCLUSIVE REMEDY SHALL BE THE CORRECTION OF ANY VERIFIED PROGRAM ERRORS TIMELY REPORTED TO COMPANY. FOR PURPOSES OF THIS SECTION 3.01, A VERIFIED PROGRAM ERROR SHALL BE DEFINED AS AN ERROR/"BUG" THAT CAN BE RECREATED BY COMPANY ON ITS OWN COMPUTERS USING LICENSEE'S DATA. COMPANY SHALL USE ITS BEST EFFORTS TO CORRECT ANY SUCH VERIFIED PROGRAM ERROR.**

**3.02 EXCEPT AS EXPRESSLY PROVIDED IN SECTION 3.01, IN NO EVENT SHALL COMPANY BE RESPONSIBLE FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL, OR OTHER DAMAGES ARISING OUT OF THE DELIVERY, INSTALLATION, OPERATION, MAINTENANCE OR SUPPORT OF THE MC OPERATING SOFTWARE OR LICENSEE'S USE OF THE MC OPERATING SOFTWARE, WHETHER OR NOT DUE TO COMPANY'S NEGLIGENCE.**

Warranty Disclaimer and Limitation of Liability Accepted

DS
_____ RC _____________ (Licensee Initials)

## IV.

## MODIFICATIONS, ENHANCEMENTS, REPLACEMENTS AND CONSULTING ARRANGEMENT

4.01 During the term hereof, Company shall, on the same terms and conditions as the license of the MC Operating Software, make available to Licensee, without any additional charge, such corrections and improvements as may generally be incorporated into the MC Operating Software by Company. Licensee shall use such corrections and improvements in accordance with this Agreement.

4.02 Company is under no obligation to furnish any enhancements or modifications to Licensee. However, it is Company's present intention to furnish such enhanced versions of the MC Operating Software, when available.

4.03 Company shall not be responsible for any changes made without the written permission of Company to the MC Operating Software by any party other than itself. Any changes made without the written permission of Company shall immediately release Company from any and all obligations to correct or maintain the MC Operating Software, but in no way shall this alter or modify Licensee's duty and obligation to maintain the confidentiality of the MC Operating Software.

4.04 Licensee shall use the consultant designated by Company (which may be Company) for resolving all questions or problems Licensee may have in the use of the MC Operating Software, whether such questions or problems shall relate to modifications, enhancements or replacements of the MC Operating Software or otherwise.

**V.**

**OWNERSHIP, CONFIDENTIALITY AND NONDISCLOSURE**

5.01 The MC Operating Software and any and all copies thereof, whether in whole or in part, whether made by Company or Licensee or anyone else, are the sole and exclusive property of Company.

5.02 Licensee understands and agrees that the MC Operating Software constitutes a trade secret of Company and is deemed confidential in accordance with the Confidentiality provisions of the License Agreement.

5.03 Without the express prior written consent of Company, Licensee agrees not to make any copies of the MC Operating Software for any reason.

5.04 Licensee agrees to take reasonable measures to maintain the security of the MC Operating Software and shall not allow parties other than authorized employees or associates of Licensee to have access to the MC Operating Software or any of its component parts.

5.05 Licensee agrees to notify Company immediately of the existence of any circumstances surrounding any unauthorized knowledge, possession, or use of the MC Operating Software or any party thereof by any person or entity.

**VI.**

**TERM OF AGREEMENT**

The term of this Software License shall be concurrent with the term of the License Agreement.

**VII.**

**TERMINATION AND TERMINATION RIGHTS**

7.01 Expiration (except for any expiration that is followed by a renewal term under the License Agreement), cancellation or termination of the License Agreement for whatever reason shall automatically terminate this Software License and the right granted by it to use the MC Operating Software, without notice to Licensee. In addition, Company may terminate this Software License upon the failure by Licensee to comply with any of the terms and conditions herein, by giving Licensee written notice of termination stating the nature of the breach at least 15 days prior to the effective date of termination; provided that Licensee may avoid termination by immediately initiating a remedy to cure such default and curing it to Company's satisfaction within the 15-day period and by promptly providing proof thereof to Company. If any such default is not cured within that time (or, if appropriate, substantial and continuing action to cure the default is not initiated within that time), or such longer period as applicable law may require, this Software License shall terminate without further notice to Licensee effective immediately upon expiration of the 15-day period or such longer period as applicable law may require.

7.02 Upon the termination, cancellation, expiration or transfer of this Software License, Licensee shall immediately destroy or return to Company any copies of the MC Operating Software and support materials.

7.03 Upon termination, cancellation, expiration or transfer of this Software License, Licensee must promptly certify in writing to Company that to the best of Licensee's knowledge, all copies of the MC Operating Software and support materials have been destroyed or returned to Company.

LICENSEE Initials/Date RC _____

## VIII.

## TAXES

8.01 Licensee agrees to pay any sales, use, ad valorem, personal property, general intangibles tax, and any registration fees arising out of this Software License and the transactions contemplated herein, except for any taxes imposed upon the gross income of Company.

8.02 Licensee shall not deduct from payments to Company any amounts paid or payable to third parties, including, but not limited to, any consultants providing services hereunder.

## IX.

## ASSIGNMENT

9.01 Licensee may not assign, sublicense, or otherwise transfer any of its rights under this Software License without the express prior written consent of Company; provided this restriction on transfer shall not apply to any transfer of the license to any person, firm, organization, corporation, or other entity which succeeds to the business of Licensee pursuant to the transfer provisions of the License Agreement.

## X.

## INDEMNIFICATION

**10.01 COMPANY SHALL INDEMNIFY LICENSEE AGAINST ALL LIABILITIES AND COSTS, INCLUDING REASONABLE ATTORNEYS' FEES, ARISING FROM THE DEFENSE AGAINST ANY CLAIM OR SUIT ALLEGING INFRINGEMENT BY ANY OF THE MC OPERATING SOFTWARE OF ANY UNITED STATES OR CANADIAN COPYRIGHT, PATENT, OR THE TRADEMARK, TRADE SECRET, OR UNFAIR COMPETITION RIGHTS OF A THIRD PARTY, PROVIDED LICENSEE PROMPTLY NOTIFIES COMPANY IN WRITING OF THE SUIT OR ANY CLAIM OF INFRINGEMENT AND THAT COMPANY IS PERMITTED TO CONTROL FULLY THE DEFENSE AND SETTLEMENT OF ANY CLAIM OR SUIT. LICENSEE SHALL HAVE THE RIGHT, AT ITS OWN EXPENSE, TO APPEAR THROUGH COUNSEL OF ITS OWN CHOOSING.**

**10.02 COMPANY SHALL HAVE THE RIGHT TO FULLY SETTLE ON BEHALF OF ITSELF AND LICENSEE ANY SUCH CLAIM OR SUIT ON ANY BASIS, INCLUDING ONE REQUIRING THE COMPANY TO SUBSTITUTE ALTERNATIVE SUBSTANTIALLY EQUIVALENT COMPUTER PROGRAMS AND SUPPORTING DOCUMENTATION.**

**10.03 COMPANY SHALL NOT BE LIABLE FOR ANY CLAIM OR SUIT BASED ON ANY UNITED STATES OR CANADIAN COPYRIGHT, PATENT, OR THE TRADEMARK, TRADE SECRET, OR UNFAIR COMPETITION RIGHTS OF A THIRD PARTY BASED ON ANY MODIFICATION DONE TO THE MC OPERATING SOFTWARE BY LICENSEE.**

**10.04 LICENSEE AGREES TO INDEMNIFY, DEFEND AND HOLD COMPANY HARMLESS FROM ANY AND ALL CLAIMS OF THIRD PARTIES RESULTING FROM OR INCIDENTAL TO THE USE OR OTHER OPERATION OF THE MC OPERATING SOFTWARE IN ACCORDANCE WITH THE PROVISIONS REGARDING LICENSEE'S INDEMNITY IN SECTION 19.02 OF THE LICENSE AGREEMENT.**

## XI.

## GENERAL

11.01 Notice under this Software License shall be in writing addressed to the parties as indicated in the notice provision of the License Agreement.

LICENSEE Initials/Date DS RC _____

11.02 Any dispute relating to the interpretation or performance of this Software License shall be resolved through non-binding mediation and binding arbitration conducted in Travis County, Texas, in accordance with the dispute resolution provisions of the License Agreement.

11.03 In the event that either party commences litigation or arbitration to enforce the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

11.04 If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provision shall remain in full force and effect and in no way shall be affected, impaired or invalidated.

11.05 **THIS SOFTWARE LICENSE SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

11.06 The terms of this Software License are incorporated into the License Agreement by reference. This Software License and related provisions of the License Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all related prior and contemporaneous agreements between the parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

**COMPANY:**

**KELLER WILLIAMS REALTY, INC.**

By: DocuSigned by: Darrell King 56BDBFE598E241C... ____________________

Name: Darrell King
Title: Chief Compliance Officer

**LICENSEE:**

**R & LS INVESTMENTS, INC.**

By: DocuSigned by: Rick Cunningham 519E9FB03F9448E... ________________

Name: Rick Cunningham
Title: Operating Principal

## ATTACHMENT E

## CONFIDENTIALITY AGREEMENT

This Agreement is made and entered into on _____________, between R & LS Investments, Inc. (“Licensee”), and ______________________________ (“Recipient”). KELLER WILLIAMS REALTY, INC. (“KWRI”) shall be a third-party beneficiary of this Agreement with full right and authority to enforce its terms against Licensee and Recipient.

### RECITALS

WHEREAS, KWRI has developed, is using and is the owner of all rights in a distinctive system (“the System”) for the development and operation of real estate brokerage market centers under the name and mark KELLER WILLIAMS, KELLER WILLIAMS REALTY, KW COMMERCIAL, KW LUXURY, KELLER WILLIAMS LUXURY, KELLER WILLIAMS LUXURY INTERNATIONAL, KW LUXURY INTERNATIONAL, KW REALTY and related names and marks (“Market Centers”); and

WHEREAS, the System includes but is not limited to the proprietary names, marks, designs and colors used in connection with the Market Centers and procedures and compilations of confidential information described in Paragraph 1 of this Agreement regarding, among other things, the inventory and financial control techniques, uniform standards and specifications, quality and uniformity of products and services, operating methods and training used by KWRI in the operation of the System (“KWRI Trade Secrets”); and

WHEREAS, KWRI’s Trade Secrets provide economic advantages to KWRI and are not generally known to, and are not readily ascertainable by proper means by KWRI’s competitors who could obtain economic value from knowledge and use of KWRI’s Trade Secrets; and

WHEREAS, KWRI has taken, and intends to take all reasonable steps to maintain the confidentiality and secrecy of KWRI’s Trade Secrets; and

WHEREAS, KWRI has granted Licensee a limited right to operate a Market Center using the System and KWRI’s Trade Secrets for the period defined in the license agreement made and entered into, 1/29/2021 (“License Agreement”) between KWRI and Licensee; and

WHEREAS, KWRI and Licensee have agreed in the License Agreement on the importance to KWRI and to Licensee and other licensed users of the System of restricting use, access and dissemination of KWRI’s Trade Secrets; and

WHEREAS, it shall be necessary for certain employees, associates, agents, independent contractors, officers, directors and interest holders of Licensee, or any entity having an interest in Licensee, (“Recipients”) to have access to and to use some or all of KWRI’s Trade Secrets in the management and operation of Licensee’s Market Center using the System; and

WHEREAS, Licensee has agreed to obtain from those Recipients written agreements protecting KWRI’s Trade Secrets and the System against unfair competition; and

WHEREAS, Recipient wishes to remain, or wishes to become, employed by or associated with Licensee; and

WHEREAS, Recipient wishes and needs to receive and use KWRI's Trade Secrets in the course of his employment or association in order to effectively perform his services for Licensee; and

WHEREAS, Recipient acknowledges that receipt of the right to use the Trade Secrets constitutes independent valuable consideration for the representations, promises and covenants of Recipient herein;

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

1. KWRI or Licensee shall disclose to Recipient some or all of KWRI's Trade Secrets relating to the System. All information and materials, including, without limitation, the Brand Standards Manuals described in Section 1.36 of the License Agreement and any information, drawings, knowledge, know-how, specifications, techniques and compilations of data (including, but not limited to, information concerning the finances, operating results and expiration dates of license agreements between KWRI and other Market Center Licensees) which is communicated to Recipient by Licensee or KWRI shall be deemed KWRI's Trade Secrets for the purposes of this Agreement.

2. Recipient shall receive KWRI's Trade Secrets in confidence and shall, at all times, maintain them in confidence, and use them only in the course of his or her employment by, or association with, Licensee and then only in connection with the development or operation by Licensee of its Market Center using the System for so long as Licensee is licensed by KWRI to use the System.

3. Recipient shall not, at any time, make copies of any documents or compilations containing some or all of KWRI's Trade Secrets for any purpose that is not directly required for the performance of his or her duly authorized role on behalf of Licensee.

4. Recipient shall not, at any time, disclose or permit the disclosure of KWRI's Trade Secrets except to other employees of, or persons associated with, Licensee and/or Market Centers, and only to the limited extent necessary to train or assist other employees or associates affiliated with Licensee or Market Centers.

5. Recipient shall surrender the Brand Standards Manuals and any other material containing some or all of KWRI's Trade Secrets to Licensee or to KWRI, upon request, or upon termination of employment by, or association with, Licensee, or upon conclusion of the use for which the Brand Standards Manuals or other information or material may have been furnished to Recipient.

6. Recipient shall not, directly or indirectly, do any act or omit to do any act, which would or would be likely to be injurious or prejudicial to the goodwill of the System.

7. In order to protect the goodwill and unique qualities of the System and the confidentiality and value of KWRI's Trade Secrets, and in consideration for the disclosure to Recipient of KWRI's Trade Secrets, Recipient further agrees and covenants that, during the time Recipient is employed by or associated with Licensee and the License Agreement and any renewal terms thereof continue to be in effect, Recipient shall not:

a. Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of Licensee's Market Center using the System to any competitor.

b. Except as permitted under the License Agreement, employ or seek to employ any person who is at the time employed by KWRI or any Licensee or Regional Representative of KWRI, or otherwise directly or indirectly induce any such person to leave his or her employment. This subsection shall not apply to any employee transfer between Licensee and KWRI.

c. Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, without the prior written consent of KWRI, own, maintain, operate, engage in, or have any interest in any real estate business in the United States or Canada that competes directly with KWRI, including any real estate business that involves (i) the real estate brokerage business; or (ii) the offer, sale or operational support of businesses in the real estate brokerage business (whether as a franchisor, licensor, regional representative, area director or other similar service provider capacity).

8. In further consideration for the disclosure to Recipient of KWRI's Trade Secrets and to protect the uniqueness of the System, Recipient agrees and covenants for two years following the earlier of the termination, cancellation, expiration or transfer of all of Licensee's interest in the License Agreement or the termination of his employment by, or association with, Licensee, the Recipient shall not, without the prior written consent of KWRI:

a. Divert or attempt to divert, directly or indirectly, any business, business opportunity or customer of the Market Center(s) using the System to any competitor.

b. Employ or seek to employ any person who is at the time employed by KWRI or any Licensee or regional representative of KWRI, or otherwise directly or indirectly induce any such person to leave his or her employment.

c. Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, partnership or corporation, without the prior written consent of KWRI, own, maintain, operate, engage in, or have any interest in any real estate brokerage business that has an associate leadership council or profit sharing program or other programs substantially similar thereto, located within the applicable Awarded Area or within a ten (10)-mile radius of any other Market Center in existence or under construction as of the earlier of (i) the termination, cancellation, expiration or transfer of all of Licensee's interest in the License Agreement; or (ii) the date the Recipient ceases to be employed by or associated with Licensee.

9. Licensee undertakes to use its best efforts to ensure that Recipient acts as required by this Agreement.

10. Recipient agrees that in the event of a breach of this Agreement, KWRI would be irreparably injured and be without an adequate remedy at law. Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, KWRI shall be entitled to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies that are made available to it at law or in equity, including the right to terminate the License Agreement, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm, and without being required to furnish a bond or other security.

11. Recipient agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by KWRI and Licensee in enforcing this Agreement.

LICENSEE Initials/Date RC _____

12. Any failure by KWRI or Licensee to object to or take action with respect to any breach of any provision of this Agreement by Recipient shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Recipient.

13. **EXCEPT AS STATED BELOW, RECIPIENT HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE COURTS OF TRAVIS COUNTY, TEXAS AND THE FEDERAL DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION. RECIPIENT HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. RECIPIENT HEREBY IRREVOCABLY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW. RECIPIENT FURTHER AGREES THAT VENUE FOR ANY LEGAL PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE TRAVIS COUNTY, TEXAS; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, KWRI OR LICENSEE MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION. WITH RESPECT TO ALL CLAIMS, CONTROVERSIES, DISPUTES, OR ACTIONS, THIS AGREEMENT SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).**

14. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which KWRI or Licensee is a party, Recipient expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

15. This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

16. All notices and demands required to be given hereunder shall be in writing and shall be sent by personal delivery, expedited delivery service, certified or registered mail, return receipt requested, first-class postage prepaid or email (provided that the sender confirms the email by sending an original confirmation copy thereof by certified or registered mail or expedited delivery service within three business days after transmission thereof), to the respective parties. “Business day” means any day other than Saturday, Sunday or a day on which federally chartered banks are authorized by law to close.

| | |
|---|---|
| Notices to KWRI: | KELLER WILLIAMS REALTY, INC.<br>1221 South Mopac Expressway, Suite 110<br>Austin, Texas 78746<br>Attention: Legal/Commitment Department<br>Email: legal@kw.com |

Notices to Licensee: Rick Cunningham

Notices to Recipient:

Any notices sent by personal delivery shall be deemed given upon receipt. Any notices given by email shall be deemed given upon transmission, provided confirmation is made as provided above. Any notices sent by expedited delivery service or certified or registered mail shall be deemed given three business days after the time of mailing. Any change in the foregoing addresses shall be effected by giving 15 days written notice of such change to the other party.

17. The rights and remedies of KWRI under this Agreement are fully assignable and transferable and shall inure to the benefit of its successors, assigns and transferees. The respective obligations of Licensee and Recipient hereunder are personal in nature and may not be assigned by Licensee or Recipient, as applicable.

18. KWRI shall have the right to execute this Agreement as a party, but in all cases KWRI shall be a third party beneficiary of this Agreement with full right and authority to enforce the terms of this Agreement against Recipient regardless of whether KWRI executes this Agreement.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

**LICENSEE:**

**R & LS Investments, Inc.**

By: ______________________________
Name: Rick Cunningham
Title: Operating Principal

**RECIPIENT:**

______________________________

LICENSEE Initials/Date RC _____

## ATTACHMENT F

## PROFIT SHARING CONTRIBUTION CALCULATION

THIS ATTACHMENT SETS FORTH THE FORMULA YOU SHALL USE IN CALCULATING YOUR MONTHLY PROFIT SHARING CONTRIBUTION. IN PRACTICE, YOU SHALL PERFORM THE CALCULATION USING THE MC OPERATING SOFTWARE AND SHALL NOT HAVE PERFORMED IT MANUALLY.

YOU SHOULD NOTE THAT, WHILE THE FORMULA ASSUMES YOUR MARKET CENTER SHALL REALIZE POSITIVE EARNINGS EACH MONTH, THERE CAN BE NO ASSURANCE THAT YOU SHALL EVER REALIZE A PROFIT FROM THE MARKET CENTER'S OPERATION.

NONE OF THE INFORMATION IN THIS ATTACHMENT IS INTENDED TO CONSTITUTE, OR IN ANY EVENT SHALL BE CONSTRUED AS, A REPRESENTATION OR APPROXIMATION OF THE GROSS COMMISSIONS, GROSS MARKET CENTER INCOME OR MONTHLY PROFIT THAT YOU MAY REALIZE.

COMPANY URGES LICENSEE TO CONSULT WITH QUALIFIED FINANCIAL, BUSINESS AND LEGAL ADVISORS ABOUT THE INFORMATION IN THIS ATTACHMENT.

Each Licensee's Profit Sharing Contribution is determined as follows:

| | |
|---|---|
| Monthly Gross Commissions[1] | Line 1 |
| Less: Production Royalty[2] | (Line 2) |
| Less: Associates' Commissions[3] | (Line 3) |
| Equals Monthly Gross Market Center Income[4] | Line 4 |
| | |
| Less: Licensee's Approved Budget Expenses[5] | (Line 5) |
| Less: Licensee's Loss Carry Forwards[6] | (Line 6) |
| Equals: Monthly Profit[7] (or if a loss, the Carryover Loss attributable to such month) | Line 7 |

The Licensee's Monthly Profit (Line 7) is then used to calculate the Profit Sharing Contribution[8] based on the following table:

| Monthly Profit | Contribution |
|---|---|
| Up to $2,990 | 25% of such amount |
| Over $2,990 but not over $11,240 | $747.50 plus 35% of the excess of such amount over $2,990 |
| Over $11,240 | $3,635.00 plus 50% of the excess of such amount over $11,240 |

LICENSEE Initials/Date RC _____

Notes:

1. The aggregate amount of all Commissions paid to the Licensee during the month for which the Gross Commissions is being determined.

2. The monthly royalty payment paid to Company by Licensee is based on Gross Revenues earned during the month for which the Production Royalty is being determined. The Production Royalty is determined by the Brand Standards Manuals and is currently equal to 6% of the Gross Revenues. It is Company's current policy to set an annual cap on each Associate's Production Royalty, for a maximum of $3,000 per Associate in Production Royalty per Region. Company may modify or eliminate this cap in its discretion. The percentage of the GCI that is used to calculate the Production Royalty amount is currently 6%.

3. The portion of the Gross Commissions (after deducting the Production Royalty) paid to the Licensee's Associates during the month for which the monthly Profit Sharing Contribution is being determined.

4. Gross Commissions minus Associate Commissions and Production Royalty.

5. The expenses that Company has approved as essential to the operation of a Market Center. Approved Budget Expenses may include expenses relating to accounting services, tax preparation, computer services, contests and sales awards, contributions, gifts, copying, Board of REALTORS and MLS dues, subscriptions, entertainment, insurance, legal expenses, equipment maintenance, federal, state and local taxes, postage, printing, public relations, rent, salaries, supplies, telephone service, training, advertising and travel. Approved Budget Expenses, and the amount allowable for each category, are described in the Brand Standards Manuals.

6. The aggregate amount of all allowable Loss Carry Forwards generated in prior months, determined in accordance with policies established by the International ALC and incorporated into the Policies and Guidelines Manual. Generally, the amount by which Approved Budget Expenses in a given month exceed Gross Market Center Income for such month constitutes a Loss Carry Forward that may be carried forward and applied in subsequent months to reduce a Licensee's Monthly Profit for purposes of calculating the Licensee's monthly Profit Sharing Contribution. Allowable Approved Budget Expenses and the period a Market Center can avoid Profit Sharing Contributions in reliance on Loss Carry Forwards may be restricted by the International ALC.

7. Gross Market Center Income minus Approved Budget Expenses and Loss Carry Forwards, if any.

8. The amount payable by Licensee under the Profit Sharing Plan.

# GENERAL RELEASE AGREEMENT

THIS GENERAL RELEASE AGREEMENT (this "Release Agreement") is made and entered into on 1/29/2021, by and between Keller Williams Realty, Inc., a Texas corporation ("Licensor"), R & LS INVESTMENTS, INC. ("Licensee"), Rick Cunningham ("Licensee's Operating Principal" and "Licensee's Controlling Principal").

## RECITALS

WHEREAS, Licensor and Licensee entered into that certain License Agreement (the "License Agreement") dated 5/9/2005, for the establishment of a franchised business located at 2701 Ocean Park Blvd., Suite 140, Santa Monica, CA 90405 (the "Market Center");

WHEREAS, Licensee desires to renew or transfer the License Agreement; and

WHEREAS, the License Agreement conditions the renewal or transfer of the License Agreement on Licensee's agreement to (i) release Licensor of all claims that Licensee may have against Licensor and (ii) indemnify Licensor with respect to claims brought by any members of Licensee's Group.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto, the parties agree as follows:

## AGREEMENT

### 1. WAIVER AND RELEASE.

**WAIVER OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE.**

**Licensee, Licensee's Operating Principal, and Licensee's Controlling Principals, for themselves and on behalf of the Releasing Parties (defined below), acknowledge that they are familiar with Section 1542 of the California Civil Code, which reads as follows:**

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

**With respect to those claims, demands, obligations, liabilities, actions, and causes of actions being released pursuant to this Release Agreement, Licensee, Licensee's Operating Principal and Licensee's Controlling Principals, for themselves and on behalf of the Releasing Parties, acknowledge that they are releasing unknown claims and waive all rights they have or may have under Section 1542 of the California Civil Code or any other statute or common law principle of similar effect.**

Case 2:23-bk-14467-WB Doc 378-1 Filed 04/07/25 Entered 04/07/25 17:30:41 Desc
Exhibit A Page 95 of 100


**Licensee, Licensee's Operating Principal and Licensee's Controlling Principals, for themselves and on behalf of the Releasing Parties acknowledge that this Release Agreement extends to claims which the Releasing Parties do not know or suspect to exist in favor of the Releasing Parties at the time of executing this Release Agreement, which if known by the Releasing Parties may have materially affected their decision to enter into this Release Agreement. It is understood by the Releasing Parties that the facts in respect of which this Release Agreement is given may hereafter turn out to be other than or different from the facts in that connection known or believed to be true. The Releasing Parties, therefore, expressly assume the risk of the facts turning out to be so different and agrees that this Release Agreement shall be in all respects effective and not subject to termination or rescission by any such difference in facts.**

**<u>RELEASE.</u>**

**Licensee, Licensee's Operating Principal, and Licensee's Controlling Principals for themselves and on behalf of their current and former officers, directors, managers, shareholders, members, partners, affiliates, agents, attorneys, representatives, predecessors, successors, and assigns (collectively, the "Releasing Parties") absolutely and unconditionally waive, release and forever discharge Licensor and its current and former affiliates and subsidiaries, and each of their current and former respective Regional Representatives, successors, shareholders, representatives, assigns, agents, attorneys, employees, officers, directors, members, managers and partners (collectively, the "Released Parties"), of and from any claims, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action whatsoever, in law or equity, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected (collectively, "Claims") that any Releasing Party has, ever had, or may in the future have against any Released Party for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the date of this Agreement arising under or related to the License Agreement (including any amendments or addendums thereto), Licensee's rights to operate the Market Center under the System, the Trademarks, the Confidential Information, and all other Licensor-related rights or obligations under any other agreements between Licensor and any Releasing Party or their affiliates. For the avoidance of doubt, the Releasing Parties do not release any rights they have against the Released Parties under, or pursuant to, this Release Agreement.**

**2. COVENANT NOT TO SUE.** The Releasing Parties agree not to commence any proceeding of any nature against the Released Parties based on any claim, demand, agreement, obligation, liability or cause of action whatsoever, in law or equity, that has been released pursuant to Section 1 above. The Releasing Parties represent and warrant that they have not assigned to anyone any claim related to the claims described in Section 1 that may now or subsequently be asserted against the Released Parties.

**2. AUTHORITY.** By executing this Release Agreement, the parties represent and warrant that each have the right and authority to enter into and to accept the terms and covenants of this Release Agreement, and that no third party has or claims an interest in any claim released by this Release Agreement.

**3. NO CONFLICTS.** Each of the undersigned hereby represents and warrants that its execution of this Release Agreement does not violate any other agreement to which it is a party.

**4. INDEMNIFICATION. Licensee, Licensee's Operating Principal, and Licensee's Controlling Principals shall fully indemnify, defend, and hold Licensor and its current and former subsidiaries and affiliates, and each of their respective current and former Regional Representative, successors, representatives and assigns, and the respective directors, officers, owners, members, managers, partners, employers, representatives, agents, independent contractors and associates of each of the foregoing harmless, including cost of separate counsel of Licensor's choosing, for any Claim related to any breach by any Releasing Party of any representation, warranty, covenant, or other obligation set out in this Release Agreement, including, but not limited to, the bringing of any Claim released under this Release Agreement by any Releasing Party and/or any member(s) of Licensee's Group. Licensee expressly agrees that the terms of this Section 4 supplement and add to Licensee's general indemnification obligations the License Agreement. For the purposes of this Section 4, the term "Claims" shall include reasonable attorneys' fees.**

**5. MISCELLANEOUS.**

5.1 Counterparts. This Release Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

5.2 Effectiveness. This Release Agreement shall take effect upon its execution and dating by Licensor.

5.3 Opportunity to Review. Licensee, Licensee's Operating Principal, and Licensee's Controlling Principals represent and warrant that they: (i) have had an opportunity to review this Release Agreement; (ii) have had an opportunity to consult with an attorney; and (iii) fully understand the content and legal effect of this Release Agreement.

5.4 Entire Agreement. This Release Agreement, together with the License Agreement and all addenda, amendments, exhibits, and schedules thereto represents the complete, integrated and entire agreement between the parties regarding the subject matter contained herein, and may not be modified except in a writing signed by the parties. To the extent of any conflict between this Release Agreement and the License Agreement, the License Agreement shall control.

5.5 Governing Law. This Release Agreement shall be governed by the laws of the State of Texas, which laws shall be controlling in the event of any conflict of law. The parties agree that venue for any matter related to this Agreement shall be in Travis County, Texas.

5.6 Section Headings. The section headings of this Release Agreement are for the convenience of the parties only and in no way alter, modify, amend, limit or restrict the contractual obligations of the parties.

5.7 Severability. The provisions of this Release Agreement are severable, and, in the event that any of them is held void and unenforceable as a matter of law, the remainder shall continue in full force and effect.

5.8 Waiver. No delay or omission by the parties hereto to exercise any right or power hereunder shall impair such right or power or be construed to be a waiver thereof.

LICENSEE Initials/Date RC _____

5.9 Definitions. All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the License Agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Release Agreement as of the date first above written.

**LICENSOR:**
**KELLER WILLIAMS REALTY, INC.**

By: DocuSigned by: Darrell King 56BDBFE598E241C...
Name: Darrell King
Title: Chief Compliance Officer
Date: 03/24/2021

**LICENSEE:**
**R & LS INVESTMENTS, INC.**

By: DocuSigned by: Rick Cunningham 519E9FB03F9448E...
Name: Rick Cunningham
Title: Operating Principal
Date: 01/28/2021

**LICENSEE'S OPERATING PRINCIPAL:**

By: DocuSigned by: Rick Cunningham 519E9FB03F9448E...
Name: Rick Cunningham
Title: Operating Principal
Date: 01/28/2021

**LICENSEE'S CONTROLLING PRINCIPAL:**

By: DocuSigned by: Rick Cunningham 519E9FB03F9448E...
Name: Rick Cunningham

LICENSEE Initials/Date RC _____

**AMENDMENT TO KELLER WILLIAMS REALTY, INC.**
**MARKET CENTER LICENSE AGREEMENT**
**FOR THE STATE OF CALIFORNIA**

The Keller Williams Realty, Inc. Market Center License Agreement between R & LS Investments, Inc. ("Licensee" or "You") and Keller Williams Realty, Inc. ("Licensor") dated 1/29/2021 (the "Agreement") shall be amended by the addition of the following language, which shall be considered an integral part of the Agreement (the "Amendment"):

**CALIFORNIA LAW MODIFICATIONS**

1. The California Commissioner of Business Oversight requires that certain provisions contained in franchise documents be amended to be consistent with California law, including the California Franchise Investment Law, CAL. CORPORATIONS CODE Section 31000 et seq., and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 et seq. To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

a. California Business and Professions Code Sections 20000 through 20043 provide rights to You concerning nonrenewal and termination of the Agreement. The Federal Bankruptcy Code also provides rights to You concerning termination of the Agreement upon certain bankruptcy-related events. To the extent the Agreement contains a provision that is inconsistent with these laws, these laws shall control.

b. If the Licensee is required in the Agreement to execute a release of claims, such release shall exclude claims arising under the California Franchise Investment Law and the California Franchise Relations Act.

c. If the Agreement requires payment of liquidated damages that is inconsistent with California Civil Code Section 1671, the liquidated damage clause may be unenforceable.

d. If the Agreement contains a covenant not to compete which extends beyond the expiration or termination of the Agreement, the covenant may be unenforceable under California law.

e. If the Agreement requires litigation, arbitration or mediation to be conducted in a forum other than the State of California, the requirement may be unenforceable under California law.

f. If the Agreement requires that it be governed by a state's law, other than the State of California, such requirement may be unenforceable.

g. If the License Agreement requires an interest rate greater than 10% per annum (the highest amount allowed in California), such interest rate will be reduced to 10% per annum.

2. Each provision of this Amendment shall be effective only to the extent that the jurisdictional requirements of the California law applicable to the provision are met independent of this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. As to any state law described in this Amendment that declares void or unenforceable any provision contained in the License Agreement, the Licensor reserves the right to challenge the enforceability of the state law by, among other things, bringing an appropriate legal action or by raising the claim in a legal action or arbitration that you have initiated.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

IN WITNESS WHEREOF, the Licensee acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment to the Agreement on 1/29/2021.

**KELLER WILLIAMS REALTY, INC.**

By: DocuSigned by: Darrell King 56BDBFE598E241C...
Name: Darrell King
Title: Chief Compliance Officer

**LICENSEE:**

**R & LS INVESTMENTS, INC.**

By: DocuSigned by: Rick Cunningham 519E9FB03F9448E...
Name: Rick Cunningham
Title: Operating Principal

LICENSEE Initials/Date RC _____

Each of the undersigned acknowledges and agrees as follows:

(1) Each has read the terms and conditions of this Amendment to the License Agreement and acknowledges that the execution of this guaranty and the undertakings of the Controlling Principals in the License Agreement are in partial consideration for the granting of this license, and that Licensor would not have granted this license without the execution of this guaranty and the undertakings by each of the undersigned;

(2) Each is included in the term "Controlling Principals" as described in Section 1.17 of the License Agreement;

(3) Each individually, jointly and severally makes all of the covenants, representations, and agreements of the Controlling Principals set forth in the License Agreement and is obligated to perform thereunder; and

(4) Each individually, jointly, and severally unconditionally and irrevocably guarantees to Licensor and its successors and assigns that all of Licensee's obligations under this Agreement shall be punctually paid and performed. Upon default by Licensee or upon notice from Licensor, each shall immediately make each payment and perform each obligation required of Licensee under this Agreement. Without affecting the obligations of any of the Controlling Principals under this guaranty, Licensor may, without notice to the Controlling Principals, waive, renew, extend, modify, amend or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims that Licensor may have against Licensee. Each of the Controlling Principals waives all demands and notices of every kind with respect to the enforcement of this guaranty, including, without limitation, notice of presentment, demand for payment or performance by Licensee, any default by Licensee or any guarantor, and any release of any guarantor or other security for this Agreement or the obligations of Licensee. Licensor may pursue its rights against any of the Controlling Principals without first exhausting its remedies against Licensee and without joining any other guarantor hereto and no delay on the part of Licensor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Licensor of any right or remedy shall preclude the further exercise of such right or remedy. Upon receipt by Licensor of notice of the death of any of the Controlling Principals, the estate of the deceased shall be bound by the foregoing guaranty, but only for defaults and obligations under this Agreement existing at the time of death, and in such event, the obligations of the remaining Controlling Principals shall continue in full force and effect.

CONTROLLING PRINCIPAL

DocuSigned by:
Rick Cunningham
519E9FB03F9448E...
_____________

Rick Cunningham

# Exhibit 2

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br>R&LS Investments, Inc.,<br>Debtor. | Case No. 2:23-bk-14467-WB<br>Chapter 7<br>Hon. Julia W. Brand |

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims (the "Settlement Agreement") is entered into by and between the following parties (each a "Party," and collectively, the "Parties"): (a) John J. Menchaca in his capacity as chapter 7 trustee (the "Trustee") of R&LS Investments, Inc. ("R&LS"), the chapter 7 debtor in the above-captioned case and (b) Keller Williams Realty, LLC (f/k/a Keller Williams Realty, Inc., "Keller Williams").

## RECITALS

**WHEREAS**, on July 18, 2023 (the "Petition Date"), R&LS filed a voluntary petition for relief under Chapter 11 Subchapter V of Title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing a chapter 11 case (the "Bankruptcy Case") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court").

**WHEREAS**, on March 3, 2025, the Bankruptcy Court converted the Bankruptcy Case to Chapter 7. On March 5, 2025, the Trustee was appointed as chapter 7 trustee of the bankruptcy estate ("Estate").

**WHEREAS,** R&LS is the licensee under that certain *Keller Williams Realty, Inc. Market Center License Agreement* dated March 30, 2020 (as amended and modified from time to time, the "License Agreement").

**WHEREAS**, Pursuant to Section 5.02 of the License Agreement, 6% of R&LS' monthly Gross Revenues are owed as a license fee to Keller Williams. Other Fees and Charges under the License Agreement consist of associate, renewal, software, technology, and late fees (required production royalty payments, fees, and charges are herein the "License Fees").

**WHEREAS**, R&LS remitted License Fees owed prepetition and postpetition until August 9, 2024. Subsequently, neither R&LS nor the Trustee has remitted any License Fees to Keller Williams.

**WHEREAS**, Keller Williams filed the *Application of Keller Williams Realty, Inc. for Allowance and Payment of Administrative Priority Claim Pursuant to Section 503(b)(1)(A) of the Bankruptcy Code* [Docket No. 329] (the "Administrative Claim Motion") seeking allowance and immediate payment of $340,787.29 in post-petition License Fees (the "Chapter 11 Administrative

Claim").

**WHEREAS**, Keller Williams also asserts a chapter 7 administrative claim in the amount of $86,191.32 on account of accruing post-conversion License Fees (the Chapter 7 Administrative Claim").

**WHEREAS**, on March 13, 2025, the Trustee filed his objection to the Administrative Claim Motion [Docket No. 349] (the "Administrative Claim Objection").

**WHEREAS**, On March 19, 2025, the Trustee filed his *Motion for Order Extending Time to Assume or Reject Executory Contracts and Unexpired Nonresidential Real Property Leases Pursuant to 11 U.S.C. § 365(d)(4)* [Docket No. 353] (the "Extension Motion"), requesting a 90-day extension to assume or reject the License Agreement. Keller Williams filed an objection to the Extension Motion [Docket No. 377] (the "Extension Objection").

**WHEREAS**, on March 28, 2025, the Trustee filed his *Emergency Motion for Order: (1) Rejecting Unexpired Real Property Leases Pursuant to 11 U.S.C. § 365; (2) Rejecting Executory Contracts Pursuant to 11 U.S.C. §§ 365 & 107; (4) Allowing Transactions in Escrow to Process; (5) Closing the Debtor's Business; and (6) Abandoning Remaining Personal Property and the Estate's Possessory Interest in Real Property Pursuant to 11 U.S.C. § 554(a)* [Docket No. 366] (as supplemented at Docket No. 376, the "Shutdown and Rejection Motion"). The Bankruptcy Court granted the Shutdown and Rejection Motion on an interim and final basis. [Docket Nos. 374 & 381].

**WHEREAS**, as set forth in the Shutdown and Rejection Motion, the Trustee has ceased operating the R&LS business.

**WHEREAS**, on April 1, 2025, Keller Williams filed its *Motion for Relief from the Automatic Stay* [Docket No. 370] (the "Lift Stay Motion"), seeking Bankruptcy Court authority to lift the automatic stay to terminate the License Agreement.

**WHEREAS**, after an exchange of information and arm's-length negotiations among the Parties, the Parties have determined that it is in their respective best interests to avoid the cost, expense, and uncertainty of litigation and have determined it to be in the Parties' best interest to resolve the disputes among them on the terms set forth herein.

**NOW THEREFORE**, the Parties, intending to be legally bound and for good and valuable consideration, the receipt of which is hereby acknowledged, agree as follows:

1. Recitals. The Recitals set forth above are incorporated herein by reference.

2. Effective Date. This Settlement Agreement shall become effective on the date (the "Effective Date") on which the Bankruptcy Court's order approving this Settlement Agreement becomes a final, non-appealable order.

3. Rejection and Termination of License Agreement. The License Agreement is hereby rejected and terminated as of the Effective Date.

4. Allowance of Chapter 7 Administrative Claim. Keller Williams' Chapter 7 Administrative Claim of $86,191.32 (the "Allowed Chapter 7 Administrative Claim") is hereby allowed in its entirety.

5. Waiver of Distribution on Chapter 7 Administrative Claim. Keller Williams agrees to waive any distribution from the Estate with respect to the Allowed Chapter 7 Administrative Claim.

6. Allowance of Chapter 11 Administrative Claim. Keller Williams' Chapter 11 Administrative Claim of $340,787.29 (the "Allowed Chapter 11 Administrative Claim" and together with the Allowed Chapter 7 Claim, the "Allowed Claims") is hereby allowed in its entirety.

7. Partial Subordination of Allowed Chapter 11 Administrative Claim. The first $50,000 of the Allowed Chapter 11 Administrative Claim to be paid, should a distribution be paid on the Allowed Chapter 11 Administrative Claim, is hereby subordinated to all other allowed administrative, priority, and general unsecured claims in the Bankruptcy Case.

8. Withdrawal of Pending Contested Matters.

   a. The Administrative Claim [Docket No. 329] is hereby deemed resolved by this Settlement Agreement, and the Trustee's Objection to the Administrative Claim is hereby deemed withdrawn and resolved [Docket No. 349]. The Trustee may seek an order vacating the hearing on the Administrative Claim Motion as part of the motion to approve this Settlement Agreement.

   b. To the extent the Trustee's Extension Motion [Docket No. 353] seeks relief in connection with the License Agreement, that relief shall be abandoned by the Trustee and any deadline extension shall not apply to the Trustee and Keller Williams, should the Extension Motion be granted. Further, Keller Williams' Extension Objection [Docket No. 377] shall be deemed withdrawn.

   c. Keller Williams' Lift Stay Motion [Docket No. 370] is hereby deemed withdrawn and the Trustee may seek an order vacating the hearing on the Lift Stay Motion as part of the motion to approve this Settlement Agreement.

9. Mutual Release. Except as noted in section 10 below, the Trustee, on behalf of each himself, R&LS, and the Estate, and Keller Williams (the "Releasing Parties") hereby mutually release one another and any of their officers, employees, directors, shareholders, partners, members, agents, attorneys, representatives, subsidiaries, divisions, affiliates, successors, trustees, heirs, and assigns (the "Released Parties") of and from any and all claims, actions, causes of action, suits, proceedings, contracts, judgments, damages, accounts, and liabilities whatsoever of every name and nature, whether known or unknown, whether or not well founded in fact or in law, and whether in law, at equity, or otherwise, which, the Trustee, R&LS, the Estate, or Keller Williams ever had or now has for or by reason of any matter, cause, or anything whatsoever, whether relating to or arising out of the License Agreement or otherwise, including without limitation any actual or alleged act or omission of any of the Released Parties (the "Mutual Release"). This Mutual Release includes an express waiver by the Releasing Parties of any and all rights under Section 1542 of the Civil Code of the State of California, which provides "[a] general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her,

would have materially affected his or her settlement with the debtor or released party."

10. Mutual Release Exceptions.

   a. The Mutual Release shall not prohibit or in any way prevent the Releasing Parties from asserting their respective rights to enforce the terms of this Settlement Agreement or any Bankruptcy Court order approving the Settlement Agreement, including Keller Williams' right to seek payment of the Allowed Claims in accordance with the terms of this Settlement Agreement.

   b. Nothing in this Settlement Agreement or any Bankruptcy Court order approving the Settlement Agreement shall be interpreted to release or extinguish any claims, actions, causes of action, suits, proceedings, contracts, judgments, damages, accounts, and liabilities whatsoever of every name and nature existing as of the Effective Date, whether known or unknown, whether or not well founded in fact or in law, and whether in law, at equity, or otherwise, which Keller Williams ever had or now has against any third party, including without limitation any guarantor of R&LS's obligations, for or by reason of any matter, cause, or anything whatsoever, whether relating to or arising out of the License Agreement or otherwise.

11. Bankruptcy Court Approval Required. This Settlement Agreement is subject to approval of the Bankruptcy Court. No later than Monday, April 7, 2025, the Trustee shall file a motion with the Bankruptcy Court seeking approval of this Settlement Agreement pursuant to FED. R. BANKR. P. 9019 on an expedited basis. In the event the Trustee determines a Motion under FED. R. BANKR. P. 9019 is impractical, the Trustee reserves the right to not file a Motion as provided in this paragraph upon providing advance written notice to Keller Williams explaining his reasoning for not filing the Motion. This Settlement Agreement shall be of no force or effect until it is approved by the Bankruptcy Court through the entry of an order approving this Settlement Agreement. This Settlement Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, affiliates, and assigns. In the event this Settlement Agreement is not approved, each of the Parties shall be returned to their position *status quo ante*.

12. Miscellaneous.

   a. Entire Agreement. No promise, inducement, commitment, or other agreement not expressly set forth herein has been made with respect to this Settlement Agreement or the subject matter hereof. This Settlement Agreement contains the entire agreement by and among the Parties with respect to all matters related hereto. All prior agreements and understandings, oral agreements, and writings regarding the matters set forth herein (if any) are expressly superseded hereby and are of no further force or effect.

   b. Amendments. This Settlement Agreement may not be altered, amended, or modified in any respect except by a writing duly executed by both Parties. For the avoidance of doubt, email signatures shall not constitute a signed writing. Any

material alterations, amendments, or modifications entered after Bankruptcy Court approval must be approved by the Bankruptcy Court before going into effect.

c. Binding Effect; Third Parties. This Settlement Agreement shall be binding on and inure to the benefit of each Party and its successors and assigns.

d. No Admission of Wrongdoing. In entering into this Settlement Agreement, no Party is admitting any fault or liability of any kind whatsoever to each other or to any third party. Nothing in this Settlement Agreement is or shall be construed to be an admission of liability or wrongdoing by any Party.

e. Defense. This Settlement Agreement may be pleaded as a full and complete defense in any subsequent action or other proceeding concerning any and all of the claims, counterclaims, causes of action, assertions, issues, defenses, or other matters released by this Settlement Agreement, except for claims arising directly from this Settlement Agreement and the claims expressly carved out in section 10 of this Settlement Agreement.

f. Venue and Jurisdiction. The Bankruptcy Court shall retain jurisdiction and venue over the subject matter of this Settlement Agreement and the Parties for the duration of the performance of the terms and provisions of this Settlement Agreement for the purpose of enabling any of the Parties to apply to the Bankruptcy Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or interpretation of this Settlement Agreement or to effectuate or enforce compliance with its terms.

g. Applicable Law. This Settlement Agreement shall be governed, interpreted, construed, and enforced in accordance with the laws of the state of California.

h. Assignability. Neither Party may assign this Settlement Agreement without the prior written consent of each Party.

i. Authority. Each Party represents and warrants that the signatory to this Settlement Agreement on behalf of such Party has the full power and authority to enter into this Settlement Agreement on behalf of such Party and to bind such Party to the terms of this Settlement Agreement.

j. Counterparts. This Settlement Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Signature pages emailed in a portable document format (.PDF) shall be acceptable and deemed binding on all Parties hereto as if they were originals.

[*signature page follows*]

**IN WITNESS HEREOF**, the Parties have each approved and executed this Settlement Agreement.

Dated: April 7, 2025

**R&LS INVESTMENTS, INC.**

By: ______________________
Name: John J. Menchaca
Title: Chapter 7 Trustee of R&LS Estate

**KELLER WILLIAMS REALTY, LLC**

By: ______________________
Name: Stacie Herron
Title: Chief Legal and Administrative Officer

**IN WITNESS HEREOF**, the Parties have each approved and executed this Settlement Agreement.

Dated: April 7, 2025

**R&LS INVESTMENTS, INC.**

By: ______________________________
Name: John J. Menchaca
Title: Chapter 7 Trustee of R&LS Estate

**KELLER WILLIAMS REALTY, LLC**

By: ______________________________
Name: Stacie Herron
Title: Authorized Signatory

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**3070 Bristol St., Suite 640, Costa Mesa, CA 92626**

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR ORDER APPROVING COMPROMISE OF CONTROVERSY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JOHN J. MENCHACA IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 7, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **April 7, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ____________________________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 7, 2025 | David M. Fitzgerald | [signature] |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Anerio V Altman aaltman@ecf.courtdrive.com, lakeforestpacer@gmail.com
Michael Jay Berger michael.berger@bankruptcypower.com,
yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
Jordan Elizabeth Chavez jordan.chavez@haynesboone.com, kim.morzak@haynesboone.com
John-Patrick M Fritz jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com
David M Goodrich dgoodrich@go2.law, kadele@go2.law;dfitzgerald@go2.law;wggllp@ecf.courtdrive.com
Jeffrey S Kwong jsk@lnbyg.com, jsk@ecf.inforuptcy.com
Lewis R Landau Lew@Landaunet.com
Anne C Manalili anne.manalili@sba.gov
John J Menchaca (TR) jmenchaca@menchacacpa.com, igaeta@menchacacpa.com;ecf.alert+Menchaca@titlexi.com
Carmela Pagay ctp@lnbyg.com
Ian Peck ian.peck@haynesboone.com, kim.morzak@haynesboone.com
Jeffrey L Sumpter jsumpter1@cox.net
United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov
Gerrick Warrington gwarrington@frandzel.com, achase@frandzel.com
Hatty K Yip hatty.yip@usdoj.gov, hatty.k.yip@usdoj.gov,dare.law@usdoj.gov
Timothy J Yoo tjy@lnbyb.com

**SERVED BY UNITED STATES MAIL**:

R&LS Investments, Inc.
11812 San Vicente Blvd #100
Los Angeles, CA 90049-6620
**DEBTOR**